# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

### Case No. 7:16-cv-30

| | |
|---|---|
| BONNIE PELTIER, as Guardian of A.P., a minor child; | : |
| | : |
| ERIKA BOOTH, as Guardian of I.B., a minor child; and | : |
| | : |
| PATRICIA BROWN, as Guardian of K.B., a minor child; | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER; CHAD ADAMS; DAWN CARTER; JEREMY DICKINSON; and MELISSA GOTT in their capacities as members of the Board of Trustees of Charter Day School, Inc.; and THE ROGER BACON ACADEMY, INC.; | : |
| | : |
| Defendants. | : |

## <u>COMPLAINT</u>

1.      This is an action under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (pursuant to 42 U.S.C. § 1983), Article I, section 19 of the North Carolina Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), the Title IX implementing regulations of the United States Departments of Agriculture ("USDA") and Education ("USED"), and North Carolina state law, challenging unlawful sex discrimination at Charter Day School ("CDS"), a Kindergarten through Eighth Grade public charter school in Leland, NC.

2.     A.P. is a current CDS student attending Kindergarten and brings this action by and through her parent and guardian, Bonnie Peltier. I.B. is a current CDS student attending the Fourth Grade and brings this action by and through her mother and guardian, Erika Booth. K.B. is a current CDS student attending the Eighth Grade and brings this action through her grandmother and legal guardian, Patricia Brown. They bring this action because the Defendants have, since the creation of CDS, unlawfully implemented and enforced a dress code that requires girls to wear skirts, skorts, or jumpers (hereinafter collectively referred to as "skirts") to school, and prohibits them from wearing pants or shorts. Boys, by contrast, are required to wear pants or shorts to school.

3.     A.P., an active five-year-old, finds that skirts restrict her movement and are not practical for either cold weather or warm weather. She wishes to wear pants or shorts to school so she can stay warmer in the winter, and so she can move freely without concerns about modesty.

4.     I.B., an active and athletic ten-year-old, finds that skirts restrict her movement and are not practical for cold weather. She wishes to wear pants or shorts to school so she can stay warmer in the winter, and so she can move freely without concerns about modesty.

5.     K.B., an active and athletic fifteen-year-old, finds that skirts restrict her movement and are not practical for cold weather. She wishes to wear pants or shorts to school so she can stay warmer in the winter, and so she can move freely without concerns about modesty.

6.     The requirement that girls wear skirts is based on impermissible sex stereotypes—specifically, the notion that skirts promote "traditional values," "mutual respect," and "chivalry." This justification reflects overly broad generalizations about what constitutes appropriate "feminine" behavior and conduct for girls, and what constitutes appropriate "masculine"

behavior and conduct for boys. The requirement that girls wear skirts reinforces these same archaic sex role stereotypes, and burdens girls with restrictions of their freedom of movement that boys do not suffer. The requirement that girls wear skirts therefore constitutes unlawful sex discrimination and should be enjoined.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action raises federal questions and seeks to redress the deprivation of rights under Title IX, 20 U.S.C. §§ 1681, and the Fourteenth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983. It has supplemental jurisdiction of the North Carolina Constitutional and state law contract claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims took place in this district and because some of the Defendants reside in this district.

9. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. A declaration of the law is necessary and appropriate to determine the parties' respective rights and duties.

10. Injunctive relief is authorized by 28 U.S.C. §2202.

## PARTIES

11. Plaintiff A.P. is a minor child who is in Kindergarten at CDS. Because she is a minor, A.P. appears through her mother, Bonnie Peltier. As a result of the requirement that girls wear skirts, A.P., has been discriminated against on the basis of sex. Based on CDS's past and existing policy, and its expressed intention to maintain the policy in the future, A.P. will face discrimination on the basis of sex and the denial of educational opportunities, in violation of the law, unless this provision of the dress code is permanently enjoined.

12.     Plaintiff I.B. is a minor child who is in the Fourth Grade at CDS.  Because she is a minor, I.B. appears through her mother, Erika Booth.  As a result of the requirement that girls wear skirts, I.B. has been discriminated against on the basis of sex.  Based on CDS's past and existing policy, and its expressed intention to maintain the policy in the future, I.B. will face discrimination on the basis of sex and the denial of educational opportunities, in violation of the law, unless this provision of the dress code is permanently enjoined.

13.     Plaintiff K.B. is a minor child who is in the Eighth Grade at CDS.  Because she is a minor, K.B. appears through her grandmother and legal guardian, Patricia Brown.  As a result of the requirement that girls wear skirts, K.B. has been discriminated against on the basis of sex. Based on CDS's past and existing policy, and its expressed intention to maintain the policy in the future, K.B. will face discrimination on the basis of sex and the denial of educational opportunities, in violation of the law, unless this provision of the dress code is permanently enjoined.

14.     Defendant CHARTER DAY SCHOOL, INC. is an entity chartered by the State of North Carolina to operate several schools, including CDS.

15.     Charter Day School, Inc. was organized as a North Carolina non-profit corporation in August 1999 and is capable of suing and being sued.  Its initial registered agent was Baker A. Mitchell, Jr., who served as the Chair of the Board of Trustees of Charter Day School, Inc. when it was created.

16.     The By-Laws of Charter Day School, Inc. vest the management of the affairs of Charter Day School. Inc. in a Board of Trustees, which has the power of, and acts as, the Board of Directors for purposes of the North Carolina Nonprofit Corporation Act, Chapter 55A of the

4

General Statues of North Carolina. The Board of Trustees adopts the disciplinary rules, regulations and procedures applicable to CDS.

