# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

### Case No. 7:16-cv-30

| | | |
|---|---|---|
| BONNIE PELTIER, as Guardian of A.P., a minor child; | ) ) ) | |
| ERIKA BOOTH, as Guardian of I.B., a minor child; and | ) ) ) | |
| PATRICIA BROWN, as Guardian of K.B., a minor child; | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **OPPOSITION TO THE MOTION FOR RULE 35 EXAMINATION** |
| CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER; CHAD ADAMS; SUZANNE WEST; COLLEEN COMBS; TED BODENSCHATZ; and MELISSA GOTT in their capacities as members of the Board of Trustees of Charter Day School, Inc.; and THE ROGER BACON ACADEMY, INC.; | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## SUMMARY OF ARGUMENT

This case challenges a provision of the Uniform Policy at Charter Day School, a K-8

public charter school funded by federal, state, and local monies, that requires female students to

wear "skirts, skorts, or jumpers" (collectively "skirts") and prohibits them from wearing pants.

The Plaintiffs in this case, A.P., I.B., and K.B., are current or former students at Charter Day

School ("CDS"), who were in Kindergarten, Fifth, and Eighth grades, respectively at the time

this suit was initiated.[1]  They bring this suit seeking to be freed from this archaic rule and allowed the freedom to wear pants to school like other students across the state of North Carolina.

Plaintiffs do not challenge CDS's authority to impose a Uniform Policy, or argue that appearance codes in general are unlawful.  Rather, Plaintiffs challenge the specific requirement that girls wear skirts.  Plaintiffs assert that this provision of the Uniform Policy has deprived them of equal educational opportunities at CDS in concrete ways, impacting their day-to-day physical comfort, freedom of movement, and ability to concentrate in class on the same terms as boys, and subjecting them to impermissible sex-stereotypes.  *See* Am. Compl. [DE 13].  They do not seek compensatory damages, but rather, seek declaratory and injunctive relief—in the form of a court order requiring Defendants to simply permit them to wear pants or shorts to school when they so choose—as well as nominal damages for the violation of their statutory and constitutional rights to be free from sex discrimination.

Having declined the opportunity to depose the minor Plaintiffs during the fact discovery period, which ended in early October, or to pursue less invasive other methods (such as written discovery) that would have led to information relevant to the Plaintiffs' mental states, Defendants now seek to compel them to undergo an intrusive mental examination.  They hinge their request not on the Complaint itself—which does not seek money damages for emotional distress—but rather, on a single line in an expert report submitted by Dr. Christia Spears-Brown, which states that "forced gender distinction increases children's beliefs in gender stereotypes, and those stereotypes lead to negative academic, social, and psychological consequences for children."  [DE 60-1]  Defendants assert that "by submitting Dr. Brown's expert report in

_____

[1] Plaintiff K.B. has since graduated from CDS, but retains claims for declaratory relief and nominal damages.

2

support of their positions that they suffer harm as a result of the Uniform Policy," Plaintiffs have "placed their mental conditions in controversy."  Defs.' Mem. [DE 62] at 6.

Defendants cannot hang their request for a compelled mental examination of the minor Plaintiffs on so slender a thread.  Neither the pleadings nor the expert report relied upon by Defendants is sufficient to place the Plaintiffs' psychological condition "in controversy." Plaintiffs do not specifically allege that they have suffered from emotional distress, nor do they claim to have suffered any especially severe or particularized psychological harm as a result of Defendants' conduct.  They request only declaratory judgment and forward-looking injunctive relief, and seek no monetary compensation from the Defendants apart from an award of nominal damages recognizing the violation of their civil rights.  The information sought through the requested mental examinations as to the Plaintiffs' mental states is thus entirely irrelevant to the claims and defenses in this case, which may be decided on the merits as a matter of law: either the facially sex-based Uniform Policy violates the law, or it does not.

Dr. Brown's expert report in no way alters the fundamental nature of the Plaintiffs' claims.  Defendants' misleading use of her conclusions distorts both the substance and purpose of the report, which presents conclusions based on a review of the relevant psychological literature, and does not purport to make any assessment of the individual Plaintiffs' psychiatric conditions.  Defendants have further failed to demonstrate "good cause" as to why the minor Plaintiffs should be forced to undergo a burdensome and unnecessary psychological examination at this late date, when Defendants could easily have obtained any relevant discovery through other, less intrusive means, but failed to make even minimal attempts to do so.  Because Defendants plainly fail to satisfy their burden to obtain such an intrusive form of discovery, their application should be denied.

