IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:16-CV-30-H(2)

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as Guardian of I.B., a minor child; and PATRICIA BROWN, as Guardian of K.B., a minor child,

Plaintiffs,

v.

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER; CHAD ADAMS; SUZANNE WEST; COLLEEN COMBS; TED BODENSCHATZ; and MELISSA GOTT in their capacities as members of the Board of Trustees of Charter Day School, Inc.; and THE ROGER BACON ACADEMY, INC.,

Defendants.

**ORDER**

This matter is before the court on Plaintiffs' Motion for Appropriate Relief [DE #76], in which Plaintiffs seek an order striking Defendants' expert report and imposing sanctions in the form of reasonable attorneys' fees and costs against Defendants' former counsel. Defendants filed a response in opposition to the motion [DE #84]; Plaintiffs replied [DE #92]; and, on July 14, 2017, a hearing was held on the motion. At the court's direction, the parties submitted supplemental briefing following the hearing [DE #129 & #132].

## BACKGROUND

Plaintiffs are current or former students of Charter Day School, a co-educational, K-8 public charter school in Brunswick County, North Carolina. They brought this action challenging the school's uniform policy, which requires female students to wear "skirts, skorts, or jumpers" and male students to wear shorts or pants. Plaintiffs allege that the school's gender-based uniform

policy subjects them to archaic stereotypes concerning appropriate behavior and conduct for girls, reinforcing the notion that girls, but not boys, must dress and behave modestly, that they are less physically active than boys, and that girls should behave and dress in a manner that is otherwise traditionally considered appropriately feminine. (*See, e.g.*, Am. Compl. [DE #13] ¶ 153.)

Plaintiffs claim the uniform policy violates federal and state law. Specifically, Plaintiffs assert the following causes of action: (1) sex-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, brought via 42 U.S.C. § 1983; (2) sex-based discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* and implementing regulations; (3) sex-based discrimination in violation of the Equal Protection Clause in Article I, Section 19 of the North Carolina Constitution; (4) breach of the Charter Agreement between the State Board of Education and Charter Day School; and (5) breach of the management agreement between Charter Day School and The Roger Bacon Academy, Inc.

On December 7, 2016, Defendants, represented by the law firm Fletcher, Toll & Ray, moved to compel mental examinations of the minor children pursuant to Rule 35 of the Federal Rules of Civil Procedure [DE #60]. By order entered January 6, 2017, the court denied the motion, concluding:

> Plaintiffs have not placed their mental conditions in controversy by evidencing any intent to use psychological evidence of their mental state. . . . Plaintiffs have pled no cause of action placing their mental state at issue, and good cause has not been shown for any mental examinations of the minor children.

(Order Denying Rule 35 Exams. [DE #68] at 3-4.)

Prior to the court's ruling, Aaron Lindquist, an associate attorney at Fletcher, Toll & Ray, had advised Plaintiffs that Defendants' expert psychologists would be observing the minor children at the school and interviewing several of Plaintiffs' teachers during the week of January

15, 2017. Within hours of the court's ruling denying Defendants' Rule 35 examinations, Plaintiffs noted their objection to the planned observation and interviews in an email sent to Defendants' counsel:

> As to your experts' planned "observations" at the school, we oppose them, and concede that we likely need magistrate intervention here. Such observations are untimely, as they should have been conducted in advance of the original expert report deadline, but were not. Moreover, given the denial of your Rule 35 motion, we do not perceive any basis for the visits by psychologists. The stated goal of the visit to the school is "direct observation of the children in the educational environment that allegedly is causing harm," and specifically "to document here the harm is located (self-esteem, self-concept, emotional stability, emotional resourcefulness, intellectual functioning, academic skills and abilities)." Duncan Hively & Hively Rep. 2-3. Because the Magistrate Judge's opinion makes clear that emotional distress damages are not at issue in the case, it is our position that no observation of the minor Plaintiffs at school or interviews with their teachers is necessary. Certainly, should the psychologists' visit go forward, any "observations" would need to be cabined within certain parameters (*i.e.*, stipulations that your experts would not approach, interact with, or interview the minor plaintiffs) to prevent them from morphing into back-door Rule 35 examinations.