17. The Board of Trustees may be sued pursuant to North Carolina General Statutes Section 115C-218.20(a).

18. Defendant ROBERT P. SPENCER is an individual who is a resident of North Carolina and is sued in his capacity as a member of the Board of Trustees of Charter Day School, Inc.

19. Defendant CHAD ADAMS is an individual who is a resident of North Carolina and is sued in his capacity as a member of the Board of Trustees of Charter Day School, Inc.

20. Defendant DAWN CARTER is an individual who is a resident of North Carolina and is sued in her capacity as a member of the Board of Trustees of Charter Day School, Inc.

21. Defendant JEREMY DICKINSON is an individual who is a resident of North Carolina and is sued in his capacity as a member of the Board of Trustees of Charter Day School, Inc.

22. Defendant MELISSA GOTT is an individual who is a resident of North Carolina and is sued in her capacity as a member of the Board of Trustees of Charter Day School, Inc.

23. Defendants Spencer, Adams, Carter, Dickinson, and Gott are hereinafter referred to as the "Board Members."

24. Defendant THE ROGER BACON ACADEMY, INC. was incorporated in March 1999 and is a North Carolina corporation capable of suing and being sued. Its registered agent and President is Baker A. Mitchell, Jr.

25. The Roger Bacon Academy, Inc. provides administrators and administrative services for CDS and the other schools operated by Charter Day School, Inc.

5

## FACTUAL ALLEGATIONS

26.     Bonnie Peltier enrolled her children, including A.P., in CDS because it offers unique educational benefits compared to other schools in the area.

27.     Bonnie Peltier and her children moved to Winnabow, NC to be close to CDS and they do not anticipate moving.

28.     Erika Booth enrolled her children, including I.B., in CDS because it offers unique educational benefits compared to other schools in the area.

29.     Erika Booth and her husband own their home and work nearby, and do not anticipate moving.

30.     Patricia Brown enrolled her grandchild, K.B., in CDS because it offers unique educational benefits compared to other schools in the area.

31.     Patricia Brown owns her home in Leland and works nearby and does not anticipate moving.

32.     Charter Day School, Inc. has implemented a dress code for CDS students, known as a "Uniform Policy," that expressly contains different requirements for attire for girls and boys. The current Uniform Policy, which was provided to the ACLU of North Carolina pursuant to a North Carolina Public Records Act request in November 2015, is attached hereto as Exhibit A.

33.     The Uniform Policy requires girls to wear skirts, "skorts" (skirts with shorts attached underneath), or "jumpers" (a type of sleeveless  dress worn over a blouse) to school, while requiring boys to wear pants or shorts.  The policy requires that all skirts, skorts, or jumpers be "knee-length or longer."  *See* Exhibit A.

6

34.     Students are required to wear their gym uniforms to school one day per week. Those uniforms are gender neutral, including shorts and pants for both boys and girls.

35.     The configuration and layout of the CDS campus means that the students, including Plaintiffs, are often traveling outside in between classes, and subject to the cold, wind, rain, and even snow.

36.     Kindergarten students have free play time in the playground or on a black-top play surface every day.  Older students have access to playgrounds and playing fields during recess periods on days other than their designated gym days.

37.     The Uniform Policy is in effect except on days when it is waived for special reasons, such as field trips or "dress-down" days when jeans are allowed either for some or all classes.  For example, the Uniform Policy was recently waived for "Panthers Spirit Day" for a $2 fee per student wishing to participate.

38.     CDS's Uniform Policy has been essentially unchanged with regard to these clothing requirements since CDS began operating.

39.     Charter Day School, Inc. did not, at the time of the creation of its original Uniform Policy, articulate a justification for the different requirements for boys and girls contained in the policy.

40.     In July of 2015, at a CDS orientation meeting prior to the scheduled start of the school year in which A.P. was to start Kindergarten, Bonnie Peltier questioned the rationale for the dress code requirement for girls, and specifically, the requirement that girls wear skirts to school.

41.     At the meeting, Kathy Thompson, a CDS office employee, stated that skirts present a more "professional image."  At the end of the meeting, she privately suggested that

7

Bonnie Peltier email "the founder," Baker A. Mitchell, Jr., to ask him about the rationale for this provision of the policy.

42.     Baker A. Mitchell, Jr. was the primary author of CDS' Uniform Policy when it was initially created.

43.     Bonnie Peltier emailed Mr. Mitchell asking him to explain the rationale for the requirement that girls wear skirts. Her email and Mr. Mitchell's response are attached hereto as Exhibit B.

44.     Baker A. Mitchell, Jr. explained in his email that the requirement that girls wear skirts was based, among other things, on "chivalry," "traditional values," and "mutual respect." *See* Exhibit B. His email included these paragraphs:

> "As you may recall, the tumult of the 1990's was capped off by the Columbine shootings April 20, 1999 in which two students killed thirteen classmates and injured twenty-four others – fourteen of whom were female.
>
> The Trustees, parents, and other community supporters were determined to preserve chivalry and respect among young women and men in this school of choice. For example, young men were to hold the door open for the young ladies and to carry an umbrella, should it be needed. Ma'am and sir were to be the preferred forms of address. There was felt to be a need to restore, and then preserve, traditional regard for peers."