## STATEMENT OF FACTS

Plaintiffs, minors A.P., I.B., and K.B. ([DE 13] ¶¶ 1, 2, 14), are current and former female students at CDS, a co-educational public charter institution located in Leland, Brunswick County, North Carolina. Through their parents and legal guardians, they challenge the provision of the CDS "Uniform Policy" requiring that female students wear skirts, "skorts" (skirts with shorts attached underneath), or "jumpers" that are knee-length or longer (collectively referred to herein as "skirts"). Under the Policy, female students attending the School are subject to discipline for wearing pants or shorts; their male classmates are not. [DE 13] ¶¶ 33-34, 39; 48-49.

In August 2015, shortly after A.P had begun kindergarten, A.P.'s parent and guardian Bonnie Peltier emailed the School's founder Baker A. Mitchell, Jr. asking him to explain the rationale for the requirement that girls wear skirts. [DE 13] ¶¶ 42-44; Ex. B. Mr. Mitchell responded via email as follows:

> As you may recall, the tumult of the 1990's was capped off by the Columbine shootings April 20, 1999 in which two students killed thirteen classmates and injured twenty-four others – fourteen of whom were female.
> The Trustees, parents, and other community supporters were determined to preserve chivalry and respect among young women and men in this school of choice. For example, young men were to hold the door open for the young ladies and to carry an umbrella, should it be needed. Ma'am and sir were to be the preferred forms of address. There was felt to be a need to restore, and then preserve, traditional regard for peers.

[DE 13] ¶ 45; Ex. B.

Plaintiffs assert that as a result of the requirement that they wear skirts, they are subject to a distinct set of harms and burdens that their male peers do not face. They allege that they are required to wear clothing almost every single day that they not only find less comfortable, but that also restricts their freedom of movement and is less warm in cold weather than what they

4

would be permitted to wear if they were boys attending the same school. [DE 13] ¶¶ 53-59, 67, 69-73, 76-82. As a result, they have routinely refrained or been prevented from engaging in numerous physical activities, including "climbing gym structures, sliding on a slide, shimmying up a fire pole, swinging from monkey bars, or performing somersaults," "climbing or doing gymnastics," and "playing sports," and "doing cartwheels or flips." [DE 13] ¶¶ 55, 70, 78. Moreover, they assert that the requirement reinforces "archaic sex-role stereotypes," and specifically,

> the notion that girls, but not boys, do—and must—behave and dress 'modestly'; that they are—and should be—less physically active; and that they do—and should—behave and dress in a manner that is otherwise traditionally considered appropriately 'feminine.' Conversely, it reinforces the idea that boys are not—and should not be—overly concerned with modesty; that they are—and should be—free to be physically active; and that they do—and should—behave and dress in a manner that is otherwise traditionally considered appropriately 'masculine.'

[DE 13] ¶ 89, 153.

After counsel sent the School a letter on September 12, 2015, requesting that the Policy be amended to permit girls to wear pants and shorts, and Defendants refused to comply, Plaintiffs initiated the instant action, asserting that by treating them in a facially different manner than boys and subjecting them to impermissible sex stereotypes about what constitutes appropriate behavior, conduct and appearance for girls, the Defendants are in violation of Title IX and the equal protection clauses of the North Carolina and U.S. Constitutions, as well as North Carolina contract law. Plaintiffs seek declaratory and injunctive relief, in the form of a court order enjoining the provision of the uniform requirement that requires them to wear skirts and subjects them to discipline for wearing pants or shorts, as well as nominal damages for violation of their rights.

## PROCEDURAL HISTORY

This suit was commenced on February 29, 2016 [DE1], and an amended complaint was filed on March 11, substituting current Board Members as Defendants [DE 13]. On April 11, 2016, Defendants filed a motion to dismiss, which remains pending [DE 27]. Defendants have not filed an Answer. Meanwhile, fact discovery has proceeded according to the Court's scheduling order and, with one short, mutually-agreed extension [DE 54-56], was completed on October 12. Plaintiffs deposed each of the named Defendants, two school administrators, as well as Mr. Mitchell and Mr. Dudeck (the Chief Financial Officer of RBA and the Treasurer of CDS). Defendants held depositions of the Plaintiffs' Guardians *ad Litem*, but declined to depose the Plaintiffs themselves, despite Plaintiffs' counsel offering on more than one occasion to discuss a suitable process for doing so. *See* Declaration of Lenor Marquis Segal, ¶¶ 4, 5; Exhibits A and B.[2]

The parties submitted their joint preconference management report on October 14 [DE 57], and on October 20, 2016, attended a management conference [DE 58] at which no discovery issues were presented for this Court's intervention. A mediation was held before Patricia Holland on November 9, 2016, which reached an impasse. *See* Declaration of Lenor Marquis Segal, ¶ 6; Exhibit C.