(Email from Lenor Marquis Segal to Aaron Lindquist sent 1/6/17 at 1:29 p.m. [DE #78-1 at 9].)

Because the Case Management Order entered in this action requires the parties to request a discovery conference prior to filing any discovery motions, Plaintiffs also stated: "Please also let me know whether [Defendants] are still planning on going forward with the 'observations.' If so, we will work with you to contact Judge Swank, as her order directs, to discuss that with her, along with any scheduling issues." (*Id.*)

Lindquist responded as follows:

> The observation is not and never was intended to be a back-door Rule 35 exam. That is why we moved the court for an order compelling the Plaintiffs to submit to a Rule 35 exam. The Doctors will simply be silent observers in the classroom and will observe recess and lunchtime (without interacting with **any** students). The interviews with the teachers are relevant even outside the scope of a mental examination as each Plaintiff's teacher(s) has direct information related to any disciplinary issues, academic performance, etc. The teachers also have a direct knowledge of the class culture and can provide additional insight into the Uniform Policy's effects on the students in general.

> [Charter Day School] is located on privately owned property and the [school] administrators are authorized to allow visitors to observe the classroom and other academic settings. Observations by different groups are actually quite common, so it is not as if any of the students will find the Doctors to be out of the ordinary. We do not think that you have a legitimate basis for objecting to the actual observation. In order to avoid this potential discovery dispute, we will stipulate that there will be no contact between the Doctors and any of the Plaintiffs.

(Email from Aaron Lindquist to Lenor Marquis Segal sent 1/6/17 at 2:33 p.m. [DE #78-1 at 7-8].) Nevertheless, Lindquist made the following proposition:

> If you will stipulate that your[] experts . . . will not testify at trial about any psychological effects, we will have no reason to rebut such a conclusion. Thus, there will be no need for the observation or teacher interviews. We could then move our experts['] flights and try to get the depositions scheduled.

(*Id.* at 7.)

Plaintiffs countered as follows:

> We would stipulate that neither of our experts will be testifying as to any psychological harms to any of our individual plaintiffs or to any student at [Charter Day School] that our experts have observed, as our experts have not and will not examine the plaintiffs or any other [Charter Day School] students. If that is acceptable, please confirm that the observation is unnecessary and will not take place.

(Email from Lenor Marquis Segal to Aaron Lindquist sent 1/6/17 at 4:36 p.m. [DE #78-1 at 7].) By email sent later that evening, Lindquist agreed to Plaintiffs' stipulation and stated that "the observation at [Charter Day School] will not occur." (Email from Aaron Lindquist to Lenor Marquis Segal sent 1/6/17 at 11:14 p.m. [DE #78-1 at 5].)

Notwithstanding the court's denial of the Rule 35 examinations and the parties' stipulation, Defendants arranged for their experts to interview six of Plaintiffs' teachers, as well as the school's assistant headmaster and social worker, and to observe Plaintiffs A.B. and I.B. in their classroom setting via webcams. Baker Mitchell, the founder and owner of the company that manages the school, made the arrangements for both the interviews and classroom observations. Following the

court's ruling on January 6, 2017, Mitchell spoke with Lindquist and the two "developed a plan to have one of the expert witnesses interview Plaintiffs' teachers over the phone." (Decl. Baker A. Mitchell [DE #129-1] ¶ 12.) On Saturday, January 7, 2017, Mitchell sent an email to the headmaster and teachers, stating: "Due to a last minute ruling by a judge in the ACLU law suit, we are having to squeeze in telephone expert interviews with some of the teachers who had the plaintiffs in their classes[.] We must conduct the interviews tomorrow, Sunday . . . . " (Email from Baker Mitchell to Jessica Lopez *et al.* sent 1/7/2017 at 9:39 a.m. [DE #84-1 at 2].) Mitchell also emailed one of Defendants' experts suggesting that he "overnight a laptop" loaded with camera software for use in observing the plaintiffs in their classrooms. (Email from Baker Mitchell to Ann Duncan sent 1/7/2017 at 1:50 p.m. [DE #84-1 at 2].) On January 9, 2017, the day after the Sunday telephone interviews, Mitchell directed that a laptop computer be sent via overnight delivery to Defendants' expert psychologists so they could conduct the classroom observations previously discussed. He notified the experts of his actions by email. (Email from Baker Mitchell to Dr. Wells Hively *et al.* sent 1/9/2017 at 9:05 a.m. [DE #84-1 at 4].) Mitchell copied Lindquist on all of these emails. However, neither Plaintiffs' counsel nor the guardians of the minor children were informed of the interviews or classroom observations prior to receiving Defendants' expert report on January 13, 2017.