45.     The overall purpose of the Uniform Policy, as expressed in the CDS Parent Handbook for 2015-16 at p. 5, states that "[CDS] requires all students to wear a uniform to instill discipline and keep order so that student learning is not impeded. Use of uniforms also helps promote a sense of pride and of team spirit, as every student is a member of the academic team." A copy of the CDS Parent and Student Handbook for 2015-16, hereinafter "CDS Handbook" is attached hereto as Exhibit C.

46.     The CDS Handbook incorporates the Uniform Policy by reference. *See* Exhibit C at p. 28.

47.     The CDS Handbook states that a student may be excluded or expelled from school for violating the rules in the CDS Handbook. *See* Exhibit C at pp. 14, 15, and 19.

48.     Violation of the Uniform Policy may result in disciplinary action. A student who is not dressed in accordance with the Uniform Policy may be removed from class and sent to the school office. Her parents would be called and asked to pick her up. The student would be excluded from class for the day, and could be expelled from CDS. *See* CDS Handbook, Exhibit C, at pp. 14 -15 (Suspension, Exclusion and Expulsion), and 19 (Intolerable Behaviors).

49.     If Plaintiffs were to wear pants or shorts to school, other than on gym day or a day otherwise designated as a special day when girls can wear pants or shorts, they would be in violation of the Uniform Policy and would likely be subject to disciplinary action.

50.     If Plaintiffs were male, they would not be subject to discipline for wearing pants or shorts to school on any day.

**Harms to A.P. of the Discriminatory Uniform Policy**

51.     A.P. does not wish to violate school rules and consequently attempts to comply with the Uniform Policy.

52.     If she had a free choice, A.P. would choose to wear pants or shorts to school every day. When the weather is colder, A.P. find that pants are generally more durable, more protective of the body, and warmer than tights or leggings. When the weather is warmer, she is more comfortable wearing shorts and finds it easier to move around.

53.     The requirement that girls wear skirts places a burden on A.P. because of her sex because it restricts A.P.'s mobility, both during periods of academic instruction and during recess or other recreational activities, and because it causes her to be uncomfortably cold in the winter.

54.     The requirement that girls wear skirts restricts A.P.'s mobility during the types of activities she commonly engages in during free play time, such as climbing gym structures,

9

sliding on a slide, shimmying up a fire pole, swinging from monkey bars, or performing somersaults. The requirement that the skirt be knee-length or longer makes these activities particularly difficult. She is able to engage in these activities more freely when she is not wearing her uniform, such as during PE class, or outside of school.

55.     The requirement that girls wear skirts also restricts A.P.'s movements during regular classroom time, for example, when she is sitting in a chair or on the floor, which is common during instruction periods in the lower grades. Her male classmates are allowed to sit with their legs in any position they choose and are not distracted from their education by concerns about personal modesty.

56.     Because of a desire to obey the teachers and to remain covered modestly, A.P. must remain continually conscious of the position of her legs during these basic learning periods, resulting in physical discomfort and distraction.

57.     For the first half the school year, children in Kindergarten also napped in school, resulting again in A.P. feeling a need to be conscious of her attire, even during times when she was supposed to be resting or sleeping. This same level of awareness was not necessary when she was wearing pants or shorts.

58.     These movement restrictions also apply when A.P. is wearing a "skort" because the skort is bulky and awkward and because of the requirement that the skort be "knee length or longer," which restricts physical movement regardless of the attached shorts underneath. In the cold weather, it is still necessary to wear tights under the skort, which results in uncomfortable bulkiness.

59.     In an attempt to move more freely and yet remain modest, A.P. has found it necessary to wear either tights (footed pantyhose) or leggings under her skort.

60.     The bulkiness of wearing these layers including the skort and leggings increases the stress of disrobing to use the restroom.

61.     At the end of the day, when she returns home, A.P. requests her mother's assistance in removing all these layers.

62.     When the weather is hot, A.P. finds these extra layers uncomfortably warm.

63.     Ripped tights violate CDS rules as set forth in the CDS Handbook.  Exhibit C at p. 28.

64.     Ms. Peltier has found that A.P.'s tights and leggings wear out quickly and frequently tear, which has required her to purchase multiple pairs and replace them frequently in order to remain in compliance with the Uniform Policy.

**Harms to I.B. of the Discriminatory Uniform Policy**

65.     I.B. does not wish to violate school rules and consequently attempts to comply with the Uniform Policy.

66.     If she had a free choice, I.B. would choose to wear pants or shorts to school every day.  When the weather is colder, I.B. find that pants are generally more durable, more protective of the body, and warmer than tights or leggings.  When the weather is warmer, she is more comfortable wearing shorts and finds it easier to move around when wearing them.

67.      I.B. frequently cries in the mornings because she does not want to wear a skirt.

68.     The requirement that girls wear skirts places a burden on I.B. because of her sex because it restricts I.B.'s mobility, both during periods of academic instruction and during recess or other recreational activities, and because it causes her to feel uncomfortably cold in the winter.

69.     The requirement that girls wear skirts restricts I.B.'s mobility during the types of activities she commonly engages in during recess, such as climbing or doing gymnastics.  For

11

example, I.B. has refrained from doing cartwheels when her male friend was doing them during recess because she knew her skirt would fly up. She is able to engage in these activities more freely when she is not wearing her uniform, such as during PE class, or outside of school.

70. The requirement that girls wear skirts also restricts I.B.'s movements during regular classroom time, when she has to be aware of the position of her legs during these basic learning periods, resulting in physical discomfort and distraction. Her male classmates are allowed to sit with their legs in any position they choose and are not distracted from their education by concerns about personal modesty.