Plaintiffs' expert reports were timely submitted on November 11, 2016; Defendants' expert reports were accordingly due on December 12, 2016. On December 1, 2016 Defendants informed Plaintiffs of their intention to seek mental examination of the Plaintiffs; Plaintiffs responded on December 5, 2016, that they would not consent. *See* Declaration of Lenor Marquis Segal, ¶ 7; Exhibit D.

---

[2] Plaintiffs file the December 21, 2016 Declaration of Lenor Marquis Segal simultaneously herewith.

On December 7, 2016, Defendants moved for an order compelling mental examination of the minor Plaintiffs pursuant to Rule 35, and for a modification of the case management order that would permit them an additional 53 days to submit their expert reports, on grounds that they required additional time to obtain the requested order and for their experts to conduct the examination. [DE 60]. The reasons given as to the need for delay were the experts' work schedules and the closure of CDS for the holidays. [DE 60-62].

On December 9, 2016, Plaintiffs filed an opposition to the Motion for Modification of the Case Management Order, and indicated their intention to submit a timely opposition to the Motion for an Order Compelling a Rule 35 Mental Examination. [DE 65]. Plaintiffs opposed the motion for an extension of time as to Defendants' statistician experts, Drs. Yishi Wang and Cuixian Chen, which was entirely unsupported. They further opposed the motion as to Defendants' psychologist experts, Drs. Ann Dell Duncan-Hively and Wells Hively, arguing that the extension was (a) unnecessary, since the motion for a Rule 35 examination was unwarranted and failed to meet the applicable legal standard, and, in the alternative, (b) was unnecessarily long and would cause an unwarranted delay in completing discovery. [DE 65]. On December 12, 2016, Defendants proceeded to serve the expert reports of Drs. Wang and Chen, mooting that portion of their motion and Plaintiffs' response. They further served what they styled as a "draft" expert report by Drs. Duncan-Hively and Hively, pending the Court's ruling on their Rule 35 motion.

The Plaintiffs incorporate herein the arguments set forth in their opposition to the Motion to Modify the Case Management Order with respect to Drs. Duncan-Hively and Hively [DE 65], and respectfully submit the following in support of their further opposition to the Rule 35 Motion.[3]

## ARGUMENT

### 1. LEGAL STANDARD

Rule 35 provides:

> When the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . The order may be made only on motion for good cause shown.

Fed. R. App. P. 35(a). The requirements of "in controversy" and "good cause" are distinct. *Curtis v. Express, Inc.*, 868 F. Supp. 467, 468 (N.D.N.Y. 1994). As the Supreme Court has emphasized, these requirements "are not met by mere conclusory allegations of the pleadings— nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination . . . . The ability of the movant to obtain the desired information by other means is also relevant." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964); *see also E.E.O.C. v. Maha Prabhu, Inc.*, No. 3:07-cv-111-RJC, 2008 WL 2559417, at *2 (W.D.N.C. June 23, 2008) (Rule 35 requires (1) an affirmative showing by the movant of "good cause" for ordering an independent medical examination, and (2) a showing that the mental or physical condition is truly "in controversy.'" (quoting Fed. R. Civ. P. 35)). The Supreme Court's holding in *Schlagenhauf* is rooted in the recognition that requiring

---

[3] Plaintiffs do not concede the admissibility of any of the expert reports submitted by Defendants.

8

plaintiffs to condition their right to pursue a remedy in federal court on the sacrifice of their fundamental right to bodily integrity through a compelled medical examination would "create constitutional problems." 379 U.S. at 114. The Supreme Court thus concluded that "[t]he plain language of Rule 35 precludes such an untoward result." and cautioned that the rule should be applied in a "discriminating" manner. *Id.* at 114, 121–22.