Defendants' expert report indicates that "[t]hrough the magic of the Internet, on Thursday, January 12, we were able to observe [Plaintiffs] AP and IB through cameras operating in their classrooms." (Duncan-Hively Expert Rep. [DE #85 at 12].) The experts state the purpose of their observations was to "explore the allegations of freedom of movement and impaired learning styles because of the skirts. Specifically, we were looking for any data that would support or refute the contention that skirt wearing 'deprives the Plaintiffs of the ability to move freely within their

school environment and engage in educational programs . . . in the same manner as boys.'" (Duncan-Hively Expert Rep. [DE #85 at 6-7].) The report summarizes the experts' classroom observations of A.P. and I.B., then "concludes" as follows: "There was no sign that wearing skirts together with leggings inhibited the behavior of either of the plaintiffs or of any of the other girls in their classes." (Duncan-Hively Expert Rep. [DE #85 at 14].)

Upon receiving the Defendants' expert report on January 13, 2017, Plaintiffs' counsel emailed Lindquist, questioning the actions taken in light of the parties' stipulation. (Email from Lenor Marquis Segal to Aaron Lindquist sent 1/13/17 at 4:14 p.m. [DE #78-1 at 5].) Lindquist denied any wrongdoing, stating:

> Your concerns about the planned observation were framed in the context of our experts visiting [Charter Day School] and conducting in-person observations. I stated that our experts were unable to travel to Wilmington and that "observation at [Charter Day School] will not occur." I did not state that our experts wouldn't observe from the comforts of their home in St. Louis. The observation that was conducted was about all of 2 hours, instead of 2 full days of observation at the school.
>
> Every classroom at [Charter Day School] has a camera installed in the room, which is how our experts were able to spend about a total of 1 hour per child observing AP & IB in their respective classrooms. There was absolutely no interaction with the plaintiffs and, in fact, no one even knew they were being observed since every classroom has a camera in it. Your objection to an in-person observation "morphing into back-door Rule 35 examinations" is irrelevant since none of the concerns you raised are present under the circumstances.
>
> The school is controlled by the corporate defendants. The teachers, administrators, and coaches are all employees of the corporate defendants. They all willingly agreed to speak with our experts via the phone this past Sunday and Monday. It is not out of the ordinary for defendants to a lawsuit to have experts visit their facility or talk to the employees. Frankly, it is pretty routine.

(Email from Aaron Lindquist to Lenor Marquis Segal sent 1/13/17 at 5:27 p.m. [DE #78-1 at 4].)

Following this email, counsel for Plaintiffs requested that Defendants join them in requesting a discovery conference to attempt to resolve their disputes. (*See* Email from Lenor

Marquis Segal to Aaron Lindquist sent 1/16/17 at 11:16 a.m. [DE #78-1 at 3].) Lindquist refused, stating:

> I am sorry you feel that this cannot be resolved by the meet-and-confer process. Frankly, I'm not sure why you feel that way as you have not proposed any potential resolutions to this issue. Since you feel that this is an issue, make a proposal for resolving this. We will consider your proposal, but will not make any proposals since we do not feel as though we have acted in a deceptive manner.
>
> You did not agree to my stipulation, which was a broad request that Dr. Spears-Brown not testify about **<u>any</u>** psychological effects. You stipulated "that neither of our experts will be testifying as to any psychological harms to any of our individual plaintiffs or to any student at [Charter Day School]" and stated that Dr. Brown would testify as to what is in her report, which concludes that gender stereotypes have "negative academic, social, and psychological consequences." The difference in my initial stipulation, which you rejected and countered, is vast. In light of the reduced scope of your stipulation and because our experts were unavailable to travel, we agreed that our experts would not travel to conduct in-person observations at [Charter Day School]. We did not agree that we would not interview the teachers.
>
> We aren't going to go into a trial where you put your expert on the stand to testify about the possible negative effects in the abstract without some kind of rebuttal. That would be highly prejudicial to our clients' case. We simply chose to leave the abstract world of research papers and dig into the specific facts, which are frankly more probative and likely to assist the trier of fact in this specific case. You may not like the direction we chose to rebut your experts, but you do not get to dictate our trial strategy.
>
> There was no stated opposition to our experts using a webcam to view AP and IB's classrooms. You objected to an in-person visit. This isn't as if we broadcast images of these children across the web to random parties. These are our expert witnesses. Though, I would like to note that the ACLU of NC and the national foundation put a picture of KB up on their respective websites along with information about where she goes to school. That photo and the accompanying blog post are still available to the world at large. Additionally, there are many different third-parties who come to observe at [Charter Day School] with regularity. In fact, my wife (and her classmates) went and observed at [Charter Day School] when she was student teaching almost 10 years ago.
>
> We do **<u>NOT</u>** consent to your discovery conference motion and will object. It is our position that you have failed to actually meet and confer by failing to propose any resolutions to this dispute.

(Email from Aaron Lindquist to Lenor Marquis Segal sent 1/16/17 at 1:53 p.m. [DE #78-1 at 2-3].)

On January 17, 2017, Plaintiffs filed a motion, pursuant to Section E of the Case Management Order entered in this action, for a discovery conference and informed the court of the events and communications that had transpired since the court's denial of Defendants' Rule 35 motion. (*See* Pl.'s Mot. Expedited Judicial Conf. [DE #70].) In light of the issues raised and in accordance with the Case Management Order, the court directed Plaintiffs to file any appropriate motions. Plaintiffs thereafter filed the motion presently before the court in which they request that Defendants' expert report be stricken in its entirety and that counsel for Defendants be required to pay their reasonable attorneys' fees and expenses.

On July 14, 2017, a hearing was held on Plaintiffs' motion at which time the court ordered supplemental briefing. On July 21, 2017, Fletcher, Toll & Ray moved to withdraw as counsel for Defendants due to a non-waivable conflict of interest. (Mot. Withdraw [DE #108].) The court allowed counsel's motion on August 7, 2017 (Order Allowing Mot. Withdraw [DE #118]). Defendants have since secured new counsel, and the parties have each submitted supplemental briefing as directed at the July 14, 2017, hearing of this matter.

**DISCUSSION**

Attorneys appearing before this court owe a duty of candor to the court and to opposing counsel. *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993); *see also* Local Civil Rule 83.1(i) (E.D.N.C. Dec. 2016) (adopting North Carolina Revised Rules of Professional Conduct as ethical standard governing practice before the court); N.C. Rev. R. Prof. Conduct 3.3 (Candor Toward the Tribunal), 3.4 (Fairness to Opposing Party & Counsel). As the Fourth Circuit has explained:

> [L]awyers, who serve as officers of the court, have the first line task of assuring the integrity of the [judicial] process. Each lawyer undoubtedly has an important duty of confidentiality to his client and must surely advocate his client's position vigorously, but only if it is truth which the client seeks to advance. The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end. . . . [T]he lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit. *See* 1 Geoffrey C. Hazard, Jr. and W. William Hodes, *The Law of Lawyering* 575–76 (1990) ( "[W]here there is danger that the tribunal will be misled, a litigating lawyer must forsake his client's immediate and narrow interests in favor of the interests of the administration of justice itself.").

*Shaffer Equip*., 11 F.3d at 457–58. Moreover, Rule 4.1 of the Revised Rules of Professional Conduct expressly prohibits attorneys from knowingly making false statements of material fact to a third person. N.C. Rev. Rule Prof. Conduct 4.1 (Truthfulness in Statements to Others). Such misrepresentations include "misleading statements or omissions that are the equivalent of affirmative false statements." *Id.* cmt. 1.