71. When I.B. was in Kindergarten and First Grade, CDS teachers instructed girls, including I.B., to "sit like a princess" when they were seated on the floor. This meant sitting with both legs bent and positioned to one side of the body, rather than sitting cross-legged. I.B. found this position less comfortable than sitting cross-legged.

72. I.B. finds the required skirts particularly uncomfortable in cold weather. Where boys are able to wear long underwear under their pants, she is unable to do so and must instead wear two layers of leggings. These are uncomfortably bulky and are still less warm than pants with long underwear.

73. Ms. Booth has found that I.B.'s tights and leggings wear out quickly and frequently tear, which has require her to purchase multiple pairs and replace them frequently in order to remain in compliance with the Uniform Policy.

**Harms to K.B. of the Discriminatory Uniform Policy**

74.     K.B. does not wish to violate school rules and consequently attempts to comply with the Uniform Policy.

75.     If she had a free choice, K.B. would choose to wear pants or shorts to school every day.  When the weather is colder, K.B. find that pants are generally more durable, more protective of the body, and warmer than tights or leggings.  When the weather is warmer, she is more comfortable wearing shorts and finds it easier to move around.

76.     The requirement that girls wear skirts places a burden on K.B. because of her sex because it restricts K.B.'s mobility, both during periods of academic instruction and during recess or other recreational activities, and because it causes her to feel uncomfortably cold in the winter.

77.     The requirement that girls wear skirts restricts K.B.'s mobility during the types of activities she commonly engages in during recess, such as playing sports or doing gymnastics. For example, K.B. has refrained from doing cartwheels or flips when her male friends are doing them during recess because she knew her skirt would fly up.  A teacher reprimanded K.B. when she was younger for doing a cartwheel while wearing a skort because the skirt portion flew up toward her head while she was upside down.  K.B. has refrained from doing cartwheels or flips while in her school uniform ever since.

78.     K.B. would also choose to play soccer with the boys during recess, but refrains from doing so because the movement allows more of her legs to show and she does not want to be teased by the boys or reprimanded by a teacher for lacking modesty.

79.     Because K.B. participates in show choir, there are many P.E. days when she must wear her regular school uniform to school and is not wearing the P.E. uniform.  On those days

13

she and other girls frequently are compelled to sit on the sidelines rather than participate in any physical activity during P.E.

80.     The requirement that girls wear skirts also restricts K.B.'s movements during regular classroom time, when she has to be aware of the position of her legs even while sitting in a chair during these basic learning periods, resulting in physical discomfort and distraction. Her male classmates are allowed to sit with their legs in any position they choose and are not distracted from their education by concerns about personal modesty.

81.     K.B. finds the required skirts particularly uncomfortable in cold weather. Where boys are able to wear long underwear under their pants, she is unable to do so and must instead wear two layers of leggings. These are uncomfortably bulky and are still less warm than pants with long underwear.

82.     K.B. frequently takes a pair of pants to school and changes after school is over so she does not have to travel home in a skirt.

83.     In First Grade, K.B. objected to her teacher's instruction that the girls should sit with their legs curled to the side and asked why girls could not sit "criss-cross applesauce" like the boys. Her teacher told her it was because girls wear skirts. Her teacher then took her aside and put her in "time out" for talking back to a teacher. Her teacher informed Ms. Brown that K.B. was being "defiant." Repeated defiance is an "Intolerable Behavior" punishable by immediate dismissal or suspension pursuant to the CDS Handbook. *See* Exhibit C at p. 19.

84.     On the last day of school before vacation in Second Grade, erroneously believing the Uniform Policy was not in effect that day, Ms. Brown sent K.B. to school in a plain tee-shirt and knee-length shorts. K.B. was sent to the school office by her teacher. Ms. Brown was called and instructed to pick K.B. up from school because she was in violation of the Uniform Policy.

Ms. Brown was working and could not pick up K.B.  K.B. was forced to sit in the school office until dismissal and was not allowed to participate in her class.

85.     In the Fall of 2014, when she was in Seventh Grade, K.B., in consultation with some of her friends, initiated a petition to change the school Uniform Policy to allow girls to wear pants and shorts to school on the same basis as boys.  K.B. obtained dozens of signatures from students and parents before and after school.  The petition was confiscated by K.B.'s math teacher, Ms. Greco, when a student asked K.B. to pass the petition around during math class.  Ms. Greco orally reprimanded K.B. for disturbing class, seized the petition, and did not return the petition to K.B.  K.B. never saw the petition again and desisted from petitioning as a result.

86.     Ms. Brown  has found that K.B.'s tights and leggings wear out quickly and frequently tear, which has required them to purchase multiple pairs and replace them frequently in order to remain in compliance with the Uniform Policy.

**Harms to All Plaintiffs of the Discriminatory Uniform Policy**

87.     The Defendants' discriminatory policies and practices have deprived and continue to threaten to deprive the Plaintiffs of the ability to move freely within their school environment and engage in educational programs and activities, including learning and recreational play, in the same manner as boys.

88.     The Uniform Policy requiring girls to wear skirts has also subjected the Plaintiffs to sex stereotypes about what constitutes typical and appropriate behavior and conduct for girls.  The requirement that girls wear skirts reinforces the notion that girls, but not boys, do—and must—behave and dress "modestly"; that they are—and should be—less physically active; and that they do—and should—behave and dress in a manner that is otherwise traditionally considered appropriately "feminine."  Conversely, it reinforces the idea that boys are not—and

should not be—overly concerned with modesty; that they are—and should be—free to be physically active; and that they do—and should—behave and dress in a manner that is otherwise traditionally considered appropriately "masculine."