Rule 35's "good-cause requirement is not a mere formality, but is a plainly expressed limitation on the use of that Rule." *Id.* at 118; *accord Maha Prabhu*, 2008 WL 2559417, at *2 ("[T]he invasion of the individual's privacy by a physical or mental examination is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate." (quoting *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962))). It is distinct from, and more stringent than, the general "relevance" standard contained in Rule 26. Accordingly, "[u]nlike other tools of discovery, physical and mental examinations require more than a showing of mere relevance." *Maha Prabhu*, 2008 WL 2559417, at *2. Necessity separates the Rule 35 procedures involving independent medical examinations and other tools of discovery, and that necessity only arises where other means of obtaining information are exhausted. *Id.* Good cause therefore manifestly does not exist where the desired information could have been obtained through less invasive tools of discovery. *Id.*

The "in controversy" requirement has been interpreted similarly narrowly. Thus, the weight of authority holds that even if the party from whom the exam is sought alleges that she has suffered from emotional distress, that is insufficient by itself to put the party's mental state "in controversy." *See Turner v. Imperial Stores*, 161 F.R.D. 89, 97 (S.D. Cal. 1995) (recognizing that a contrary rule would mean that "mental examinations could be ordered whenever a plaintiff claimed emotional distress or mental anguish. Rule 35(a) was not meant to

be applied in so broad a fashion"); *Acosta v. Tenecot Oil Co.*, 913 F.2d 205, 209 (5th Cir. 1990) (such "a broad interpretation of Rule 35 would render meaningless the rule's express limitations"); *Cody v. Marriott Corp.*, 103 F.R.D. 421, 422 (D. Mass. 1984) ("'[S]weeping examinations of a party who has not affirmatively put into issue [her] own mental . . . condition are not to be automatically ordered merely because the person' has made a claim of emotional distress" (quoting *Schlagenhauf*, 379 U.S. at 121)); *Ford v. Contra Costa County*, 179 F.R.D. 579, 580 (N.D. Ca. 1998) (permitting mental examinations whenever a plaintiff sought damages for emotional distress "would not only run afoul of FRCP 35(a), but it would also subject innumerable plaintiffs to mandatory yet unnecessary psychiatric examinations").

Where emotional distress claims are brought, courts have generally only found that the plaintiff's mental or physical conditions are in controversy under limited circumstances, including cases where (1) the plaintiff has asserted a specific cause of action for intentional or negligent infliction of emotional distress; (2) the plaintiff has claimed unusually severe emotional distress; (3) the plaintiff has alleged a specific type of disorder or other psychiatric injury; (4) the plaintiff has offered her own expert testimony to supplement her claim of emotional distress; or (5) the plaintiff concedes that her medical condition is "in controversy" pursuant to Rule 35. *Maha Prabhu*, 2008 WL 2559417, at *3. Courts will refuse mental examinations when there is no claim of specific psychiatric injury, but rather, only claims of "generalized" or "garden variety" emotional distress. *See, e.g.*, *Turner*, 161 F.R.D. at 97 (Rule 35 motion denied in Title VII case where there were no allegations that Plaintiff suffered permanent or severe psychological damage beyond "garden variety claims of emotional distress" resulting from discrimination); *Cody*, 103 F.R.D. at 423 (same); *Nathai v. Florida Detroit Diesel-Allison, Inc.*, 268 F.R.D. 398, 401 (M.D. Fla. 2010) (same); *Winstead v. Lafayette County*

10

*Board of County Commissioners*, N.D. Fla.2016, 315 F.R.D. 612, 615 (same); *Bowen v. Parking Auth. of City of Camden*, 214 F.R.D. 188, 193 (D.N.J. 2003) (same); *Bridges v. Eastman Kodak Co.*, 850 F. Supp. 216, 222 (S.D.N.Y. 1994) (same).

Courts have recognized that such a cautious approach to the "in controversy" requirement is particularly critical in the context of discrimination cases: If by alleging injury sufficient to create a justiciable controversy Plaintiffs' automatically placed their mental conditions at issue for purposes of Rule 35, this would result in plaintiffs in the vast majority of discrimination cases being subjected to mental examinations. *See Acosta*, 913 F.2d at 209 (Rule 35 motion denied in age discrimination case for merely alleging discrimination but not that he had suffered emotional or mental damages, as "[a] ruling in [the employer's] favor would sanction a mental examination in every age discrimination case"); *also c.f. Hodges v. Keane*, 145 F.R.D. 332, 335 (S.D.N.Y. 1993) (cautioning that "to find that allegations of past pain and suffering necessarily triggered the Rule 35(a) threshold of placing one's 'mental condition in controversy' would open the floodgates to requests for mental examinations whenever a plaintiff alleged past pain and suffering in a routine Section 1983 case").