Federal district courts have the inherent power to sanction bad faith litigation conduct. *Shaffer Equip.*, 11 F.3d at 462. This inherent power, which must be exercised with great caution and restraint, includes the authority to "issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions." *Id.* Any sanctions imposed should be fashioned to serve the dual purpose of remedying any harm caused by the abusive litigation conduct and insuring the orderly administration of justice and the integrity of the courts. *See id.* at 463. Thus, punitive measures may be imposed to deter future misconduct but should not be more severe than reasonably necessary. *Id.* at 461-63 (affirming district court's finding of ethical breach but vacating judgment and remanding for court's consideration of sanction less severe than dismissal of action).

The parties do not dispute that Defendants' former counsel breached their ethical obligations. In response to Plaintiffs' motion, Fletcher, Toll & Ray admits that Lindquist violated his duty of candor, an ethical breach for which the firm is responsible. They further concede that Plaintiffs were misled by Lindquist's statements to Plaintiffs' counsel, though the firm maintains that the misrepresentations were the result of negligence and not intentionally made. (Resp. Mot. Appropriate Relief [DE #84] at 3-5.) Defendants assert that it was not the firm's intent, at any time, to violate the letter or spirit of the court's order denying their Rule 35 motion, but rather their plan was to find alternative means of obtaining the information. (*Id.* at 8.) While Mitchell shared with Lindquist his suggestion that they use cameras existing in the classroom to have their experts observe the children, Defendants maintain that Lindquist did not pass this along to Plaintiffs' counsel or the lead attorney representing Defendants (who was on leave due to a medical condition) and that Lindquist further failed to inform Mitchell of his communications with Plaintiffs' counsel, including their stipulation that the "observation at [Charter Day School] will not occur." (*Id.* at 7.) Fletcher, Toll & Ray, as well as Defendants' current counsel, ask that the court not penalize their clients by excluding their experts' report. Fletcher, Toll & Ray characterizes the events as a "perfect storm" of circumstances (*Id.* at 5.) They urge the court to consider "the mitigating circumstances of the medical and mental condition of the lead counsel," the inexperience of Lindquist (who had been practicing law just over a year), and "the unintentional consequences of the non-communication" in fashioning a sanction that will not affect or impede Defendants' ability to defend this action. (*Id.* at 8-9.)

Contrary to Defendants' assertions, the information provided to the court does not support a finding that Lindquist's misrepresentations were the result of simple negligence. Mitchell's testimony is that he and Lindquist discussed the court's January 6, 2017, order denying the Rule

35 motion and that Lindquist informed Mitchell that the order prohibited "an interactive, in-person examination of Plaintiffs." (Mitchell Decl. ¶ 11.) They discussed other options for obtaining the mental health information sought by their Rule 35 motion and "developed a plan to have one of the expert witnesses interview Plaintiffs' teachers over the phone." (Mitchell Decl. ¶ 12.) While it is unclear whether this "plan" was developed before or after Lindquist entered into the stipulation with Plaintiffs' counsel, Mitchell copied Lindquist on the Saturday, January 7th emails scheduling the teacher interviews for the following day, as well as the Monday, January 9th email in which he advised the experts that a laptop computer was being sent via overnight delivery so they could conduct the classroom observations remotely. The remote observations were not conducted until five days later, on January 12, 2017. Yet, Lindquist never advised Mitchell or Defendants' experts of the parties' January 6th stipulation that no classroom observations or teacher interviews would be conducted.

Upon receiving the experts' report on January 13, 2017, Plaintiffs learned about the classroom observations and emailed Lindquist asking him to explain. Lindquist did not claim to be unaware of Mitchell's actions or apologize for having not communicated the stipulation to Mitchell. Rather, Lindquist defended their actions in conducting the observations, claiming that he only agreed that the observations would not occur ***at*** the school – "I did not state that our experts wouldn't observe from the comforts of their home in St. Louis." (Email from Aaron Lindquist to Lenor Marquis Segal sent 1/13/17 at 5:27 p.m. [DE #78-1 at 4].) He further justified the teacher interviews on the basis that the teachers are employees of the corporate defendants and willingly agreed to speak with Defendants' experts. (*Id.*) When informed that Plaintiffs would be requesting a discovery conference to address the matter, Lindquist insisted, "There was no stated opposition to our experts using a webcam to view AP and IB's classrooms. You objected to an in-person