89.    That these stereotyped generalizations about girls' and boys' expected conduct and behavior are at play is evident from Baker Mitchell's express invocation of the justification for the policy of promoting "chivalry" and "traditional values."

90.    Plaintiffs have suffered and will continue to suffer concrete and irreparable injury as a result of Defendants' illegal conduct.

91.    Monetary damages alone cannot remedy the irreparable injury suffered by the Plaintiffs.

92.    The Defendants' discriminatory policies and practices threaten harm to the dignity interests of Plaintiffs.

**CDS is a Public School that is a State Actor with Regard to the Plaintiffs**

93.    Plaintiffs attend school under compulsion of State law.  N.C. Gen. Stat. § 115C-378.

94.    The North Carolina Charter School Statute authorizes Plaintiffs to elect to attend charter schools, including CDS.  N.C. Gen. Stat. § 115C-218(a).

95.    The North Carolina Charter School Statute explicitly provides that charter schools are public schools within the public school system.  N.C. Gen. Stat. § 115C-218.15.

96.    The North Carolina Charter School Statute prohibits charter schools, including CDS, from charging tuition.  N.C. Gen. Stat. § 115C-218.50.  Charter schools must be nonsectarian.  *Id.*

16

97.     The North Carolina Charter School Statute provides that public funds be allocated to charter schools, including CDS, from funds otherwise allocated to the local school district in accordance with a statutorily-established formula.  This allocation is non-discretionary.  It compels local school districts from which CDS enrolls students to transfer a share of their operating budgets to CDS.

98.     In August 1999 Charter Day School, Inc., filed an application (the "Charter Application") with the North Carolina State Board of Education ("SBE") to operate CDS as a charter school (attached hereto as Exhibit D).

99.     On February 3, 2000, the SBE and Charter Day School entered into their first Charter Agreement.

100.    The SBE granted a new charter (the "Charter Agreement") to Charter Day School, Inc. effective 1 July 2015 through 30 June 2025 (attached hereto as Exhibit E).

101.    The Charter Agreement, at Section 5.1, requires compliance with "the Federal and State Constitutions and all applicable federal laws and regulations, including, but not limited to, such laws and regulations governing […] civil rights."

102.    Plaintiffs were admitted to CDS pursuant to standards and procedures established by the North Carolina Charter School Statute.

103.    Charter Day School, Inc. and the SBE have agreed that CDS is a public school pursuant to Article IX, Section 2, of the North Carolina Constitution and North Carolina's Charter Schools Statute.  Exhibit E at Par. 2.1.

104.    The North Carolina Charter School Statute prohibits CDS from discriminating against any student on the basis of ethnicity, national origin, gender or disability.  N.C. Gen. Stat. § 115C-218.55.

105.     State law establishes standards regulating in detail student assessment, proficiency and promotion standards.  N.C. Gen. Stat. § 115C-218.85.  These standards apply at CDS.

106.     If CDS students fail to meet academic performance criteria established by the SBE, Charter Day School, Inc. may lose the charter for CDS.

107.     The North Carolina Charter School Statute empowers CDS to discipline students and establishes limitations on the powers it grants by requiring that all policies adopted by CDS governing student conduct be consistent with the United States and North Carolina Constitutions. *See* N.C. Gen. Stat. §115C-390.1 *et seq.*

108.     The SBE consented to Charter Day School, Inc. entering into the CDS Management Agreement with The Roger Bacon Academy, Inc.  The CDS Management Agreement may not be terminated without the consent of the SBE.  Exhibit E at Par. 4.

109.     The SBE issues a "School Report Card" for CDS, as it does for all other North Carolina public schools.

**The Entwinement Among CDS, Charter Day School, Inc.,  and The Roger Bacon Academy, Inc.**

110.     CDS, Charter Day School, Inc., and The Roger Bacon Academy, Inc. are linked by a complex interconnecting set of personal, corporate and operational relationships.

111.     Mr. Mitchell is currently the Secretary of Charter Day School, Inc.

112.     Mr. Mitchell is currently the President and "owner" of The Roger Bacon Academy, Inc.

113.     The CDS website and CDS teachers and administrators refer to Mr. Mitchell as the "founder" of CDS.

114.     Mr. Mitchell filed the application for a charter with the SBE.  *See* Exhibit D.

115.    In 2000, Mr. Mitchell personally signed the first charter agreement with SBE for CDS on behalf of Charter Day School, Inc. as the "Chair of Board of Directors."

116.    On July 1, 2005, CDS entered into an agreement with The Roger Bacon Academy, Inc. for management and facility services.  ("CDS Management Agreement," attached hereto as Exhibit F).

117.    The CDS Management Agreement is valid and enforceable.

118.    Under the CDS Management Agreement, The Roger Bacon Academy, Inc. is responsible for the management, operation, administration, accounting and education at CDS in accordance with the Charter Application of August 27, 1999, and the documents attached thereto.

119.    The CDS Management Agreement provides that "RBA shall make reasonable rules, regulations and procedures applicable to CDS, to be adopted by CDS in the sole discretion of the Board [of Trustees of Charter Day School, Inc.], and is authorized and directed to enforce the rules, regulations and procedures adopted by [Charter Day School, Inc.]."

120.    The Roger Bacon Academy, Inc. website identifies Baker A. Mitchell, Jr, its Founder, as Secretary of the Board of Trustees of Charter Day School, Inc. and Mark C. Dudeck, Chief Financial Officer of The Roger Bacon Academy, Inc. as Treasurer of Charter Day School, Inc.