Such a broad application of the rule would also have a chilling effect on private enforcement of civil rights laws, undermining their remedial purpose: "If the price of even having the opportunity to vindicate one's rights . . . in court necessarily included a six-hour-long forced psychological examination, many plaintiffs with viable cases might decline to pursue their claims." *Winstead*, 315 F.R.D. at 614; *Robinson v. Jacksonville Shipyards, Inc*., 118 F.R.D. 525, 531 (M.D. Fla. 1988) ("Reporting of sexual harassment claims would certainly be discouraged, thereby undercutting the remedial effect intended by Congress in enacting Title VII." (citation omitted)).

11

## 2. DEFENDANTS FAIL TO MEET THE STANDARD FOR COMPELLING THE MINOR PLAINTIFFS TO UNDERGO A MENTAL EXAMINATION.

Defendants have failed to meet their burden of demonstrating that a Rule 35 exam is warranted. Plaintiffs seek no compensatory damages for emotional distress; the submission of Dr. Brown's report does not alter that in any way, and none of the additional conditions that would be required in order to put the Plaintiffs' mental states in controversy are present. Defendants have further failed to make the requisite showing of good cause. Defendants' motion should therefore be denied.

### a. Plaintiffs Have Not Placed Their Mental States in Controversy.

The information Defendants seek to obtain through the compelled mental examination of the minor Plaintiffs is not relevant to this case, much less "in controversy" for purposes of Rule 35. Plaintiffs do not seek to recover monetary damages at all, but instead pursue only injunctive and declaratory relief, as well as nominal damages. [DE 13] at 29, ¶¶ 1-3. Indeed, they do not even allege that they have suffered from emotional distress as a result of Defendants' conduct, much less "unusually severe" emotional distress, or assert that they have been forced to seek medical treatment or psychological counseling as a result of the policy. For those reasons alone, Defendants' motion must fail.[4]

---

[4] The other factors courts have considered relevant in assessing whether plaintiffs' mental states are in controversy are manifestly absent in this case. *See Maha Prabhu*, 2008 WL 2559417, at *2 (listing factors). Plaintiffs do not assert separate claims for intentional or negligent infliction of emotional distress. And as argued in the following section, although they have submitted an expert report, it should not be construed as supporting claims that do not exist.

The Plaintiffs in this case have alleged and will prove that as a result of the CDS dress code which requires them to wear skirts on all days that the uniform is required, they are deprived of equal educational opportunities on the basis of their sex. Specifically, they allege that:

> The requirement that girls wear skirts causes Plaintiffs to suffer physical discomfort and restricts their mobility, both during periods of academic instruction and during recess or other recreational activities. Boys do not suffer the same restriction on their mobility or comfort. The Uniform Policy requiring girls to wear skirts is based on impermissible sex stereotypes—specifically, the notion that skirts promote "traditional values," "mutual respect" and "chivalry." This justification reflects overly broad generalizations about what constitutes appropriate "feminine" behavior and conduct for girls. The requirement that girls wear skirts reinforces these same archaic sex role stereotypes, and burdens girls with restrictions of their freedom of movement that boys do not suffer.

[DE 13] ¶¶ 172-73. The Complaint further alleges specific harms experienced by each Plaintiff as a result of being forced to wear skirts. *See id.* at ¶¶ 53-59, 67, 69-73, 76-82.[5] For example, the Complaint alleges that I.B. "frequently cries in the mornings because she does not want to wear a skirt" and she "has refrained from doing cartwheels when her male friend was doing them during recess because she knew her skirt would fly up." *Id.* ¶¶ 68, 70. K.B. alleged that when she was at CDS she refrained from playing soccer during recess "because the movement allow[ed] more of her legs to show and she [did] not want to be teased by the boys or reprimanded by a teacher for lacking modesty." *Id.* at ¶ 79.

---

[5] Plaintiffs have elaborated on these harms at length and in great detail in their responses to Defendants' interrogatories. These responses, too, reference no psychological harms, and make clear that the injuries claimed relate to the dignitary harms of being subjected to discrimination and the impact on Plaintiffs' educational opportunities rather than on their individual psychological condition. *See* Declaration of Lenor Marquis Segal, ¶ 8; Exhibit E (Plaintiffs' Reponses and Objections to Defendants' First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions to Plaintiffs at 10-12, response to Interrogatory 15).