visit." (Email from Aaron Lindquist to Lenor Marquis Segal sent 1/16/17 at 1:53 p.m. [DE #78-1 at 2].) Even now, Defendants maintain they never agreed they would not perform teacher interviews despite Lindquist's offer that "there will be no need for the observation *or teacher interviews*" if Plaintiffs would stipulate their expert would not testify about any psychological effects (email from Aaron Lindquist to Lenor Marquis Segal sent 1/6/17 at 2:33 p.m. [DE #78-1 at 7] (emphasis added)) and Lindquist's subsequent email stating that Plaintiffs' counterproposal, modifying the scope of the psychological testimony "is agreed to" (email from Aaron Lindquist to Lenor Marquis Segal sent 1/6/17 at 11:14 p.m. [DE #78-1 at 5]). At the very least, this evidence establishes that Lindquist acted with deliberate indifference to or with willful disregard for the consequences of his actions.

Subsequent to the withdrawal of Fletcher, Toll & Ray, Defendants' present counsel submitted supplemental briefing in accordance with this court's instructions at the hearing on July 14, 2017. They contend that Defendants relied, in good faith, on their former counsel's advice in conducting the classroom observations and teacher interviews and that their conduct did not violate federal law governing student privacy. (Defs.' Suppl. Brief Mot. Appropriate Relief [DE #129 at 3].) Thus, it is asserted that "[t]he proper remedy as to Defendants [would be] to strike the portion of the January 2017 expert report that relies on remote observations of Plaintiffs." (Defs.' Suppl. Brief Mot. Appropriate Relief [DE #129 at 4].) They argue that any monetary sanctions, if imposed, "should run against former counsel alone for their own admitted conduct, none of which should be attributed to Defendants." (*Id.* [DE #129 at 3].)

Whether a court should impose sanctions against a party for his attorney's misconduct is not settled either by case law or this court's local rules. *See* Local Civ. R. 11.1 (E.D.N.C. Dec. 2016) ("If an attorney or any party fails to comply in good faith with any local rule of this court,

the court in its discretion may impose sanctions.") Under principles of agency law, clients are generally bound by their attorneys' actions. *Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 409 (4th Cir. 2010) ("[A] party voluntarily chooses his attorney as his representative in the action, and, thus, he cannot later 'avoid the consequences of the acts or omissions of this freely selected agent.'" (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962)). "Under this formulation of the attorney-client relationship, a "district court[ ] [has the] discretion to impose . . . sanctions [against the client] without a finding that [the client] acted in bad faith or was herself guilty of willful misconduct.'" *Smith v. Bank of Stanly*, No. 1:09-CV-951, 2014 WL 5034732, at *3 (M.D.N.C. Oct. 8, 2014) (alterations in original) (quoting *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 817 (8th Cir. 2001)). As the court noted in *Bank of Stanly*, guidance from the Fourth Circuit suggests that federal district courts have discretion to sanction a party for its attorney's misconduct pursuant to agency law but may decline to do so if the court finds the party "played an insubstantial role in the sanctionable conduct." *Bank of Stanly*, 2014 WL 5034732, at *4.

In fashioning appropriate sanctions against Defendants and their former counsel, the court has considered all of the facts and circumstances of the misconduct, including the prejudice to Plaintiffs, the role and culpability of those involved in the misconduct, the need for deterrence, and the effectiveness of available sanctions in remedying the harm to Plaintiffs and deterring future misconduct. The court finds that Defendants played a substantial role in the classroom observations and teacher interviews, but that their actions appear to have been taken in reliance upon counsel's advice or, at the very least, without knowledge of counsel's ethical breach.