121.    Mark C. Dudeck is presently the registered agent for Charter Day School, Inc.

122.    Pursuant to the Charter Agreement, the SBE requires Charter Day School, Inc. to operate CDS in accordance with the Charter Application, which contemplated the management of CDS by The Roger Bacon Academy, Inc.

123.    The Roger Bacon Academy, Inc. is entirely entwined with and, except for tax purposes, virtually indistinguishable from Charter Day School, Inc.

124.    The Roger Bacon Academy, Inc. logo was used on the Charter Application along with the Charter Day School logo.

125.    The CDS cheerleaders and sports teams compete as "Roger Bacon Academy Vikings" or "RBA Vikings."

126.    The sign identifying CDS bears The Roger Bacon Academy, Inc. logo, but not the Charter Day School, Inc. logo.

127.    Charter Day School, Inc. has no employees who serve as administrators for CDS.

128.    All CDS administrators are employed by The Roger Bacon Academy, Inc.

129.    CDS rents space for the School under a lease from The Roger Bacon Academy, Inc.

130.    Pursuant to the CDS Management Agreement, Charter Day School, Inc. and The Roger Bacon Academy, Inc. maintain a joint bank account (the "Joint Account").

131.    Pursuant to the CDS Management Agreement, The Roger Bacon Academy, Inc. owns all records pertaining to the operation of CDS.

132.    Pursuant to the CDS Management Agreement, The Roger Bacon Academy, Inc. selects and hires CDS personnel, including teachers.

133.    The Parent and Student Handbook of CDS was authored by "Charter Day School, Inc., Board of Trustees, in affiliation with The Roger Bacon Academy." Exhibit C at cover page.

**Federal Financial Assistance**

134.    Charter Day School, Inc. receives Federal financial assistance and is subject to the requirements of Title IX.

135.    Charter Day School, Inc., directly or indirectly, receives funds from USED.

136.     Charter Day School, Inc. holds a contract from the SBE to provide free and low cost meals to students pursuant to the USDA's National School Lunch Program at Douglass Academy, a public charter school in New Hanover County operated by Charter Day School, Inc. and The Roger Bacon Academy, Inc. ("USDA Contract"). The USDA Contract is identified as Agreement Number 65C by the SBE.

137.     Pursuant to the USDA Contract, Charter Day School, Inc. has agreed to comply with Title IX and USDA's Title IX implementing regulations, 7 C.F.R. §15a.1 *et seq.*

138.     Charter Day School, Inc. directly or indirectly receives funds from the USDA.

139.     All of the federal funds received by Charter Day School, Inc. on behalf of CDS are, pursuant to the CDS Management Agreement, deposited into the Joint Account.

140.     All of the federal funds received by Charter Day School, Inc. on behalf of Douglass Academy are, pursuant to the management agreement for Douglass Academy ("Douglass Management Agreement"), deposited into an account jointly held by Charter Day School, Inc. and The Roger Bacon Academy, Inc.

141.     The CDS Management Agreement and the Douglass Management Agreement authorize The Roger Bacon Academy, Inc. to pay fees to itself from their respective Joint Accounts.

142.     The Roger Bacon Academy, Inc. pays other expenses for the operation of CDS and Douglass Academy from their respective Joint Accounts.

143.     Because The Roger Bacon Academy, Inc. controls the federal funds received by Charter Day School, Inc. and receives a substantial portion of those federal funds as fees, and because the two entities are intertwined, The Roger Bacon Academy, Inc. is itself subject to Title IX.

**Defendants' Conduct**

144.     Defendants have acted and engaged in conduct as set forth in paragraphs 1 through 143 above intentionally, willfully, and in disregard of the rights of Plaintiffs.

145.     Defendants have acted and engaged in conduct as set forth in paragraphs 1 through 143 above with actual notice of and deliberate indifference to the rights of Plaintiffs.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:  Equal Protection
### (Against Charter Day School, Inc., the Board Members, and The Roger Bacon Academy, Inc.)

146.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 145 above.

147.     Pursuant to North Carolina law and the Charter Agreement, Charter Day School, Inc. is a public school obligated to comply with the United States Constitution and the North Carolina Constitution.

148.     Because of its entwinement with Charter Day School, Inc., The Roger Bacon Academy, Inc. is a state actor obligated to comply with the United States Constitution and the North Carolina Constitution.

149.     Defendant Charter Day School, Inc., the Board Members, and The Roger Bacon Academy, Inc. have jointly and severally promulgated, implemented, ratified, and enforced a policy that has deprived Plaintiffs of their right to equal protection under the law.

150.     By promulgating and enforcing a Uniform Policy requiring girls to wear skirts, Defendants Charter Day School, Inc., the Board Members, and The Roger Bacon Academy, Inc. have intentionally and without adequate justification classified Plaintiffs on the basis of their sex and thereby discriminated against them on the basis of sex and sex stereotypes in violation of

Plaintiffs' right to equal protection of the laws, secured by the Fourteenth Amendment to the United States Constitution.

151.     The Uniform Policy requiring girls to wear skirts, on its face, treats girls differently than boys and causes them to suffer a burden that boys do not suffer.  The requirement that girls wear skirts causes Plaintiffs to suffer physical discomfort, and restricts their mobility, both during periods of academic instruction and during recess or other recreational activities.  Boys do not suffer the same restriction on their mobility or comfort.