13

The harms alleged in this case are fully cognizable. *See Parents Involved in Community Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *Heckler v. Matthews*, 465 U.S. 728 (1984); *Faulkner v. Jones*, 10 F.3d 226, 228 (4th Cir. 1993); *Women's Equity Action League v. Cavazos*, 879 F.2d 880, 885 (D.C. Cir. 1989); *Doe ex rel. Doe v. Vermillion Parish Sch. Bd.*, 421 Fed. App'x 366, 372-74 (5th Cir. 2011). However, they do not rise to the level of placing Plaintiffs' psychological conditions "in controversy" sufficient to merit the intrusive and burdensome violation of personal privacy implicated by a forced psychological examination. The harms Plaintiffs suffer as a result of the CDS dress code are the *per se* harms of being subjected to discriminatory treatment and archaic and limiting sex stereotypes at school, rather than the "specific psychiatric injury or disorder" that courts have considered sufficient to trigger Rule 35's "in controversy" requirement. *See Winstead*, 315 F.R.D.at 615 (Rule 35 examination not warranted even in cases claiming damages for the common "garden variety" emotional distress "that normally accompanies … discrimination"). The information Defendants seek to obtain on the Plaintiffs' mental conditions and the impact of Defendants' conduct on those conditions is therefore entirely irrelevant to the claims and defenses asserted in this case.

If Defendants had any doubt as to whether Plaintiffs sought to recover for emotional distress, the deposition testimony provided by the Plaintiffs' Guardians should have eliminated it. For example, the following exchange took place in Guardian ad litem Bonnie Peltier's deposition:

> Q: Ms. Peltier, has A.P. been harmed in any sense by having to conform to the CDS uniform code?
>
> A: Can you define harmed? I'm not sure what you mean by that.
>
> Q: Injured, harmed. I don't mean physically injured, perhaps psychologically. Has there been any harm she has suffered as a result of having to comply with the code, uniform code?

A: I'm not sure how to answer that. She is subject to a dress code policy that I feel is—

Q: I'm not asking about what you feel.

MS. SEGAL: She was still finishing.

A: In my opinion it just reinforces gender stereotypes. It's teaching her something I would not teach her myself. So in that sense, yes.

BY MR. FLETCHER:

Q: Have you seen any evidence of any psychological trauma that she suffered as a result of that?

A: No.

Q: Has she suffered any physical injury as a result of complying with the dress code?

A: I don't think so.

Peltier Dep. Tr. 48:7-49:3. Later, when asked whether she wanted to provide any clarification of

her testimony, Ms. Peltier further stated as follows:

A: I just really feel like you had asked if AP was harmed by this and I just feel like she wasn't physically harmed, but she should not be subjected to these antiquated gender stereotypes, and I feel that that is harmful in itself. So in that manner I guess I feel she's been harmed.

Q: What evidence do you have of that harm? I mean, you stated that you feel like she's been harmed, but do you have any concrete evidence of that?

A: Well, she's a child now and I can't say how this will harm her in the future. You know, I don't know.

Q: Has—I'm not trying to get into the medical issues, but you haven't consulted with a physician over this, have you?

A: No.

*Id.* at 66:2-16.

This exchange establishes incontrovertibly that Ms. Peltier does not claim that her

daughter (Plaintiff A.P.) is suffering from any psychological harm, has not sought related

medical treatment, and is not seeking to recover anything whatsoever by way of damages for

15

psychological harms.  Defendants' position that the Plaintiffs' mental states are at issue is thus flatly contradicted by the depositions that they themselves conducted.[6]

Because the Defendants' request is unauthorized by Rule 35 itself, it is not surprising that it is entirely unsupported by any relevant authority.  Indeed, Defendants cite no case in which a compelled mental examination has been authorized absent *both* an allegation of emotional distress *and* a claim for related compensatory damages.[7]  Indeed, Plaintiffs' own research has discovered no such case, nor have they located *a single* case granting a Rule 35 motion in an analogous context: a civil rights action seeking only prospective declaratory and injunctive relief and nominal damages.  The Court should not take the unprecedented step of authorizing a Rule 35 exam here.

---

[6] Defendants' counsel chose not to pursue a similar line of questioning relating to emotional or psychological harms in the depositions of I.B. or K.B.'s Guardians, despite being free to do so. In any event, those depositions confirm that like A.P., the other two Plaintiffs do not seek to recover any compensatory damages in connection with the Defendants' use of the challenged policy. *See* Brown Dep. Tr. 24:3-18 (responding in the negative to questions related to whether she was seeking to recover money damages from CDS); Booth Dep. Tr. 19:16-18; 32:7-8 (same).