As to Defendants, the court determines that an appropriate sanction would be an order aimed at remedying the acts taken by Defendants in contravention of the parties' stipulation. While Defendants argue there was no stipulation concerning the teacher interviews, the court finds

differently. Based upon counsel's email exchange, the court finds that Defendants, upon acceptance of Plaintiffs' counter-stipulation, agreed there would be no classroom observations or teacher interviews conducted. Accordingly, the court determines that it would be appropriate to strike those portions of the experts' January 13, 2017, report that refer or rely upon the experts' classroom observations or teacher interviews and to bar Defendants from offering testimony or opinions by either of their experts as to the classroom observations or teacher interviews.[1]

As to Defendants' former counsel, Fletcher, Toll & Ray, the court finds that a monetary sanction would be appropriate. The court directs Plaintiffs to submit for the court's consideration the information set forth below in support of their request for reasonable attorneys' fees and expenses. Upon receipt of this information and any responses thereto, the court will enter an order setting the amount due as sanctions.

---

[1] In their response to Defendants' supplemental brief, Plaintiffs argue that the teacher interviews also violated the protective order entered in this action. Paragraph 10 of the protective order provides that "[a]ny information tending to reveal the identity of any minor, whether or not a party to this proceeding, shall be designated by each of the Parties as Confidential Information." (Prot. Order [DE #53] ¶ 10.) Paragraph 5 of the order governs disclosure of "[i]nformation or documents designated as 'Confidential.'" Plaintiffs maintain that paragraph 5, as pertinent to the instant motion, prohibits disclosure of information identifying the minor plaintiffs except to "[t]he Parties and their *officers, directors, and members*" unless otherwise agreed, in writing, by all parties. (Prot. Order [DE #53] ¶ 5(a), (i) (emphasis added).) Plaintiffs argue, therefore, that disclosure of such information to teachers of the school was not authorized because they are not officers, directors, or members. (Pls.' Resp. Defs.' Suppl. Brief [DE #132] at 5-6.)

Defendants and their former counsel have not had an opportunity to address this issue as it was raised for the first time in Plaintiffs' Response to Defendants' Supplemental Brief. On September 28, 2017, Defendants filed a motion for leave to file a reply to address Plaintiffs' argument. (Defs.' Mot. Leave File Reply [DE #134].) Because the court finds that other grounds require that the teacher interviews be stricken from the expert report, the court need not determine, for purposes of the instant motion, whether the teacher interviews violated the protective order. Accordingly, the court denies Defendants' motion for leave to file a reply.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiffs' Motion for Appropriate Relief [DE #76] and ORDERS as follows:

1. The court STRIKES from the January 13, 2017, Pyschological Report authored by Defendants experts Wells Hively, Ph.D., and Ann Duncan-Hively, Ph.D., J.D., any and all portions of the report, including any opinions or conclusions, which summarize, reference or rely upon (i) classroom observations of the minor plaintiffs or other students of Charter Day School; or (ii) teacher interviews conducted by Defendants' experts or either of them. Within twenty (20) days of the date of this order, Defendants shall submit a revised expert report, with appropriate redactions, to Plaintiffs;

2. Defendants shall be barred from offering, eliciting, presenting, or otherwise relying upon (whether at trial or in support of any dispositive motions in this matter) any testimony, statements, or opinions of their experts or either of them, concerning their classroom observations of the minor plaintiffs;

3. Defendants shall be barred from offering, eliciting, presenting, or otherwise relying upon (whether at trial or in support of any dispositive motions in this matter) any testimony, statements, or opinions concerning teacher interviews conducted by their experts or either of them concerning any of the minor plaintiffs;

4. Plaintiffs shall file, within thirty (30) days of the date of this order, an affidavit or affidavits setting forth the attorneys' fees and expenses sought by them in pursuing their motion for appropriate relief, including any time spent complying with this order. Plaintiffs' affidavit(s) shall include, or be accompanied by a supporting memorandum of law containing, such information or documentation as may be necessary for the court to make a determination as to the

reasonableness of the fees and expenses requested. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (party seeking an award of fees must "produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates" are in accord with the prevailing market rates); *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 & n.9 (1983); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978);

5. Defendants and their former counsel, Fletcher, Toll & Ray, shall each have fourteen (14) days from the filing of Plaintiffs' affidavit and any supporting information or documentation to object or otherwise respond thereto; and

6. In due course following the parties' submission of the above items or the expiration of the time for doing so, the court will enter an order determining the amount of sanctions to be imposed against Fletcher, Toll & Ray.

This 28th day of September 2017.

KIMBERLY A. SWANK
United States Magistrate Judge