152.     The Uniform Policy requiring girls to wear skirts is based on impermissible sex stereotypes—specifically, the notion that skirts promote "traditional values," "mutual respect" and "chivalry."  This justification reflects overly broad generalizations about what constitutes appropriate "feminine" behavior and conduct for girls, and what constitutes appropriate "masculine" behavior and conduct for boys.  The requirement that girls wear skirts reinforces these same archaic sex role stereotypes, and burdens girls with restrictions of their freedom of movement that boys do not suffer.

153.     With regard to Plaintiffs, Charter Day School, Inc. has acted under color of law.

154.     With regard to Plaintiffs, the Board Members have acted under color of law.

155.     With regard to Plaintiffs, The Roger Bacon Academy, Inc. has acted under color of law.

## SECOND CAUSE OF ACTION:  Title IX
### (Against Charter Day School, Inc. and The Roger Bacon Academy, Inc.)

156.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 145 above.

157.    Charter Day School, Inc. and The Roger Bacon Academy, Inc. operate education programs that currently receive, and at all relevant times have received, federal financial assistance.

158.    Title IX of the Educational Amendments of 1972 provides in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

159.    The Title IX implementing regulations of USDA and USED both prohibit a recipient of Federal financial assistance from subjecting any person on the basis of sex to discrimination, including "Subject[ing] any person to separate or different rules of behavior, sanctions, or other treatment." 34 C.F.R. §§ 106.31(a) and (b)(4), 7 C.F.R. §§ 15a.31(a) and (b)(4).

160.    The Title IX implementing regulations of USDA expressly prohibit a recipient of Federal financial assistance from "Discriminat[ing] against any person in the application of any rules of appearance." 7 C.F.R. §15a.31(b)(5).

161.    By promulgating and enforcing a Uniform Policy requiring girls to wear skirts, Defendants Charter Day School, Inc. and The Roger Bacon Academy, Inc. have denied Plaintiffs the benefits of educational programs and activities and subjected them to discrimination on the basis of sex and sex stereotypes, in violation of Title IX, 20 U.S.C. §1681(a), 34 C.F.R. § 106.31(a), and 7 C.F.R. § 15a.31(a).

162.    The Uniform Policy requiring girls to wear skirts, on its face, treats girls differently than boys and causes them to suffer a burden that boys do not suffer. The requirement that girls wear skirts causes Plaintiffs to suffer physical discomfort and restricts their

24

mobility, both during periods of academic instruction and during recess or other recreational activities. Boys do not suffer the same restriction on their mobility or comfort.

163. The Uniform Policy requiring girls to wear skirts is based on impermissible sex stereotypes—specifically, the notion that skirts promote "traditional values," "mutual respect" and "chivalry." This justification reflects overly broad generalizations about what constitutes appropriate "feminine" behavior and conduct for girls, and what constitutes appropriate "masculine" behavior and conduct for boys. The requirement that girls wear skirts reinforces these same archaic sex role stereotypes, and burdens girls with restrictions of their freedom of movement that boys do not suffer.

164. By incorporating the Uniform Policy as a school rule subject to discipline via the Parent and Student Handbook, Charter Day School, Inc. and The Roger Bacon Academy Inc. have established disparate rules of behavior based on sex in violation of Title IX and the USDA and USED implementing regulations thereunder. Title IX, 20 U.S.C. §1681(a), 34 C.F.R. § 106.31(b)(4), and 7 C.F.R. § 15a.31(b)(4).

165. By establishing the Uniform Policy, Charter Day School, Inc. and The Roger Bacon Academy, Inc. have discriminated against Plaintiffs in a rule of appearance in violation of Title IX and the USDA implementing regulations thereunder, 20 U.S.C. §1681(a) and 7 C.F.R. § 15a.31(b)(5).

### THIRD CAUSE OF ACTION: Equal Protection Under the North Carolina Constitution
**(Against Charter Day School, Inc., the Board Members, and The Roger Bacon Academy, Inc.)**

166. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 145 above.

167. Article I, Section 19, of the North Carolina Constitution provides "No person shall be denied the equal protection of the laws." Equal protection requires that all persons similarly situated be treated alike.

168. The Equal Protection Clause of Article I, Section 19 of the North Carolina Constitution is functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

169. Paragraph 2.1 of the CDS charter specifically acknowledges that the school was created pursuant to Article IX, Section 2, of the North Carolina Constitution, providing that "The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein *equal opportunities* shall be provided for all students." (emphasis added). This text legally recognizes that students such as Plaintiffs have a fundamental right to an equal opportunity to a sound basic education.

170. By promulgating and enforcing a Uniform Policy requiring only female students to wear skirts, state actor Defendants have arbitrarily, intentionally, purposefully, and without adequate justification treated Plaintiffs differently than similarly situated male students by classifying Plaintiffs on the basis of their sex, thereby discriminating against them on the basis of sex and sex stereotypes, and inhibiting their fundamental right to an equal opportunity to a sound basic education, in violation of Plaintiffs' right to equal protection of the laws secured by Article I, Section 19, of the North Carolina Constitution.

171. The Uniform Policy requiring girls to wear skirts, on its face, treats girls differently than boys and causes them to suffer a burden that boys do not suffer. The requirement that girls wear skirts causes Plaintiffs to suffer physical discomfort and restricts their

mobility, both during periods of academic instruction and during recess or other recreational activities.  Boys do not suffer the same restriction on their mobility or comfort.