[7] In fact, Defendants cite only two cases in support of their position, both of which are inapposite.  In *Smith v. Bd. of Governors of the Univ. of N. Carolina*, No. 7:08-CV-30D, 2008 WL 4877131, at *2 (E.D.N.C. Nov. 10, 2008), a race discrimination case brought under Title VII, the Eastern District of North Carolina found that a mental examination was warranted. However, in that case, the Plaintiff had sought $300,000 in damages for emotional anguish and distress, and conceded that her mental state was at issue. *Id.* at *1-3.  Here, Plaintiffs do not plead emotional distress or seek money damages—and obviously, make no similar concession. In *Goodman v. Harris County*, 571 F.3d 388 (5th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010), a civil rights claim concerning a police shooting of an unarmed bicyclist, the Fifth Circuit held with little discussion that it was not an abuse of discretion for the district court to have ordered a mental examination of the defendant; the court relied on the fact that the defense was based upon an assessment of the *plaintiff's* mental state—thus, the requested exam would "level the playing field." *Id.* at 399.  The court further found it relevant that the defense depended entirely upon the defendant's own testimony concerning the events precipitating the shooting.  The holding in *Goodman* thus has no perceptible bearing on the instant case.

16

**b. Dr. Brown's Report Does Not Place Plaintiffs' Mental States in Controversy.**

The submission of Dr. Brown's expert report in no way alters the nature of the Plaintiffs' claims for injunctive and declaratory relief. Indeed, in asserting that Dr. Brown's report has placed the Plaintiffs' mental states in controversy, Defendants distort both Dr. Brown's own words and the report's fundamental purpose.

First, Defendants mischaracterize Dr. Brown's statement by quoting it out of context. According to Defendants' brief, "Dr. Christia Spears Brown, stated in her expert report that the Uniform Policy has 'negative academic, social, and psychological consequences' *for the Plaintiffs and, for that matter, all of the students at Charter Day School*." [DE 62] at 3 (emphasis added). Dr. Brown's full statement actually reads as follows:

> Requiring gender-differentiated uniforms artificially increases the distinction between boys and girls. Practices that enhance gender distinctions, in turn, increase gender stereotypes. **These increases in gender stereotypes lead to negative academic, social, and psychological consequences** *for children*.

Spears Brown Rep. at 3-4 (emphasis added) [DE 60-1]. From this context, it is clear that her conclusions refer to the anticipated psychological impact of gender-based distinctions, such as the requirements in the CDS uniform that girls wear skirts, on children *in general*, and not on the three individual Plaintiffs—or even the students at CDS—in particular. Dr. Brown's report expands on this key point in the body of the report, which contains a thorough analysis of many studies in the academic literature that demonstrate just that, and reiterates it in the conclusion. *Id.* at 6, 14. Defendants' attempt to mislead the Court by selectively quoting this language out of context must be rejected.

It is amply clear from this context that the purpose of Dr. Brown's report is to present findings and conclusions on the psycho-social impact of gender-based distinctions on school children based on a review of the relevant literature, rather than to offer a clinical evaluation of

17

the individual Plaintiffs' mental states.  Dr. Brown prefaces her primary conclusions with a statement that "the evidence presented in this report is based on research primarily from developmental psychology, social psychology, and education."  *Id*. at 3.  Drs. Duncan-Hively and Hively were free to attempt to debunk Dr. Brown's conclusions based upon their own literature review, but have apparently declined to do so.  Furthermore, Defendants' exposition on the purported flaws in Dr. Brown's methodology, Def. Br. [DE 62] at 6, in addition to being completely irrelevant in the context of the instant motion, are entirely misplaced, given that she in no way purported to conduct an individual psychological assessment of the individual Plaintiffs.  Regardless, the opinions expressed in her report based on her literature review in no way put the Plaintiffs' mental conditions in controversy.

While submission of an expert report is among the factors that courts have considered in evaluating whether the plaintiff's mental state is "in controversy," in each of those cases, unlike in this case, the expert report was submitted in support of an underlying claim for emotional distress in which the Plaintiffs sought significant money damages for specific harms they claimed to have suffered as a result of the defendant's conduct.  *See, e.g.*, *Simpson v. Univ. of Chicago*, 220 F.R.D. 354, 362 (D. Colo. 2004) (Rule 35 motion granted where plaintiff sought damages for PTSD, stated her intention to present expert testimony regarding emotional injuries, and conceded that she had placed her mental health in controversy); *Gaines-Hanna v. Farmington Pub. Sch.*, No. 04-CV-74910-DT, 2006 WL 932074, at *9 (E.D. Mich. Apr. 7, 2006) (authorizing mental examination where plaintiff "alleged unusually severe emotional distress," sought money damages for related medical and psychological treatment, and offered medical expert testimony in support of her damages claims).  As discussed above, such an underlying claim is absent here, and Plaintiffs seek only nominal damages and injunctive and declaratory

relief. Relying on Dr. Brown's report to impute a claim to recover for clinical psychological harm would distort the Complaint beyond recognition.