172.    The Uniform Policy requiring girls to wear skirts is based on impermissible sex stereotypes—specifically, the notion that skirts promote "traditional values," "mutual respect" and "chivalry."  This justification reflects overly broad generalizations about what constitutes appropriate "feminine" behavior and conduct for girls.  The requirement that girls wear skirts reinforces these same archaic sex role stereotypes, and burdens girls with restrictions of their freedom of movement that boys do not suffer.

## FOURTH CAUSE OF ACTION: Breach of Contract
### (Against Charter Day School, Inc. and the Board Members)

173.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 145 above.

174.    The Charter Agreement between the SBE and Charter Day School, Inc. is valid and enforceable.

175.    The Charter Agreement was entered into for Plaintiffs' direct, not incidental, benefit.

176.    Plaintiffs, as students at CDS, are intended third-party beneficiaries of the Charter Agreement.

177.    The North Carolina Charter School Statute prohibits CDS from discriminating against any student on the basis of gender.  N.C. Gen. Stat. § 115C-218.55.

178.    Paragraph 5.1 of the Charter Agreement requires Charter Day School, Inc. to abide by applicable law, including "the Federal and State Constitutions and all applicable federal laws and regulations, including, but not limited to, such laws and regulations governing […] civil rights […]."  *See* Exhibit E.

179. By promulgating and enforcing a Uniform Policy requiring girls to wear skirts in violation of the U.S. Constitution, Title IX , the Title IX implementing regulations of USED and USDA, the North Carolina Constitution, and the North Carolina Charter School Statute, Defendant Charter Day School, Inc. and the Board Members have breached the terms of the Charter Agreement.

**FIFTH CAUSE OF ACTION: Breach of Contract**
**(Against The Roger Bacon Academy, Inc.)**

180. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 145 above.

181. The CDS Management Agreement between the Charter Day School, Inc., and The Roger Bacon Academy, Inc., was entered into for Plaintiffs' direct, not incidental, benefit.

182. Plaintiffs, as students at CDS, are intended third-party beneficiaries of the CDS Management Agreement.

183. Section 4.08 of the CDS Management Agreement requires that "RBA shall provide educational programs that meet federal, state, and local requirements and the requirements imposed under the [North Carolina Charter School Statute] and the Charter." *See* Exhibit F.

184. Section 4.13 of the CDS Management Agreement states that "RBA will not directly cause CDS to be in material breach of the educational and business requirements of its Charter with the SBE." *See* Exhibit F.

185. Section 5.03 of the CDS Management Agreement requires that CDS not breach the Charter Agreement. *See* Exhibit F.

186. Section 11.04 of the CDS Management Agreement requires compliance with the law and the Charter Agreement. Specifically, it provides that The Roger Bacon Academy, Inc.

"shall manage and operate [CDS], and shall at all times conduct all of its other affairs, in compliance with the Operational Documents and all applicable federal, state and local statutes, rules and regulations…" *See* Exhibit F.

187.    The North Carolina Charter School Statute prohibits CDS from discriminating against any student on the basis of gender.  N.C. Gen. Stat. § 115C-218.55.

188.    By promulgating and enforcing a Uniform Policy requiring girls to wear skirts in violation of Title IX, the Title IX implementing regulations of USED and USDA, the U.S. Constitution, the North Carolina Constitution, the North Carolina Charter School Statute, and the Charter Agreement, Defendant The Roger Bacon Academy, Inc. has breached the terms of the CDS Management Agreement.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully requests that this Court:

1.    Permanently enjoin Defendants from establishing or enforcing the provision of the Uniform Policy requiring that girls wear skirts and prohibiting them from wearing pants or shorts;

2.    Declare that the actions of Defendants violate Plaintiffs' rights:

      a.    Under the Fourteenth Amendment of the United States Constitution;

      b.    Under Title IX of the Education Amendments of 1972;

      c.    Under Article I, section 19 of the North Carolina Constitution;

      d.    As third-party beneficiaries of the Charter Agreement between Charter Day School, Inc. and the SBE; and

      e.    As third-party beneficiaries of the CDS Management Agreement between Charter Day School, Inc. and The Roger Bacon Academy, Inc.;

3.    Award Plaintiffs nominal damages to fairly and reasonably compensate them for the violation of their civil and Constitutional rights;

4.    Award Plaintiffs their expenses, costs, and reasonable attorneys' fees under 42 U.S.C. § 1988 and any other applicable provision of law; and

5.    Award other equitable and monetary relief as the Court deems just and proper.


Respectfully submitted this the 29th day of February, 2016.

ELLIS & WINTERS LLP

/s/ Lenor Marquis Segal
Lenor Marquis Segal
NC State Bar No. 43445
Post Office Box 33550
Raleigh, NC  27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010
lenor.marquissegal@elliswinters.com
Local Civil Rule 83.1 Counsel


AMERICAN CIVIL LIBERTIES UNION OF
NORTH CAROLINA LEGAL FOUNDATION

/s/ Christopher A. Brook
Christopher A. Brook
NC Bar No. 33838
Jenifer Wolfe
NC Bar No. 46511
Legal Director, American Civil Liberties Union
of North Carolina Legal Foundation
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone:  (919) 834-3466
Facsimile:   (866) 511-1344
cbrook@acluofnc.org
jwolfe@acluofnc.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

/s/ Lenora M. Lapidus
_____

Lenora M. Lapidus
(LR 83.1(a) *special appearance*)
Galen Sherwin
(LR 83.1(a) *special appearance*)
Amy Lynn Katz
(LR 83.1(a) *special appearance*)
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2615
llapidus@aclu.org
gsherwin@aclu.org
wrp_ak@aclu.org
*Attorneys for Plaintiffs*