### 3. Defendants Fail to Show Good Cause to Compel the Minor Plaintiffs to Submit to a Mental Exam.

Defendants' motion should be denied for the independent reason that they fail to satisfy the separate burden of demonstrating good cause. As discussed above, the Plaintiffs have suffered and continue to suffer harms as a result of the policy; however, they have not alleged, nor would they argue now, that the policy has caused emotional harm that rises to a level beyond that typically found in sex discrimination cases—namely, the "garden variety" distress of being subject to unequal treatment, *see Winstead*, 315 F.R.D. at 615, for which they seek no compensatory damages. Good cause does not exist to seek information that Defendants cannot even demonstrate is relevant, much less genuinely "in controversy."

Moreover, Defendants cannot show "necessity," as they could easily have obtained any relevant information through other means. Here, Defendants declined to even conduct depositions of the minor Plaintiffs, despite several offers by Plaintiffs' counsel to make them available and discuss appropriate procedures for conducting them. Declaration of Lenor Marquis Segal, ¶¶ 4, 5; Exhibits A and B. Defendants assured counsel that they were not interested in deposing the children. Declaration of Lenor Marquis Segal, ¶ 4; Exhibit A. While Defendants posed questions of A.P.'s Guardian, Ms. Peltier, related to the existence of emotional distress claims, they failed to pursue the same line of questioning of I.B. and K.B.'s Guardians. Nor did Defendants propound any interrogatories on the subject of emotional or psychological harm. *See* Declaration of Lenor Marquis Segal, ¶ 8; Exhibit E. They should thus hardly be heard now to protest that they did not have ample opportunity to probe on the issue of the Plaintiffs' mental states through less intrusive means.

It is also relevant that the extensive, detailed responses the Plaintiffs provided to the interrogatories Defendants did pose were not even included in the list of materials reviewed by Defendants' experts. Had they reviewed them, it would have further confirmed that Plaintiffs' present mental states have no bearing whatsoever on this case. The Defendants' purported need to subject the minor Plaintiffs to a forced mental exam is thus entirely manufactured.

Finally, Plaintiffs must address Defendants' reference to K.B.'s learning disability and history of abuse and neglect in her early childhood—information to which they only have access at all because they were supposed to be nurturing and educating her—in support of their demand that she be subjected to a mental examination. This argument is inappropriate and prejudicial. Again, neither K.B. nor any of the other minor Plaintiffs seeks damages in connection with any psychological harms caused by the challenged policy. Accordingly, determination of causation as to any psychological or educational issues that K.B. may presently experience is not remotely relevant to the claims and defenses in this case. Plaintiff K.B.'s experiences with the Uniform Policy are detailed not only in the discovery responses, but also in her blog post, produced in this matter. *See* Declaration of Lenor Marquis Segal, ¶ 9; Exhibit F.

There is no need to conduct a mental examination of K.B. Defendants' misuse of this child's painful history in the service of their meritless motion borders on retaliatory, and could even be considered sanctionable.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Compel a Mental Examination must be denied.

20

Respectfully submitted this the 21st day of December, 2016.

ELLIS & WINTERS LLP

/s/ Lenor Marquis Segal
Lenor Marquis Segal
NC State Bar No. 43445
Post Office Box 33550
Raleigh, NC 27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010
lenor.marquissegal@elliswinters.com
Local Civil Rule 83.1 Counsel

AMERICAN CIVIL LIBERTIES UNION OF NORTH
CAROLINA LEGAL FOUNDATION

/s/ Christopher A. Brook
Christopher A. Brook
NC Bar No. 33838
Legal Director, American Civil Liberties Union
of North Carolina Legal Foundation
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: (919) 834-3466
Facsimile: (866) 511-1344
cbrook@acluofnc.org

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

/s/ Galen Sherwin
Galen Sherwin
(LR 83.1(a) *special appearance*)
Lenora M. Lapidus
(LR 83.1(a) special appearance)
Amy Lynn Katz
(LR 83.1(a) *special appearance*)
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2615
llapidus@aclu.org
gsherwin@aclu.org
wrp_ak@aclu.org
*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Lenor Marquis Segal
*Attorneys for Plaintiffs*