# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

**Case No. 7:16-cv-30**

BONNIE PELTIER, as Guardian        :
of A.P., a minor child, et al.;         :
                                   :
       Plaintiffs,              :       **PLAINTIFFS' MEMORANDUM**
                                   :       **OF LAW IN SUPPORT OF**
       v.                  :       **SUMMARY JUDGMENT**
                                   :
CHARTER DAY SCHOOL, INC., et al.;    :
                                   :
       Defendants.            :
                                   :

## INTRODUCTION

Plaintiffs A.P., I.B., and K.B. were, when this suit was initiated, students at Charter Day School ("CDS"), a public K-8 charter school in Leland, North Carolina. They challenge the provision of the school's uniform policy that requires them to wear skirts to school, and that prohibits them from wearing pants, because they are girls. Plaintiffs do not contest Defendants' authority to impose a school uniform policy in general, but only the specific provision of the policy requiring girls to wear skirts (the "Skirts Requirement"). The Skirts Requirement forces them to wear clothing that is less warm and comfortable than the pants their male classmates are permitted to wear and, more importantly, restricts Plaintiffs' physical activity, distracts from their learning, and limits their educational opportunities.

According to Baker Mitchell, CDS founder and President of The Roger Bacon Academy, Inc. ("RBA"), which manages and operates CDS, the Skirts Requirement was put into place to promote "traditional" values—that girls and boys are different—and to emphasize "chivalry"— i.e., that girls are more "fragile" and deserving of protection than boys. Plaintiffs' Rule 56.1

Statement ("R56.1 Stmt.") ¶¶ 89-94. Mr. Mitchell's explanation of the justification for the Skirts Requirement is consistent with that of other CDS officials, including its faculty and Board of Directors of Charter Day School, Inc. *Id.* ¶¶ 97-98, 101-04.

Subjecting boys and girls to facially different treatment based on sex stereotypes about what constitutes appropriate behavior for girls is unlawful. Because there are no material factual disputes, Plaintiffs are entitled to summary judgment on all claims as a matter of law.

## SUMMARY OF ARGUMENT

The uniform policy in place at CDS ("Uniform Policy") facially discriminates between boys and girls, requiring girls to wear clothing that is designed to reflect and reinforce "traditional" gender roles. *Id.* ¶¶ 89-98. This violates the Constitution. By requiring girls to wear skirts, Defendants intended to signal to children at CDS, starting in Kindergarten, that boys and girls are different, and specifically, to promote the notion that girls are more "fragile" and deserving of protection than boys. *Id.* ¶¶ 89-98, 102, 104, 166-67. Beyond this rationale, the only other justifications Defendants have offered for the Skirts Requirement are (1) the purported satisfaction of students and parents with the status quo, *id.* ¶¶ 111-12, and (2) justifications for having a uniform policy overall, such as a desire to teach students to respect rules, *id.* ¶ 107. Each of these defenses is insufficient to withstand constitutional scrutiny.

Generalizations about the "'proper place' of women and their need for special protection," *Orr v. Orr*, 440 U.S. 268, 283 (1979), rest on "paternalistic" attitudes about women. that, "in practical effect, put women, not on a pedestal, but in a cage." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973). Justifications for sex-based classifications that rely on overly broad generalizations about men and women are both "stunningly anachronistic," and "illegitimate." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1692-93 (2017). Accordingly, "gender

classifications that appear to rest on nothing more than conventional notions about the proper station in society for males and females have been declared invalid time and again by the Supreme Court." *Knussman v. Maryland*, 272 F.3d 625, 636 (4th Cir. 2001). This clearly-established law requires the same result here, where the justification for the Skirts Requirement sounds in sex stereotypes regarding chivalry and girls' purported "fragility." Nor is there evidence that the Skirts Requirement promotes professionalism or fosters respect between peers—such justifications themselves rest on antiquated notions of appropriate dress for women and men, and on harmful attitudes that blame men's disrespectful or violent treatment of women on women's attire.

The Skirts Requirement is the type of archaic classification, used "to create or perpetuate the legal, social, and economic inferiority of women," that has been long-prohibited by the Supreme Court. *United States v. Virginia*, 518 U.S. 515, 534 (1996). The Skirts Requirement was not only intended to model "traditional gender roles," but has also had its intended effect, placing a particular burden on female students at CDS. As Plaintiffs and their parents/Guardians ad Litem have testified, Plaintiffs find skirts less comfortable on a daily basis and less warm in the wintertime than pants. R56.1 Stmt. ¶¶ 179-257; *see also id.* ¶¶ 123-126, 154-164. The Skirts Requirement forces them to pay constant attention to the positioning of their legs during class, thus distracting them from learning, and has led them to avoid certain activities altogether, such as climbing or playing sports during recess, all for fear of exposing their undergarments and being reprimanded by teachers or teased by boys. *Id.* ¶¶ 123-153, 179-257. The Skirts Requirement also sends them a clear message that their comfort and freedom to engage in physical activity are less important than those of their male classmates, *id.* ¶¶ 165-258—harms against which the guarantee of equal protection stands as a bulwark.

Defendants' remaining justifications are equally invalid. Parental support for the Skirts Requirement, even if held by a majority, is not sufficient to justify a discriminatory policy, as "estimates of what is appropriate for *most women*" do not justify imposition of those preferences on all women. *Virginia*, 518 U.S. at 550 (emphasis in original); *see also Arnold v. Carpenter*, 459 F.2d 939, 943 (7th Cir. 1972) (ratification of gendered grooming code by students did not save it from constitutional infirmity). Nor is the Skirts Requirement justified by the principles underlying the Uniform Policy more generally—instilling discipline, student learning, and a sense of team spirit—as the same goals could be achieved by a uniform policy that permitted girls to wear pants. Indeed, there is evidence that the Skirts Requirement actually detracts from student learning by fostering sex stereotypes and restricting students' mobility. There is therefore no relationship, much less the "substantial" one required by the Supreme Court, *see Virginia*, 518 U.S. at 532-33, between the Skirts Requirement and the achievement of any of Defendants' purported goals.

Plaintiffs are also entitled to summary judgment on their Title IX claims. In requiring different clothing for boys and girls, the Skirts Requirement constitutes *per se* "discrimination" on the basis of sex under Title IX. This conclusion comports with the plain meaning of the statute as well as its purpose, to root out stereotypes like those embodied in the Skirts Requirement and guarantee women and girls full and equal opportunity in education. And it comports with Title IX regulations that expressly prohibit the application of differential "rules of behavior, sanctions, or other treatment" based on sex, 34 C.F.R. § 106.31 (b)(4) (2017), 7 C.F.R. § 15a.400(b)(4) (2017). The discriminatory effects of the Skirts Requirement have further resulted in the denial of equal educational opportunity to Plaintiffs—who find themselves uncomfortable, cold, and distracted in class, and unable to participate equally in physical activity

during recess for fear of exposure, reprimand, and teasing. In short, the Skirts Requirement is precisely the type of discriminatory treatment that Title IX was designed to prevent.

Expert testimony further bolsters Plaintiffs' first-hand accounts of their experience, demonstrating that the Uniform Policy is an outlier compared to local and national standards for school uniforms, and is out of touch with current societal norms that treat pants as a commonplace and accepted form of attire for women. R56.1 Stmt. ¶¶ 69, 121 & Ex. 20. This testimony highlights the potential long-term, harmful consequences of the Skirts Requirement on female students, including restricting their physical activity and perpetuating the perception that girls are less physically active than boys. R56.1 Stmt. ¶ 152. Sex classifications in schools foster inter-group stereotypes and bias, which can lead to negative academic, social, and psychological consequences for children, including by impacting their self-concept, confidence, interest, and motivation about their science and math abilities. *Id.* ¶ 172. Differentiating by sex, including through gender-differentiated dress codes, can also harm female students' academic performance, particularly in STEM fields. *Id.* ¶¶ 173-77. Taken together, the record shows the discriminatory effects of the Skirts Requirement, not only on Plaintiffs, but potentially on all female students at CDS.

Plaintiffs are entitled to summary judgment on their state law claims as well. Because Defendants cannot justify the policy under the heightened level of scrutiny applicable under the federal Equal Protection Clause, they also fail to meet the more exacting standard triggered by denial of equal educational rights under the North Carolina Constitution. *Sneed v. Greensboro City Bd. of Ed.*, 299 N.C. 609, 618, 264 S.E.2d 106, 114 (1980).

Defendants' violation of Title IX and the Constitution, moreover, represents a breach of both the CDS Charter Agreement, entered into between Charter Day School, Inc. ("CDS, Inc.")

and the North Carolina Board of Education, and the management agreement between CDS and

Roger Bacon Academy, both of which require, *inter alia*, full compliance with federal and state

civil rights laws, including Title IX and the state and federal Constitutions. R56.1 Stmt. ¶¶ 24,

271-78, 281, 324-27. As public students in North Carolina, Plaintiffs are the direct and intended

beneficiaries of these contractual provisions and accordingly enjoy the ability to enforce those

contracts through an action for breach. *See Holshouser v. Shaner Hotel Grp. Props. One Ltd.

P'ship*, 134 N.C. App. 391, 399-400, 518 S.E.2d 17, 24–25 (1999), *aff'd*, 351 N.C. 330, 524

S.E.2d 568 (2000). A finding of a violation of Title IX and the federal and state Constitutions

necessitates a finding that Defendants have breached those contractual provisions. Plaintiffs are,

therefore, entitled to summary judgment on all claims.

## STATEMENT OF FACTS

## I. FACTUAL BACKGROUND

### A. The CDS/RBA Skirts Requirement and Defendants' Justifications

Plaintiffs, minors A.P., I.B., and K.B., were all students enrolled at CDS at the time the

suit was instituted. R56.1 Stmt. ¶¶ 4-13. I.B. and A.P. remain students at the school.[1] *Id.* ¶¶ 6, 10.

Because they are minors, Plaintiffs bring this case through their parents, who have been

appointed their Guardians ad Litem for purposes of this litigation. *Id.* ¶¶ 7, 11, 15. Plaintiffs'

Guardians Ad Litem ("GALs") chose to send their children to CDS because it offers unique

---

[1] A.P. was a 5-year-old Kindergarten student when this case was initiated; she is currently in the Second Grade. R56.1 Stmt. ¶¶ 4-6. I.B. was a 10-year-old Fourth Grade student when this case was initiated; she is currently in the Sixth Grade, and has attended CDS since she was in Kindergarten. *Id.* ¶¶ 8-10. K.B. was a 15-year-old Eighth Grade student when she brought this action, and attended CDS from the First through the Eighth Grade. *Id.* ¶¶ 12-13. She is currently a Tenth Grade student at North Brunswick High School. *Id.* ¶ 14. Because she has graduated from CDS, K.B. no longer seeks injunctive relief, but continues to seek a declaratory judgment and nominal damages relating to her years as a CDS student subjected to an unlawful policy.

educational benefits compared to other schools in the area, including higher test scores and a better academic reputation. *Id.* ¶¶ 16-22, 80.

CDS was established pursuant to Article IX, Section 2, of the North Carolina Constitution and North Carolina's Charter Schools Statute, N.C. Gen. Stat. § 115C-218.5 *et seq.* (2017), under a charter granted by the North Carolina State Board of Education to CDS, Inc, in partnership with RBA. R56.1 Stmt. ¶¶ 259, 268-71. CDS, Inc. also holds charters for three other charter schools, South Brunswick Charter School, Douglass Academy, and Columbus Charter School. *Id.* ¶ 314. CDS was founded by Baker Mitchell, Jr., who served on the original CDS Board of Trustees, and currently serves as Board Secretary, a non-voting position. *Id.* ¶¶ 3, 26, 27. All four CDS, Inc. schools are managed and operated by RBA, an organization that was also founded by and is wholly owned by Mr. Mitchell, who serves as RBA's President. *Id.* ¶¶ 30-33, 293. Pursuant to its management agreement with CDS, RBA promulgates CDS policies that are approved by the CDS, Inc. Board. *Id.* ¶ 292. In his role as President of RBA, Mr. Mitchell is responsible for promulgating RBA policies and running day-to-day operations at all four CDS, Inc. schools. *Id.* ¶ 34, 293.

The individual defendants, Robert Spencer, Chad Adams, Suzanne West, Colleen Combs, Ted Bodenschatz, and Melissa Gott (collectively the "Board Members"), comprise the Board of Trustees of CDS, Inc., which adopts the disciplinary rules, regulations, policies and procedures applicable to CDS. *Id.* ¶¶ 28, 29.

CDS maintains a uniform policy ("Uniform Policy") requiring female students to wear skirts, "skorts" (skirts with shorts attached underneath), or "jumpers" (collectively referred to herein as "skirts") as "bottoms," all of which must be knee-length or longer, and male students to wear pants or shorts. *Id.* ¶¶ 35, 39-44. When the Uniform Policy first went into effect, girls were

7

permitted to wear only skirts or jumpers; skorts were added in 2002, and polo dresses were approved in 2016; otherwise, these basic requirements have remained essentially unchanged since CDS began operating in 2000. *Id.* ¶ 45. RBA proposes and implements modifications to the Uniform Policy, which are ultimately approved by Mr. Mitchell and the Board. *Id.* ¶¶ 292, 295-301.

The Uniform Policy is incorporated in the Student Handbook, which states that the purpose of the Policy is "to instill discipline and keep order so that student learning is not impeded. Use of uniforms also helps promote a sense of pride and of team spirit, as every student is a member of the academic team." *Id.* ¶ 38.

Students at CDS are permitted to wear a separate Physical Education ("PE") uniform, which is unisex, and consists of a tee-shirt and sweatpants or shorts, on days that they are scheduled to have PE class. *Id.* ¶¶ 50-51. Because students in different classes are scheduled to have PE on different days, some percentage of CDS students wear the PE uniform on any given school day. *Id.* ¶ 50 & Ex. 3, Answer 9. The Uniform Policy is also frequently suspended for various reasons, including on days when students are scheduled to go on certain field trips; when there are special events, such as health, archery, or girls' sports; when students achieve certain academic benchmarks; when students make donations to non-school-related charity organizations; or for celebrations or special events at the school. R56.1 Stmt. ¶¶ 52-59.

Students face a range of potential disciplinary actions for violating the Uniform Policy, from having a note sent home, to having a call placed to parents asking that they bring appropriate attire to school, to being excluded from class, or ultimately, to being expelled. *Id.* ¶¶ 60-65. When the regular Uniform Policy is in effect, a female student attending CDS would be disciplined for wearing pants, while her male classmate would not. *Id.* ¶¶ 66-67.

The CDS Uniform Policy was first developed in 1999-2000, at the time of CDS's founding. *Id.* ¶ 73. During that time period, a series of meetings was held regarding the formation of the school, and members of the community who attended the meetings were allegedly polled and stated that they favored having uniforms at the school. *Id.* However, there are no records of these meetings, no meeting agendas or minutes, and no documentation regarding the formation of the Uniform Policy generally or the Skirts Requirement in particular. *Id.* ¶ 74. Mr. Mitchell testified that the Board based its decision to adopt a uniform policy on "data show[ing that] uniforms promote discipline and better behavior," and referenced "numerous studies in the education literature" and "psychology journals" that were so numerous "you wouldn't bother to list them" as they were "just common knowledge." *Id.* ¶¶ 76-77. However, the sole "research study" relating to the creation of the Uniform Policy that Defendants produced consisted of an infographic published in *U.S.A. Today* on April 12, 1999 comparing the cost of non-uniform school clothing to the cost of school uniforms. *Id.* ¶ 75.

At the beginning of the 2015-16 school year, Bonnie Peltier was in the process of deciding where she would be sending her two children to school; her daughter had been admitted to South Brunswick Charter School ("SBCS"), another CDS/RBA school in South Brunswick, North Carolina, and she was also researching CDS for her son. Ex. 4 ¶¶ 7-10; R56.1 Stmt. ¶ 80. Ms. Peltier emailed Michelle Mena, the headmaster of SBCS, where girls were also required to wear skirts, to inquire about the rationale for that requirement; Ms. Mena replied that "[T]he dress code policy has been with us since our first year. 15 years ago." R56.1 Stmt. ¶¶ 81-83.

Ms. Peltier ultimately decided to enroll both children at CDS because her son had been admitted there, and she wanted to send both children to the same school. *Id.* ¶ 80. Shortly before the start of the school year, at an orientation for CDS parents, Ms. Peltier again raised the

9

question of why the Uniform Policy required girls to wear skirts. *Id.* ¶ 84. At the meeting, RBA

employee Kathy Thompson explained that skirts present a "more professional image." *Id.* ¶ 85.

At the end of the meeting she suggested privately that Ms. Peltier contact Mr. Mitchell who

could explain the rationale for the Skirts Requirement.  *Id.* ¶ 86.

Ms. Peltier subsequently emailed Mr. Mitchell, on July 26 and again on August 2, asking

him to explain the rationale for the requirement that girls wear skirts.  *Id.* ¶ 88. He responded via

email:

> As you may recall, the tumult of the 1990's was capped off by the Columbine
> shootings April 20, 1999 in which two students killed thirteen classmates and
> injured twenty-four others – fourteen of whom were female.
>
> The Trustees, parents, and other community supporters were determined to
> preserve chivalry and respect among young women and men in this school of
> choice. For example, young men were to hold the door open for the young ladies
> and to carry an umbrella, should it be needed. Ma'am and sir were to be the
> preferred forms of address. There was felt to be a need to restore, and then
> preserve, traditional regard for peers.

*Id.* ¶ 89.

During his deposition, Mr. Mitchell stood by the reasons expressed in his August 3,

2015 email, stating that there was nothing he would change about his explanation for the Skirts

Requirement.  *Id.* ¶ 93. He clarified that his reference to restoring and preserving "traditional

regard for peers" meant distinguishing between how male students should treat female students

versus male students, and defined "chivalry" as "a code of conduct where women are . . .

regarded as a fragile vessel that men are supposed to take care of and honor."  *Id.* ¶¶ 94-95. Mr.

Mitchell further testified that CDS's Skirts Requirement is intentionally designed to convey the

message, starting as early as Kindergarten, that boys and girls are different, and that "females

are to be treated courteously and more gently than boys."  *Id.* ¶ 96.

An earlier draft of Mr. Mitchell's email shared with Sawyer Batten, RBA's Public

Information Officer, articulated this justification for the Skirts Requirement even more

directly. *Id.* ¶¶ 91-92. Mr. Mitchell introduced his draft to Mr. Batten, explaining that his

intent was "to use this parent's question re dress to expound on a broader issue and lend a

foundation to many of our policies and practices." *Id.* ¶ 91. His original draft read:

> As you may recall, the 1990s was a period which saw a national degrading of
> values and, in particular, a disregard and disrespect for females by some of the
> country's most prominent leaders. . . Both the Trustees, the parents, and the other
> community supporters were determined to respect the traditional gender roles in
> this school of choice.

That paragraph continues, "There was felt a need to restore, and then preserve, traditional roles

within the school's society." It further states,

> Thus, the uniform policy seeks to make clear the mutual respect and values that
> traditionally prevailed for ladies and gentlemen before the statistics on rape,
> unwed motherhood, spousal abuse, STDs, and abortions began to skyrocket. That
> gentlemen wear pants and ladies wear dresses is not just a policy of the school
> that has prevailed for 15 years, it has been a norm of civilization for many
> thousands of years. The school is chartered to preserve this norm along with many
> others.

The email concludes, "The uniform policy is an important aspect of the school acknowledging

the importance of traditional values." *Id.* ¶ 91 & Ex. 54.

Mr. Mitchell's explanation, both in his draft and the final email sent to Ms. Peltier, is

consistent with a response drafted by CDS faculty to a parent inquiry in January 2014, by Lisa

Edwards, the Assistant Headmaster of CDS Elementary, questioning the requirement that girls

wear skirts. As Ms. Edwards explained:

> When Roger Bacon Academy established the Charter Day School the uniform
> distinction was the vision of the Founder and Headmaster. Staff men are to wear
> shirt and a tie and ladies wear a skirt/dress to the knee. I feel there is a belief that
> children do not see adults "dressed up" as professionals as much as we used to
> and we would like to model that for students. I think that we want students to
> understand the respect they owe themselves and the respect that we have for the
> education process.
>
> In addition, we teach and expect that boys open the doors for the girls and that the
> gentlemen let ladies go before them. In wearing skirts, it models the difference

and that we expect the proper treatment of young ladies. All combined trying to establish a culture of respect for others, self and creating great character.

R56.1 Stmt. ¶ 97. Jesse Smith, another RBA employee, responded: "I couldn't have said it better than your reply. It is a touchy subject but I love how you used the reference of distinguishing between boys/girls when opening doors, etc." *Id.* ¶ 98.

After this lawsuit was filed, in March of 2016, Defendants held a board meeting at which they presented the results of a survey of parent/student satisfaction to the Board. *Id.* ¶ 111. The survey did not inquire about the Skirts Requirement specifically, but about overall satisfaction with the Uniform Policy. *Id.* ¶ 108. The Board voted unanimously to keep the policy unchanged. Board members testified that their decision was based on the survey results showing that a majority of parents approved of the Uniform Policy, and that they did not wish to change it because it might displease parents. *Id.* ¶ 112.

In depositions, the Defendant Board Members and Principals of CDS middle and elementary schools endorsed the explanation for the Skirts Requirement expressed in Mr. Mitchell's August 3, 2015 email—specifically, that the Skirts Requirement is intended to promote the "traditional" view that boys and girls are different, and that boys should behave chivalrously to girls by treating them particularly gently and courteously. *Id.* ¶ 102. For example, Colleen Combs explained: "The argument of this email is we are attempting to teach people respect for each other using the device, the tool of the uniform policy. One that makes a distinction between boys and girls. . . . And I think for reasons that I have explained before that it is nice that boys who are often bigger and—that boys learn to respect girls and treat them as a matter of respect more gently than they might treat other boys." *Id.* & Ex. 17, 86:24-87:7. Melissa Gott similarly stated: "I also believe that the uniform policy . . . is supported by the community and parents and the trustees; and the purpose of it, among other things, is to preserve

chivalry and respect among the students. I believe also that traditional roles such as opening the doors for young ladies, carrying umbrellas is important and is fostered by the uniform policy, among other things." R56.1 Stmt. ¶ 102 & Ex. 16, 87:13-16.

Aside from embracing Mr. Mitchell's justification, Defendants have offered no specific rationale for the Skirts Requirement, instead emphasizing the justification for the Uniform Policy as a whole: That it teaches students to follow rules and instills discipline. R56.1 Stmt. ¶¶ 76, 107. At the same time, Board Members and administrators either admitted that a uniform requirement that permitted girls to wear pants could accomplish the same goals, or stated that they simply did not know whether or not it would do so. *Id.* ¶ 120. They further acknowledged that men and boys are capable of behaving respectfully toward women and girls regardless of whether they are wearing pants/shorts or skirts/dresses. *Id.* ¶ 116. And they testified that the Skirts Requirement either had no impact on respect, student discipline, order, or student learning, or that they did not know whether it would have any of those effects on students. *Id.* ¶¶ 115-118. Similarly, they testified that the same levels of pride and team spirit could likely be achieved with a uniform that permitted girls to wear pants or shorts. *Id.* ¶ 120. Many of the female Board Members testified that they themselves frequently wore pants in professional settings or for athletics or outdoor recreation, and the male Board Members testified that their siblings, children, or wives frequently wore pants to work or school. *Id.* ¶ 122.

**B.    Harms to Plaintiffs from the Skirts Requirement**

The Skirts Requirement mandates that Plaintiffs wear clothing that they find to be less comfortable than the options that would be available to them if they were boys. As K.B. attests, in her experience, shorts or pants are generally more comfortable and allow for greater movement than the skirts, skorts or jumpers allowed by the Skirts Requirement. *Id.* ¶ 224; *see*

*also id.* ¶¶ 225-43. As a result, although she wears skirts from time to time, such as occasionally to attend church, she typically prefers to wear pants or shorts. *Id.* ¶¶ 224-25 & Ex. 8 ¶ 21. Her objections to the Skirts Requirement led her to circulate a petition to her classmates requesting that CDS allow girls to wear pants, which generated approximately 100 signatures before her teacher confiscated it. R56.1 Stmt. ¶¶ 249-53.

Similarly, I.B. attests that she prefers to wear pants or shorts, explaining: "I am not a 'girly' person and have never liked the way skirts and dresses look and feel. Wearing skirts and dresses does not feel comfortable to me." *Id.* ¶ 199 & Ex. 7 ¶ 4. As a result, she almost never wears skirts or dresses outside of school, except on special occasions such as weddings, and does not purchase or own skirts or dresses, except for hand-me-downs. R56.1 Stmt. ¶¶ 193-98, 208-09. In fact, she is planning not to attend a CDS dance because she has been informed that girls are required to wear dresses. *Id.* ¶ 210.

A.P., who is currently only seven and in the Second Grade, does not have as strong a preference and typically wears what her mother chooses for her. *Id.* ¶ 180 & Ex. 5, 30:24-31:3. However, she usually takes off her dress once she gets home if she is going outside to play. R56.1 Stmt. ¶ 184. Her mother would simply prefer her to have the option of wearing pants so that she could enjoy greater freedom to be physically active during play time at school. *Id.* ¶ 189.

Much of the physical discomfort Plaintiffs experience as a result of the Skirts Requirement is related to concerns about modesty that are reinforced by teachers and peers alike. Female students at CDS are expected to "sit in a feminine, modest manner" during class. Ex. 8 ¶ 6; *see also* R56.1 Stmt. ¶¶ 123-28, 216-221, 237, 240-43. As K.B. explains, this meant that "[w]e weren't free to sit with one ankle crossed over the thigh of our other leg or spread them apart like the boys could, because if we did, our underpants or underlayer of shorts, leggings, or tights

14

would show. Instead, we had to cross our legs at the ankles and keep our knees together." Ex. 8 ¶ 6.

Teachers play an active role in policing the position in which female students sit and move. For example, when K.B. was in the First Grade, she was told she should not sit cross-legged in class, and when she questioned the teacher as to why the boys were permitted to sit cross-legged while she was not, she was told it was because she was wearing a skirt. R56.1 Stmt. ¶ 243. As a result, K.B. states, "I guess I learned the lesson because I was careful about the way I sat from then on, but it always took focus away from my classwork." *Id.* & Ex. 8 ¶ 3. The directive to sit modestly continued to be enforced as she grew older: "girls were told to sit in a feminine, modest manner" and as a result, "I always had to be conscious of how I was sitting, and that took focus that distracted me from my academic work." Ex. 8 ¶ 6; *see also id.* ¶ 8 ("[Teachers] would tell us how to sit so boys couldn't see up our skirts."). This led her to conclude that "the teachers didn't care if the girls were as comfortable in class as the boys were," which she found upsetting. *Id.* ¶ 6. She reports that one of the teachers once scolded her for doing a cartwheel, even though she was wearing a skort, because "the skirt flew up over my head when I was upside down and that wasn't appropriate." R 56.1 Stmt. ¶ 231 & Ex. 8 ¶ 5.

Similarly, I.B. was told in Kindergarten and First Grade to "sit like a girl" or "sit like a princess" (i.e. with her legs curled to one side, rather than cross-legged) so that her underwear would not show, which "made [her] feel uncomfortable and singled out, since the boys were allowed to sit cross-legged, or however they were most comfortable." R56.1 Stmt. ¶¶ 217-21. In class, female students "are . . . expected not to do things that show the underlayer of shorts or leggings." Ex. 7 ¶ 18. As a result, she testified, "I need to pay attention to how I am sitting, which sometimes keeps me from concentrating on learning." *Id.* ¶ 8; *see also* R56.1 Stmt. ¶¶

15

216-18. And she reports that "[t]eachers . . . would scold us if we were sitting or doing an activity that made our shorts or leggings show, and we could still get teased." Ex. 7 ¶ 18.

Testimony from CDS Board Members and administrators corroborates I.B.'s and K.B.'s accounts that CDS teachers expect female students to sit in positions that are deemed appropriately modest, and reprimand or corrected them if they fail to do so. R56.1 Stmt. ¶¶ 123-28. For example, Rosina Walton, Assistant Headmaster of the middle school at CDS, testified that if a female student were sitting such that her undergarments were showing "she might be . . . asked to sit a different way so she is not embarrassed," and stated that if she found a student sitting with her legs "wide open" she "would probably just, like, tap her and say you don't want to sit, you know, kind of thing." Ex. 23, 43:19-23; *see also id.* at 43:24-45:19; R56.1 Stmt. ¶¶ 125-26.

Exposure of one's undergarments could result not only in correction or reprimands by teachers, but also teasing by peers. As I.B. explains, "When I wear skirts to school, I feel exposed, and like it would be easier for someone to hurt me or look up my skirt." Ex. 7 ¶ 4; R56.1 Stmt. ¶¶ 200-02. Both I.B. and K.B. report having been teased when their undergarments showed. R56.1 Stmt. ¶ 139. I.B. reports that when she was in first grade, "a boy looked up my friend's skirt." Ex. 7 ¶ 13. K.B. recounts that when she would play soccer during recess while wearing her uniform, "I would be teased by the boys because my skirt would fly up and reveal whatever was underneath. I thought this was silly as they couldn't see my underwear because I would have on a skort or leggings, but they razzed me about it anyway." Ex. 8 ¶ 13; R56.1 Stmt. ¶ 233. She reports that she was even teased by classmates during tornado drills and fire drills, which required students to curl up on the floor or crawl on hands and knees, resulting in the boys behind her looking up her skirt. R56.1 Stmt. ¶¶ 234-35. She observes: "Learning how to deal

16

with a disaster is probably stressful for everyone, but it was especially stressful for me and the other girls who were being teased by the boys. I always wished I was wearing pants or shorts during those drills." Ex. 8 ¶ 16.

The Skirts Requirement also causes Plaintiffs particular physical discomfort during the winter due to inferior warmth. In Plaintiffs' experience, even with leggings or tights worn underneath, the skirts mandated by the Uniform Policy are shorter than pants, and the fabric of tights and leggings is thinner than that of pants. R56.1 Stmt. ¶¶ 159-62, 186, 208, 215. Skirts with tights or leggings are not as warm as the option of wearing pants with long underwear underneath. *Id.* ¶¶ 159-61, 204-05, 225, 227. This has a particular impact at CDS because students play and spend time outdoors almost every day, eat lunch outdoors as long as the temperature is above 50 degrees, and are therefore frequently exposed to the cold. *Id.* ¶¶ 154-58. The record is replete with communications from teachers entreating parents to remember to send children to school clothed adequately for cold weather and cool conditions even inside CDS's classrooms. *Id.* ¶ 158. Indeed, the discomfort caused by the Skirts Requirement in cold weather impacted I.B. so harshly that she testified: "When I was in kindergarten and first grade, I used to sometimes cry in the mornings before school because I would be cold wearing only a skirt with leggings." Ex. 7 ¶ 5; R56.1 Stmt. ¶ 207.

The Skirts Requirement has limited Plaintiffs' mobility and participation in physical activities. Although students wear their PE uniforms on the days they have gym class, students at CDS also have access to playgrounds and playing fields every day during recess periods, regardless of whether it is their scheduled day for PE, and they commonly engage in physical activities during those periods. R56.1 Stmt. ¶ 132. Plaintiffs have testified that on days when they are wearing their regular uniform, they have refrained from engaging in activities like

playing on swings, climbing monkey bars, or playing soccer. For example, I.B. has avoided playing on the swings "because my skirt would fly up when I was playing in them," as well as from climbing and gymnastics. Ex. 7 ¶ 13; *see also* R56.1 Stmt. ¶¶ 212-13. She describes how other girls at CDS, like her, "will avoid the monkey bars because they do not want their underwear to be seen," and do not play games such as "jackpot." Ex. 7 ¶¶ 13, 14. As I.B. concludes: "I think it's unfair that boys get to wear shorts and girls can only be really active on days when we have PE and can wear shorts or sweatpants." *Id.* ¶ 19.

K.B. has similarly avoided certain physical activities due to fear of teasing or correction by teachers. After a teacher reprimanded her for doing a cartwheel when her skirt flew up over her head, K.B. refrained from doing cartwheels or flips when she was in her uniform—but observed that "the boys were free to do cartwheels and flips without feeling embarrassed." Ex. 8 ¶ 5; *see also* R56.1 Stmt. ¶¶ 231-32.

> I gave up trying to play soccer on any day except days when I was in my P.E. uniform because it was simply too embarrassing. But I was angry that the boys could play however they wanted in their regular school clothes while I had to avoid the activities I enjoyed because I had to worry about being "ladylike."

Ex. 8 ¶ 13; *see also id.* ¶ 14 (she would refrain from participating in PE on days she was in "show choir," which required her to wear her uniform even on some PE days, and would instead "have to sit and watch while the other kids in the class played sports . . . even though I loved sports. If I had been wearing pants or shorts as part of my school uniform, I could have participated in Show Choir and participated in gym."). By contrast, she describes how on days when she was permitted to wear the PE uniform, "I was free to do flips and cartwheels and I could sit in class unselfconsciously and focus on my classwork rather than worrying about whether my legs were in the proper position for a girl" which made those days "much easier for me." *Id.* ¶ 7.

Plaintiffs have also testified as to their own understanding of the messages conveyed by the Skirts Requirement. According to I.B., the requirement that girls wear skirts "sends the message that girls should be less active than boys and that they are more delicate than boys." R56.1 Stmt. ¶ 222. She believes that it "makes the boys feel empowered," and contributes to views like that expressed by one of her friends—"that girls could not play football." Ex. 7 ¶¶ 16, 17. K.B. similarly attests:

> It seemed particularly unfair to me that school administrators and teachers claimed to treat boys and girls equally, but then on most days they would make us girls dress in a way that restricted our movement and they would tell us how to sit so boys couldn't see up our skirts. It seemed silly and sexist, and it made me angry to be treated like a person whose comfort and convenience was less important to them than the boys'. If girls could wear pants or shorts, we wouldn't have to worry about those things.

Ex. 8 ¶ 8. She further adds:

> The dress code and the constant monitoring by teachers and school administrators made me feel like they thought girls should not play roughly or be as active and able to move around as freely and comfortably as boys – that we simply weren't worth as much as boys. They seemed to be telling me every day that girls are not in fact equal to boys, and that would make me feel inferior and angry at the same time.

*Id.* ¶ 19. A.P.'s mother similarly objects to her daughter being exposed to these types of messages and believes that they cause her daughter harm. R56.1 Stmt. ¶ 190.

## II.    HARMS FROM SEX STEREOTYPES

According to Plaintiffs' expert, Dr. Christia Spears Brown, a developmental psychologist specializing in gender, "requiring girls to wear skirts has the effect of reinforcing gender roles in which girls are viewed as weak and passive and focused on their appearance instead of agency." *Id.* ¶ 177 & DE 60-1, pp. 11-14. Studies have shown that girls who wear dresses and skirts are less active during recess and free playtime than girls wearing shorts or pants, and that restrictive clothing including skirts limits girls' ability to engage in physical activity to the same extent as

19

boys. R56.1 Stmt. ¶¶ 143-46. As a result of different clothing requirements, "by early childhood, girls begin to understand that they need to limit their movements in ways that boys do not," and begin to limit themselves to "allowed behaviors," i.e., "the ones that maintain modesty." DE 60-1, p. 13 (internal quotation omitted). Moreover, girls who wear feminine clothing are perceived to be less active and athletic than girls wearing more gender-neutral styles, which can influence whether they are encouraged to engage in active play by teachers and peers. R56.1 Stmt. ¶ 146. Gender-differentiated uniforms can thus contribute to stereotyped views about athletics as a male domain, and result in depriving girls of the numerous positive effects associated with physical activity, including improved psychological, musculoskeletal and cardiovascular health, better academic performance, and lower obesity. *Id.* ¶¶ 149-51. Dr. Brown concludes: "[T]he gender stereotype that girls are not physically active—a stereotype that is created *and* reinforced by restrictive clothing—leads girls to be less physically active than boys, despite the numerous benefits associated with physical activity." DE 60-1, p.14.

Drawing from studies from the field of developmental psychology, Dr. Brown testified that practices such as differentiated uniforms that enhance gender distinctions in the classroom increase sex stereotypes. R56.1 Stmt. ¶¶ 169-71. Such stereotypes, in turn, lead to negative academic, social, and psychological consequences for children, including impacting their self-concept, confidence, interest, and motivation about their science and math abilities. *Id.* ¶¶ 172-76. These effects can be particularly harmful to students who do not conform to gender stereotypes. *Id.* ¶ 178. Sex stereotypes also contribute to the well-documented gap between men and women's entry into the fields of science, technology, engineering, and math. *Id.* ¶ 173.

Increasing the salience of gender distinctions in the classroom further harms children's academic performance by placing girls in a state of "stereotype threat"—a condition that arises

when a person belongs to a stigmatized social group (e.g. gender) and their group membership is made distinct or salient. *Id.* ¶¶ 174-76. This "activates a disruptive concern about the fulfilling [of] the negative stereotype," which has been shown to impact performance in the tasks they were concerned about—for example, performance in mathematics testing. DE 60-1, pp. 8-10; *see also* R56.1 Stmt. ¶¶ 176-77. The developmental psychology research shows that girls' math performance is significantly impaired during stereotype threat conditions. R56.1 Stmt. ¶ 176 & DE 60-1, p. 9.

> Dr. Jo Paoletti, a fashion and dress historian at the University of Maryland, further stated:
>
> In the knee-length skirts mandated by CDS, particularly in warm weather when girls are less likely to be wearing leggings, girls must be more aware and cautious than boys about how they sit and move, in order to avoid showing their underwear. This constant attention to the position of their legs constitutes a distraction for girls, moving their attention from the task at hand, whether learning or recreation.

Ex. 20, p. 9. Moreover, Dr. Paoletti points out that the "skorts" option is not functionally the equivalent of shorts, but rather, are "a skirt variant, not a shorts variant." Ex. 20, pp. 3, 9; *see also* R56.1 Stmt. ¶ 42. She goes on to explain:

> Functionally and practically, they are limiting in ways that shorts are not. Skorts add a layer of fabric that serves no practical purpose, other than gender distinction. … In order to stay warm in colder weather, girls must add additional layers, adding to the bulk of their clothing and making toileting inconvenient. Moreover, depending on how a dress code is enforced, the concerns about modesty may be true when wearing a skort as well as a skirt, as the "shorts" underlayer may be viewed as an undergarment that should not be showing. … The fact that the school requires a different—gender neutral—uniform with options of shorts or pants for days when the students have physical education class demonstrates that CDS is well aware of the constraints on freedom of movement entailed by wearing skirts, skorts, or jumpers, and of the relative benefits of wearing pants or shorts particularly during physical activity."

Ex. 20, p. 9.

Dr. Paoletti's review of the history of dress codes and gender led her to conclude that the Uniform Policy in place at CDS is "an outlier," and that "[t]he 'tradition' that the requirement evokes has not been the norm for nearly half a century in either the educational context or in society as a whole." Ex. 20 pp. 6-8; R56.1 Stmt. ¶¶ 68, 69. Her review of local dress codes in Leland, which included the private Catholic school in the area, did not discover any other school, aside from those operated by RBA, that prohibits girls from wearing pants or shorts. R56.1 Stmt. ¶ 68 & Ex. 20 pp. 6-7. In fact, she reports that in her years of research, she has *never* come across any other school that does so. Ex. 20 pp. 6-7. Consequently, "[f]ar from being 'traditional,' requiring girls and women to wear skirts and limiting their freedom to wear pants to athletic activities only is regressive, reflecting community standards that have not been the norm for decades." *Id.* at 8. These facts, as well as her knowledge of the literature on school uniforms, led her to conclude:

> The research on school uniforms does not support claims of their positive effect, and the research on gender stereotypes, gendered clothing, and physical activity supports the plaintiffs' claims that they are disadvantaged by the gender distinctions made by their uniforms and the physical limitations that result. Put as plainly as possible, there is no evidence that the CDS skirts requirement is doing any good, and there is evidence that it causes harm.

*Id.* at 10.

## ARGUMENT

## I.     STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must

consider both whether "there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party" and whether "the disputed fact is one that might affect the outcome of the litigation." *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986)).

## II.    THE SKIRTS REQUIREMENT VIOLATES THE CONSTITUTIONAL GUARANTEE OF EQUAL PROTECTION.

### A.    Gendered Codes of Dress and Appearance Must Be Adequately Justified to Survive Constitutional Review, and Have Historically Been Struck Down.

Gender-based distinctions in rules related to students' appearance have been repeatedly struck down by the Fourth Circuit. Even before the Supreme Court enunciated the standard of review applicable to gender-based distinctions, the Fourth Circuit invalidated a school grooming code incorporating different hair-length requirements for boys and girls. *Massie v. Henry*, 455 F.2d 779, 783 (4th Cir. 1972). Recognizing the "overlapping" due process and equal protection considerations at play, the court found insufficient evidence that the rule actually furthered the school's interest in either discipline or safety. *Id*. The Fourth Circuit reaffirmed the strong principle recognized in *Massie* the following year, in two additional hair-length cases. *See Long v. Zopp*, 476 F.2d 180, 181-82 (4th Cir. 1973) (holding high school football coach could not deny male player his "letter" because his hair exceeded the coach's permissible length); *Mick v. Sullivan*, 476 F.2d 973, 973-74 (4th Cir. 1973) (holding that fear of potentially disruptive effect of boys' long hair on school discipline could not justify public school hair length restriction); *see also Arnold*, 459 F.2d at 942-44 (restrictions on male student's constitutional right to wear long hair not justified by health, safety, distraction, or parental and student preference). Thus,

controlling case law in this Circuit has long guarded against unjustified gender-based distinctions governing the appearance of students in public schools.[2]

Early cases in courts around the country addressing gender-based dress codes reached the same result, following reasoning similar to that of the Fourth Circuit in *Massie*. For example, in *Johnson v. Joint Sch. Dist. No. 60, Bingham Cnty.*, 508 P.2d 547, 548-49 (Idaho 1973), the Idaho Supreme Court upheld a determination that a school dress code prohibiting female students from wearing slacks, pantsuits, or "culottes" had no relation to discipline, safety or morals, or the educational process, and was therefore "unreasonable, capricious and arbitrary." *Johnson*, 95 Idaho at 318-19. Similarly, in *Scott v. Bd. of Educ., Union Free Sch. Dist.*, 305 N.Y.S.2d 601 (N.Y. Sup. Ct. 1969), the court invalidated a provision of the school's dress code prohibiting girls from wearing slacks except with permission of the principal "when warranted by cold or inclement weather," finding that the provision exceeded the school's authority. *Scott*, 305 N.Y.S.2d at 606-07; *see also Wallace v. Ford*, 346 F. Supp. 156, 163-64 (E.D. Ark. 1972) (invalidating under arbitrariness standard dress code policy requiring girls to wear "dresses, skirts and blouses, dress slacks and blouses or pants suits" because it prohibited other "legitimate forms of dress" including "knicker suits" and "jump suits").

Although these cases did not expressly raise sex discrimination claims—as such claims had yet to be fully recognized in the law—they reflect an early awareness on the part of the courts that gender-based dress and grooming codes, including those that limited girls to skirts or

---

[2] Cases from other circuits rejecting such an analysis and upholding gender-based hair length restrictions, such as *Karr v. Schmidt*, 460 F.2d 609 (5th Cir. 1972), are contrary to the Fourth Circuit's precedent in *Massie* and its progeny and thus should not be followed by this Court.

dresses, exceeded the bounds of government authority.[3] Given that such sex-based distinctions in codes of dress and appearance have been repeatedly invalidated under the less stringent standards of scrutiny applied in *Massie* and its progeny, they will be unable to survive the more "demanding" test of heightened scrutiny that the Supreme Court has since made clear applies to sex-based classifications. *Virginia*, 518 U.S. at 531-33.

**B.     The Skirts Requirement Triggers Heightened Scrutiny Because on Its Face, It Subjects Boys and Girls to Different Requirements.**

The U.S. Constitution protects the right to equal treatment under law regardless of sex. *See, e.g.*, *Virginia*, 518 U.S. at 533; *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982); *Knussman*, 272 F.3d at 636; *Dep't of Transp. v. Rowe*, 353 N.C. 671, 674, 549 S.E.2d 203, 207 (2001). Accordingly, state actors, including North Carolina's public charter schools,[4] are prohibited from drawing sex-based classifications without adequate justification. The Equal Protection Clause requires "the defender of the challenged action [to] show 'at least that the classification serves important governmental objectives and that the discriminatory means

---

[3] There has been limited applicable case law in the education context since the above cases were decided in the early 1970s. The lack of more recent reported cases concerning requirements that girls wear skirts is likely a function of both the evolution of the law in this area, including the enactment of Title IX and the Supreme Court's elucidation of the appropriate standards for sex-based classifications under the Constitution, and changing community standards that have led to the near eradication of prohibitions on girls wearing pants. *See* Ex. 20 pp. 5-8.

[4] This Court has already held that CDS is a state actor. DE 91 at 12. RBA is similarly a state actor because the original Charter Application was filed by CDS in conjunction with RBA and included a draft of the original Management Agreement between RBA and CDS, and the Charter itself incorporates the entire application. R56.1 Stmt. ¶¶ 284-86, 309, 325-26 & Ex. 93 ¶ A. The state has accordingly delegated authority to conduct the traditional public function of educating students not only to CDS, but also to its operator, RBA. Finally, as this Court has previously recognized, the individual Board Members set policy for CDS and may sue and be sued pursuant to the North Carolina Charter Schools Law, and consequently are not entitled to Eleventh Amendment immunity. DE 91 at 12-13. *See also* N.C. Gen. Stat. §115C-218.25 (2017) (specifying that charter school board members are subject to the public records law); *Jordan v. N. Kane Educ. Corp.*, No. 08-C-4477, 2009 WL 509744 (N.D. Ill. Mar. 2, 2009) (because under Illinois law a non-profit organization operating a charter school is subject to state public records laws, it is a state actor). All Defendants are therefore properly considered state actors.

employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 524 (quoting *Hogan*, 458 U.S. at 724). The justification offered must be "exceedingly persuasive," and it "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 533. This burden, the Supreme Court has emphasized is "demanding and . . . rests entirely on the State." *Id.*

Moreover, the Supreme Court has taken particular aim at classifications that rely upon or reinforce traditional gender roles. The Supreme Court has long recognized that sex-based classifications "carry the inherent risk of reinforcing stereotypes about the 'proper place' of women and their need for special protection." *Orr*, 440 U.S. at 283. Such stereotypes, which rest on "paternalistic" attitudes about women, "in practical effect, put women, not on a pedestal, but in a cage." *Frontiero*, 411 U.S. at 684. To guard against these effects, the Supreme Court has made clear that the government's justification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533; *accord Morales-Santana*, 137 S. Ct. at 1692–93 ("[O]verbroad generalizations . . . have a constraining impact, descriptive though they may be of the way many people still order their lives."). Accordingly, as the Supreme Court has emphasized, if the governmental objective "'is to exclude or 'protect' members of one gender' in reliance on 'fixed notions concerning [that gender's] roles and abilities,' the 'objective itself is illegitimate.'" *Morales-Santana*, 137 S. Ct. at 1692 (quoting *Hogan*, 458 U.S. at 725). Under this test, as the Fourth Circuit has observed, "gender classifications that appear to rest on nothing more than conventional notions about the proper station in society for males and females have been declared invalid time and again by the Supreme Court." *Knussman*, 272 F.3d at 636.

The Skirts Requirement challenged in this case triggers this heightened form of review. It is undisputed that the CDS Uniform Policy prescribes different items of clothing that boys and girls are permitted to wear as "bottoms." R56.1 Stmt. ¶¶ 39-41, 45. As this Court held in denying Defendants' Motion to Dismiss, the policy on its face draws a distinction based on students' sex, thus giving rise to equal protection claims.[5] DE 91 at 7-8; *see also Hayden v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 567-80 (7th Cir. 2014) (grooming code limiting male athletes' hair length triggered, and failed to satisfy, heightened scrutiny); *Sturgis v. Copiah Cty. Sch. Dist., No. 3*, 10-CV-455, 2011 WL 4351355, at *3 (S.D. Miss. Sept. 15, 2011) (holding that female plaintiff stated a valid Equal Protection claim in a challenge to her school's requirement that girls wear an off-the-shoulder "drape" in yearbook pictures, while boys were to wear a tuxedo). Consequently, Defendants will be required to meet the requirements of heightened scrutiny in order to justify the Uniform Policy's sex-based classification. *Virginia*, 518 U.S. at 533; *Hayden*, 743 F.3d at 577.

> ### C. Defendants Will Not be Able to Satisfy Heightened Scrutiny Because the Skirts Requirement is Explicitly Based on Impermissible Sex Stereotypes.

Mr. Mitchell's explanation of the rationale for the Skirts Requirement—"to preserve chivalry and respect among young women and men" and to "restore, and then preserve, traditional regard for peers," R56.1 Stmt. ¶ 89—is grounded on impermissible gender stereotypes. The edict that boys open doors for girls and open their umbrellas flows directly

---

[5] On the Motion to Dismiss, this Court declined to enunciate the applicable standard of review, and suggested that "sex-differentiated standards consistent with community norms may be permissible to the extent they are part of a comprehensive, evenly-enforced grooming code that imposes comparable burdens on both males and females alike." DE 91 at 7 n.2 (quoting *Hayden*, 743 F.3d at 581). The Seventh Circuit's dicta in *Hayden* should not be taken to imply that anything other than heightened scrutiny would apply simply because the case concerns grooming codes. *See Virginia*, 518 U.S. at 555; *cf. Doe v. Vermilion Par. Sch. Bd.*, 421 Fed. App'x. 366, 372 (5th Cir. 2011) (heightened scrutiny applied to school board's decision to separate male and female students into parallel single-sex classrooms within a coeducational school).

27

from the view, as explained by Mr. Mitchell at depositions, that boys and girls are different, that boys are expected to treat girls "more gently," and that a woman is "regarded as a fragile vessel that men are supposed to take care of and honor." *Id.* ¶¶ 94-96. The earlier draft of Mr. Mitchell's email was even more explicit that what Mr. Mitchell meant by traditional values was actually traditional *gender roles*. His draft states that in implementing the Skirts Requirement, Board Members, parents, and other community members had been "determined to respect the traditional gender roles in this school of choice" and "to restore, and then preserve, traditional roles within the school's society;" he further attributes "skyrocket[ing]" rates of "rape, unwed motherhood, spousal abuse, STDs, and abortions" to a breakdown in "the mutual respect and values that traditionally prevailed for ladies and gentlemen." Ex. 54; R56.1 Stmt. ¶ 91.

Mr. Mitchell's explanation reflects the genuine reason for the Skirts Requirement: it has been repeatedly articulated not only by Mr. Mitchell but also by other CDS administrators, and has been universally endorsed by CDS Board Members.[6] R56.1 Stmt. ¶¶ 97-98, 101-04. Prior communications on the subject, including the email exchange between Smith and Thompson referencing "model[ing] the difference" between boys and girls, *id.* ¶ 97, demonstrates that this rationale for the Skirts Requirement has been consistently articulated over time. In fact, not a single CDS or RBA witness disputed Mr. Mitchell's description of these reasons for the Skirts Requirement or disavowed his views.[7] On the contrary, CDS Board Members and administrators at their depositions nearly universally embraced Mr. Mitchell's

---

[6] The record also supports the conclusion that Mr. Mitchell is the driving force behind the substantive policies at CDS, and that he was and remains the ultimate decisionmaker behind any changes in the Uniform Policy. R56.1 Stmt. ¶¶ 3, 26, 27, 30-36, 71-72, 82, 86, 88-93, 97, 269-71, 285-301.

[7] While some Board Members stated that they would not personally have chosen to link the Skirts Requirement to the Columbine massacre specifically, all endorsed Mr. Mitchell's views regarding the goal of the Skirts Requirement to promote chivalry and traditional values. *Id.* ¶¶ 100-04.

28

vision of "traditional" gender roles and "chivalry" as the cornerstone of the Skirts

Requirement. *Id.* ¶¶ 101-04.

This goal—to preserve "traditional" gender roles that treat girls and women as the more

"fragile" sex—is *per se* illegitimate, because it aims to "'protect' members of one gender' in

reliance on 'fixed notions concerning [that gender's] roles and abilities.'" *Morales-Santana*,

137 S. Ct. at 1693 (quoting *Hogan*, 458 U.S. at 725). Such views reflect precisely the sort of

"romantic paternalism" that the Supreme Court has noted "in practical effect, put[s] women,

not on a pedestal, but in a cage." *Frontiero*, 411 U.S. at 684; *accord Orr*, 440 U.S. at 283

(gender-based classifications "carry the inherent risk of reinforcing stereotypes about the

'proper place' of women and their need for special protection"); *Knussman*, 272 F.3d at 635-36

("[G]ender classifications that appear to rest on nothing more than conventional notions about

the proper station in society for males and females have been declared invalid time and

again."); *see also* Ex. 20 pp. 8-9 ("chivalry" justification is "based on stereotypes of women as

passive, vulnerable, weak, and in need of the protection of men, who are presumed to be

aggressive, protective, and strong"); DE 60-1, p. 4 (defining sex stereotypes as "associations

and beliefs about particular attributes thought to characterize a group" and pointing out that

they are "inherently flawed, because they ignore within-group variability and exaggerate

between-group differences"). Such "stunningly anachronistic" views simply cannot, as a matter

of law, serve to justify the Skirts Requirement. *Morales-Santana*, 137 S. Ct. at 1693. This

explanation, by itself, demonstrates the unconstitutionality of the Skirts Requirement.

The other reasons Defendants have articulated for the Skirts Requirement—fostering a

professional image and "mutual respect"—are similarly tainted with stereotypes. In addition,

there is no evidence in the record that the Skirts Requirement actually furthers those goals.

The notion that skirts are somehow more "professional" than pants is similarly unsupported by any evidence, and appears to rest on nothing more than the subjective views of individuals like Mr. Mitchell. One Board Member, in an attempt to justify the Skirts Requirement, explained that it would help prepare students for workplaces that had different dress codes for men and women; the only example he could come up with was the restaurant chain Hooters. R56.1 Stmt. ¶ 103.

Defendants have offered no evidence supporting the relationship between increased "respect" and the Skirts Requirement. Defendants admitted at depositions that they did not know whether permitting girls to wear pants would impact whether boys at CDS treat girls with respect, that there has been no demonstrable impact on "respect" on days when students wore their P.E. uniforms, and that boys and men are equally capable of respecting women and girls regardless of whether they are wearing a skirt or pants. Defendants further admitted that whether a girl or woman is wearing a skirt has no impact on the level of respect to which she is entitled— either in a professional context or at school. And many of the Defendants conceded that they themselves (if they were female) or their wives, siblings, or other relatives (if male) routinely wear pants in professional settings and are no less deserving of respect under those circumstances. Moreover, Plaintiffs have testified to their first-hand experience that rather than fostering respect, the requirement that they wear skirts has resulted in boys teasing them and "looking up" their skirts.

Despite Mr. Mitchell's assertion that women have been expected to wear skirts for "thousands of years," Ex. 54; R56.1 Stmt. ¶ 91, Plaintiffs' expert, Dr. Paoletti, documents that pants have been an accepted and uncontroversial part of professional attire for women since the 1970s, and states that "requiring girls and women to wear skirts and limiting their freedom

30

to wear pants to athletic activities only is regressive, reflecting community standards that have not been the norm for decades." Ex. 20 p. 8. Based on her review of the relevant literature, she finds "[t]here is no evidence in the research supporting the notion that requiring girls to wear skirts will have any effect on respect among students." *Id.* She further observes that "as a policy matter, girls and women should not be afforded respect based on their appearance or attire, and boys and men are capable of behaving politely and respectfully regardless of the . . . clothing worn by their peers." *Id*. And she notes that "the argument that girls in skirts will be treated more respectfully than girls wearing pants smacks of an all-too-familiar 'blame-the-victim' argument often used to excuse disrespectful or even violent behavior based on girls' and women's appearance or attire." *Id*.

Thus, the "mutual respect" and professionalism arguments, in addition to being entirely unsupported by any research, are equally tainted with stereotypes. Defendants therefore cannot carry their burden of showing that the Skirts Requirement is "substantially related" to the goals of promoting "respect among peers."

> **D.**    **The Skirts Requirement Places an Unequal Burden on Girls And Results in "Perpetuating" the Legal, Social, and Economic Inferiority of Women.**

While the Court has been careful to emphasize that not all sex-based classifications are unlawful, it has also made clear that those used "to create or perpetuate the legal, social, and economic inferiority of women" will not stand. *Virginia*, 518 U.S. at 534. There is ample evidence that the Skirts Requirement is not the type of "even-handed" code of appearance that has historically been upheld in other contexts, *see Hayden*, 743 F.3d at 581 (collecting hair

length cases decided under Title VII),[8] but rather, imposes burdens on female students alone—in both concrete and intangible, but no less significant, ways—that contribute to perpetuating their subordinate status.

Plaintiff I.B. attests, for example, that she feels that the uniform policy "sends the message that girls should be less active than boys and that they are more delicate than boys." R56.1 Stmt. ¶ 222 & Ex. 7 ¶ 16. She believes that it "makes the boys feel empowered," and contributes to views such as the opinion expressed by one of her friends—"that girls could not play football." Ex. 7 ¶ 17. K.B. similarly attests that the constant monitoring and reprimands sent the message "that we simply weren't worth as much as boys" and that they were "not in fact equal to boys," making her "feel inferior and angry at the same time." Ex. 8 ¶ 19. A.P.'s mother testified that she objects to her daughter being exposed to these types of messages and believes that they cause her daughter harm. R56.1 Stmt. ¶ 190 & Ex. 4 ¶ 22-23. As this testimony demonstrates, the Skirts Requirement has successfully conveyed the intended message that girls and boys are different and that girls are more "fragile" and deserving of protection than boys. This is, of course, precisely the type of effect that heightened scrutiny of sex-based classifications is intended to guard against.

---

[8] Even assuming that Title VII cases have any application in the Equal Protection context, as the court observed in *Hayden*, many of the Title VII cases in this arena date from the 1970s, and thus predate significant developments in the law relating to sex stereotyping, including the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See* 743 F.3d at 578-81. They also fail to reflect current community standards that have evolved considerably in the intervening years. *Id.* at 581; R56.1 Stmt. ¶¶ 69, 121 & Ex. 20, pp. 6-8 (discussing evolution of community standards regarding women wearing pants, and concluding that pants are now an accepted part of female attire in both the professional and education settings). However, it should be noted that over the years, courts have found that policies that reflect stereotypes or impose specific burdens on women are discriminatory. *See, e.g.*, *Frank v. United Airlines, Inc.*, 216 F.3d 845, 855 (9th Cir. 2000) (different weight requirements between male and female flight attendants facially violated Title VII and were unjustified as a BFOQ); *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 610 (9th Cir. 1982) (same); *Carroll v. Talman Fed. Sav. & Loan Ass'n of Chicago*, 604 F.2d 1028 (7th Cir. 1979) (invalidating requirement that only female employees wear uniforms as "demeaning to women," and rejecting defense that women needed a uniform to prevent them from engaging in "dress competition" as "based on offensive stereotypes prohibited by Title VII").

Plaintiffs have suffered more concrete harms as well. They are required to wear clothing almost every single day that they not only find less comfortable, but that also restricts their freedom of movement and is less warm in cold weather than the clothing they would be permitted to wear if they were boys attending the same school. *See* R56.1 Stmt. ¶¶ 159-64, 188, 194, 200-07, 209, 216, 224-58. The cold is a particular issue at CDS, where students spend time outside of the classroom each day, including during lunch periods, and where temperatures inside the classrooms are frequently chilly. *Id.* ¶¶ 132, 154-58; *see also id.* ¶ 207 (stating that I.B. used to cry every morning when she had to put on her uniform due to cold). Stockings, tights and leggings are less durable, tear more easily, and are less protective of the legs than pants, and leave the wearer more subject to insect bites and abrasions. *Id.* ¶¶ 141-42, 186-87, 225, 254.

Teachers play an active role in policing female students' movements and position, and have corrected or reprimanded Plaintiffs when they have sat in a position or engaged in physical activity that caused their undergarments or underlayer to show. *Id.* ¶¶ 125-26, 128, 140, 217, 240. For example, K.B. and I.B. attest to having been instructed to "sit like a lady" or "sit like a princess" during class. *Id.* ¶¶ 217, 242-43. As a result, they have experienced difficulties concentrating during class due to the pressure to constantly be aware of the positioning of their legs. *Id.* ¶¶ 216-18, 237-41. Both K.B. and I.B. also have been teased by their male peers, including the incident where a male student looked up K.B.'s skirt during an emergency drill. *Id.* ¶¶ 139, 233-35; Ex. 7 ¶¶ 13, 18.

The fear of drawing rebukes from teachers or teasing from male students has caused Plaintiffs to avoid engaging in physical activities during recess, including playing soccer, doing cartwheels, swinging on swings, and climbing monkey bars. R56.1 Stmt. ¶¶ 135, 212-14, 230-33, 236, 238. Thus, record evidence demonstrates how Plaintiffs' constant anxiety about exposure,

with the attendant risk of reprimands, teasing, shame and embarrassment, and consequent attention to their physical position have resulted in physical discomfort, distraction from classroom learning, and limitation on opportunities to participate in physical activity. These burdens are suffered by female students alone. *See Hayden*, 743 F.3d at 581-82.

The suspension of the regular Uniform Policy on days when the students have PE or when they are scheduled for certain field trips that involve physical or outdoor activity illustrates that CDS is fully aware of the limitations on children's physical mobility caused by the Skirts Requirement: if the clothing mandated for female students under the Uniform Policy afforded girls equal opportunities to engage in physical activity, then there would be no need to waive the Skirts Requirement in favor of the PE uniform for activities that involve physical activity. *See* R56.1 Stmt. ¶ 70 & Ex. 2 (Letter to Christopher Brook, Sept. 8, 2015 ("CDS agrees that students should be able to attend school and actively participate in school related activities without unfair or unequal treatment based on sex. Per CDS's policies, during physical education and activities where pants or shorts are appropriate, such as some field trips, girls may wear shorts or pants.")).

Indeed, in depositions, several of the individual Board Members acknowledged the negative effects of wearing skirts as compared to wearing pants, including conceding: that skirts are generally colder in the winter time, *see* R56.1 Stmt. ¶ 159; that skirts cause heightened awareness of positioning of the legs when seated due to modesty concerns, *id.* ¶ 123; that skirts are not typically what one would choose to wear during athletic activities or exercise, *id.* ¶¶ 50-54, 57-59, 122, 133-34, 145; that skirts can or should cause girls to refrain from engaging in certain activities, such as doing a flip or hanging on the monkey bars, *id.* ¶¶ 133-34; and that skirts are less protective of the legs than pants, *id.* ¶¶ 141, 147. Defendants nonetheless apparently deem these acknowledged limitations insufficiently important to displace the

fundamental purpose of the requirement to instill "traditional gender roles." This should be no surprise, as acceptance of these limitations is entirely consistent with the traditional view that girls are and should be less physically active than boys.[9]

Plaintiffs' first-hand experience is bolstered by evidence on the harms to girls in general from school uniform policies that require girls to wear skirts, as well as evidence on the effects of gender stereotypes in general. These harms include limitations on physical mobility, associated with the desire to preserve "modesty," the perception of girls who wear feminine clothing as less active and athletic, and increased stereotyped views about athletics as a male domain. R56.1 Stmt. ¶¶ 144-46, 152 & DE 60-1. Restrictions on mobility deprive girls of the many psychological, physical, and academic benefits associated with physical activity. R56.1 Stmt. ¶¶ 149-53. Moreover, practices such as differentiated uniforms enhance gender distinctions in the classroom and increase sex stereotypes. *Id.* ¶¶ 169-73. Such stereotypes, in turn, lead to negative academic, social, and psychological consequences for children, including by impacting their self-concept, confidence, interest, and motivation about their science and math abilities. *Id.* ¶ 172. Increasing the salience of gender distinctions in the classroom has also been shown to harm girls' academic performance by placing girls in a state of "stereotype threat." *Id.* ¶ 174.

---

[9] These distinct harms pertain notwithstanding the option of wearing "skorts" or leggings or tights under their skirts. *See* Ex. 8 ¶ 5 (attesting that she was reprimanded for doing a cartwheel even though she was wearing a skort, and that "because it looks like a skirt, when we were wearing skorts the teachers would still treat us as if we were wearing plain skirts and would monitor the way we sat."); *id.* ¶ 13 (stating that boys "razzed" her if her skirt flew up while she was playing soccer, whether or not she was wearing a skort or leggings underneath); Ex. 7 ¶ 18 ("Although we can wear skorts or leggings under our skirts to school, that doesn't help because we are still expected not to do things that show the underlayer of shorts or leggings under our skirts. Teachers still would scold us if we were sitting or doing an activity that made our shorts or leggings show, and we could still get teased."); Ex. 20 p. 9 (skorts fall under the category of "a skirts variant rather than a shorts variant," which "[f]unctionally and practically . . . are limiting in ways that shorts are not. Moreover, being subjected on a daily basis to these types of messages regarding one's unequal status to boys constitutes a particular type of dignitary harm that merely providing girls the option of wearing "skorts" or leggings does nothing to address).

These numerous harmful outcomes, suffered by girls alone, represent a stark example of the injuries wrought by sex stereotypes—making it even more critical that the Skirts Requirement be declared invalid. *See Morales-Santana*, 137 S. Ct. at 1692–93; *Knussman*, 272 F.3d at 636.

E.    **Defendants Cannot Justify the Skirts Requirement Based on Community Preference.**

In seeking to justify the incorporation of the Skirts Requirement in the Uniform Policy, Defendants have explained that the Uniform Policy reflected the desires of the members of the community who took part in formulating CDS policies at the time of the school's founding. R56.1 Stmt. ¶ 73; *id.* ¶¶ 111-12 (CDS Board voted at the March 7, 2015 board meeting, after this lawsuit was initiated, to preserve the Skirts Requirement because a majority of parents had indicated that they were in favor of the policy). This justification similarly must fail.

It is well-settled that the preference of the majority is not a sufficient justification for the imposition or preservation of a discriminatory policy on a minority. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause…and the city may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic."); *ACLU v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1477-78 (3rd Cir. 1996) (school's referendum in support of prayer at a graduation ceremony was insufficient justification, as "[a]n impermissible practice can not [*sic*] be transformed into a constitutionally acceptable one by putting a democratic process to an improper use."); *Hobson v. Hansen,* 320 F. Supp. 409, 414 (D.D.C. 1970) ("If the plan discriminates along either racial or economic lines, it is, of course, constitutionally unacceptable regardless of whether it is endorsed by a legitimate majority of parents of the

36

children attending the schools."). Rather, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894 (1992).

This principle, which has been long-established in the context of the right to equality in education, *see, e.g.*, *United States v. Scotland Neck City Bd. of Educ.*, 407 U.S. 484, 491 (1972) (preference of white parents not to send their children to school with Black children "cannot . . . be accepted as a reason for achieving anything less than complete uprooting of the dual public school system"), was directly addressed in *United States v. Virginia*, 518 U.S. 515. There, the Court rejected the state's argument that the exclusion of women from the state's premier military academy was justified by the need to preserve the popular option of a single-sex education—characterizing this majority-preference-based justification as "notably circular." *Id.* at 545. The Court further rejected the explanation that most women would not prefer the "adversative" pedagogical approach employed at VMI and would instead prefer the more stereotypically feminine approach taken by the proposed parallel program that had been proffered as an alternative. Emphasizing that some women would both prefer and be equipped to handle VMI's adversative approach, the Court observed: "It is on behalf of these women that the United States has instituted this suit, and it is for them that a remedy must be crafted." *Id.* at 550; *see also Arnold*, 459 F.2d at 943 (ratification of gendered grooming code by

students did not save it from constitutional infirmity).[10] Consequently, the presumed satisfaction of a majority parents with the Uniform Policy is legally insufficient as a justification for both the initial decision to institute a policy that facially treats boys and girls differently, as well as for the Board's subsequent decision to maintain the Skirts Requirement.

Moreover, Plaintiffs have not sought to eliminate the option of wearing skirts but have merely sought that a pants option be *added* for girls. Their sworn testimony explains their personal preference for wearing pants and details the harms they have experienced as a result of being deprived of this option. Evidence also suggests that Plaintiffs are not alone: In K.B.'s case, her objection to the Skirts Requirement motivated her to circulate a petition to her classmates asking that CDS permit girls to wear pants, generating approximately 100 signatures. R56.1 Stmt. ¶¶ 249, 253. CDS surveys further indicate that each year, some percentage of parents indicated their dissatisfaction with the uniform. *Id.* ¶¶ 108-09. The purported preference of a majority of parents for a Uniform Policy that mandates girls wear skirts is thus an impermissible justification, as it is Plaintiffs and other CDS students and parents who object to the Skirts Requirement, rather than its supporters, on whom the Court must focus. *See Virginia*, 518 U.S. at 550; *Black Horse*, 84 F.3d at 1477-78.

---

[10] Courts have similarly rejected "majority preference" defenses in the context of Title IX. *See McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 296 (2d Cir. 2004) (school district could not justify denial of athletic opportunity by arguing that society or the community values the success of female athletes less than male athletes); *Cohen* v. *Brown Univ.*, 101 F.3d 155, 178-80 (1st Cir. 1996) ("To assert that Title IX permits institutions to provide fewer athletics participation opportunities for women than for men, based upon the premise that women are less interested in sports than are men, is (among other things) to ignore the fact that Title IX was enacted in order to remedy discrimination . . . [and] would pervert the remedial purpose of Title IX.").

### F. The Skirts Requirement Is Not Substantially Related to the Justifications for the Uniform Policy More Generally.

The Skirts Requirement is similarly not justified by the other purposes contained in the CDS Student Handbook for the Uniform Policy more generally: to instill discipline, uniformity, respect and team spirit, and foster student learning. R56.1 Stmt. ¶ 38. These goals may or may not be sufficiently important to justify the existence of a uniform policy more broadly. *See Massie*, 455 F.2d at 783; *Mick*, 476 F.2d at 973-74. However, they fail to justify the Skirts Requirement in particular because there is no evidence that the Skirts Requirement itself is in any way—much less substantially—related to achieving those goals.

The Seventh Circuit's decision in *Hayden v. Greensburg Community School Corp.*, 743 F.3d 569 (7th Cir. 2014), is instructive here. In that case, the court struck down a hair-length requirement that applied to male athletes, finding that the requirement drew "an explicit distinction between male and female athletes and impose[d] a burden on male athletes alone," without "a legally sufficient justification for the sex-based classification." *Id.* at 582. The court rejected the proffered justification for the policy—promoting team unity and a "clean-cut image"—observing that these goals could just as easily have been achieved by adopting the same grooming rules that applied to girls' hair. *Id.* at 581. Although the court suggested in dicta that a policy that imposed comparable but "not identical" hair-length standards on both male and female athletes might have withstood heightened scrutiny in the absence of evidence that it imposed an unequal burden on male athletes, *id.* at 581-82, the court found that was not the case with challenged policy, which affected male students alone. *Id.* at 582.

Here, as in *Hayden*, the skirts requirement imposes a restriction on only one sex—girls—without adequate justification. And here, as in *Hayden*, the same general goals that underpin the Uniform Policy as a whole could just as easily be achieved by a uniform policy

39

that permitted girls to wear pants. As previously discussed, there is no evidence in support of the notion that the Skirts Requirement promotes "respect among peers"—on the contrary, Plaintiffs testify to its harmful effects. Defendants similarly produced no evidence that the Skirts Requirement promotes student discipline or improves student learning.[11] Although Defendants placed special emphasis on the role of the Uniform Policy in teaching students to follow the rules, they also were unable to point to any reason students could not also learn to follow the rules if the rules permitted girls to wear pants. The following exchange with Board Member Melissa Gott provides a typical example:

> Q: Do you agree that requiring girls to wear skirts helps keep order?
> A: Among other things, yes.
> Q How does it do that?
> A: . . . [I]t's a uniform policy and by fostering a traditional educational environment that's what helps our students succeed, and that is our number one goal at the school.
> Q: Do you think permitting girls to wear pants would undermine order?
> A: I do not know.

Ex. 16, 77:12-81:12. Similarly, Defendants conceded that there would likely be no change in team spirit if girls were allowed to wear pants, or in some cases, stated that they did not know whether there would be any change. R56.1 Stmt. ¶ 120. Defendants therefore are far from meeting their heavy burden of establishing a "substantial" relationship between the

---

[11] There is also no evidence that the Uniform Policy as a whole fulfils the goal of promoting discipline or student learning. Although Mr. Mitchell referenced research studies supporting a link between uniforms and improved discipline so numerous "you wouldn't bother to list them" as they were "just common knowledge," R56.1 Stmt. ¶¶ 75-78, Defendants produced no such studies—with the exception of an infographic in *U.S.A. Today*. This hardly constitutes valid data sufficient to support a "substantial relationship" between the Policy as a whole and improved disciplinary outcomes. In fact, according to Dr. Paoletti, the evidence remains inconclusive on whether dress codes or uniforms actually promote discipline or improve behavior, despite their widespread adoption on these grounds, leading her to conclude: "Defendants' claims that the uniform requirement will 'instill discipline and keep order so that student learning is not impeded' are thus not solidly supported by the existing research." Ex. 20 p. 8. It is therefore entirely possible that the Uniform Policy as a whole would not survive the review mandated by *Massie*. However, the Court need not go that far, as only the Skirts Requirement is at issue in this case.

requirement that girls wear skirts and the goals they seek to achieve through the Uniform Policy.

The lack of any relationship between the Skirts Requirement and the general objectives stated in the Student Handbook is further underscored by the uncontested fact that students are permitted to wear gender-neutral outfits, including the option of shorts or sweatpants, on days when they have P.E. or on days when the uniform is suspended for other reasons, such as field trips or athletics. There is no evidence of increased disciplinary issues or declines in "team spirit" or "student learning" on those days. And here, again, Plaintiffs' testimony shows that their own ability to focus during school has in fact suffered as a result of their discomfort. *Id.* ¶¶ 216-18, 237-41; Ex. 7 ¶ 8; Ex. 8 ¶¶ 3, 7, 8.  In sum, there is no evidence that the Skirts Requirement furthers the achievement of the general goals stated for the Uniform Policy. On the contrary, the evidence suggests that the Skirts Requirement may undermine those goals. *See Hayden*, 743 F.3d at 581-82.

## III.    THE SKIRTS REQUIREMENT VIOLATES TITLE IX.

Title IX provides that no person may be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2012).[12] The Skirts Requirement violates all

---

[12] Both CDS and RBA are subject to Title IX. The Supreme Court has held that "entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999). Receipt of federal funds subjects both public and private entities to Title IX's non-discrimination provisions. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). Title IX regulations define "recipients" as "any public or private agency, institution, or organization, or other entity . . . to whom Federal financial assistance is extended . . . and which operates an education program or activity which receives such assistance." 34 C.F.R. § 106.2(i) (2017).  It is uncontested that CDS directly receives federal funds, and that RBA is also responsible for the "operation of" CDS pursuant to the Management Agreement. DE 13-7; R56.1 Stmt. ¶¶ 291, 315, 328-29 & Exhs. 15, 117-121. Federal funds are also passed through to RBA in the form of management fees. R56.1 Stmt. ¶ 323; DE 13-7 Art. VI. Accordingly, both entities are subject to Title IX.

three prongs of Title IX. It subjects Plaintiffs to "discrimination,"—i.e. facially different treatment—on the basis of their sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005), and promotes unlawful sex stereotypes of the very type Title IX was designed to prohibit. It further results in Plaintiffs being "excluded from" and "denied the benefits of" participation in educational opportunities on the basis of their sex.

**A.    The Skirts Requirement Subjects Plaintiffs to Discrimination and Stereotypes.**

Both the Supreme Court and the Fourth Circuit have long recognized the importance of Title IX in securing equal educational opportunities that too often remain out of reach for women and girls. *See Mercer v. Duke Univ.*, 401 F.3d 199, 207 (4th Cir. 2005) ("There can be no doubt that Title IX's goal of reducing gender-based discrimination in education is an important public goal."). Accordingly, in light of the statute's remedial purpose to eliminate sex discrimination, courts "must accord [Title IX] a sweep as broad as its language." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)); *see also Jackson*, 544 U.S. at 175 (2005) ("'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a 'broad reach.'").

Title IX is absolute in its prohibition against "discrimination" in any program or activity that receives federal funds, subject to narrow, clearly enumerated exceptions. "Discrimination" should be afforded its plain meaning—treating students in a facially different manner. By requiring girls to wear skirts while permitting boys to wear pants or shorts, the Uniform Policy does just that. This interpretation is supported by regulatory definitions of the term "discrimination": both USDA and USED, from whom CDS/RBA receive federal funds, define discrimination as including "[s]ubject[ing] any person to separate or different rules of behavior,

42

sanctions, or other treatment." 34 C.F.R. §§ 106.31(a), (b)(4) (2017); 7 C.F.R. § 15a.400(b)(4) (2017). To the extent that the Court finds there is any ambiguity to the statutory term "discrimination" in the context of dress codes, these longstanding regulatory interpretations are consistent with the text as well as the purpose of Title IX, and constitute a reasonable interpretation of the statute that should be afforded deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-844, n. 11 (1984); *Preston v. Co. of Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 n.2 (4th Cir. 1994) (affording deference to USED Title IX regulation prohibiting retaliation). Requiring girls to wear skirts and disciplining them should they wear pants or shorts to school subjects girls to "different rules of behavior, sanctions, or other treatment" than boys. *Cf. Mercer*, 190 F.3d at 648 (exclusion of female athlete from participation on men's football team was prohibited under general provision of USED regulation applying Title IX's prohibitions in the context of athletics).[13]

The structure of Title IX further supports this interpretation. Although the statute contains certain defined exceptions (covering, for example, religious organizations, social fraternities or sororities, "voluntary youth service organizations," *see* 20 U.S.C. § 1681(a)(2)-(9) (2012), or separate living facilities, *see* 20 U.S.C. § 1686 (2012)), gender-differentiated dress codes are not

---

[13] Plaintiffs initially pointed to an additional USDA regulation that explicitly prohibited "[d]iscriminat[ion] in the application of any rules of appearance." 7 C.F.R. § 15a.31(b)(5) (rescinded Oct. 2017). USDA has since replaced that regulation with the Title IX "common rule" drafted by the Department of Justice in 2000. *See* U.S. Department of Agriculture, *Education Programs or Activities Receiving or Benefitting from Federal Financial Assistance*, 82 Fed. Reg. 46655 (Oct. 6, 2017). Accordingly, Plaintiffs now withdraw their argument that the Skirts Requirement violates the prior USDA regulation on rules of appearance. However, the replacement of that regulation in favor of the common rule does not impact Plaintiffs' claims because the common rule, like the USED rule, continues to define discrimination in the manner discussed above. 7 C.F.R. § 15a. 400(b)(4). Moreover, USDA's adoption of the common rule should not be interpreted to mean that USDA has *sub silentio* adopted the position that dress codes that differentiate on the basis of sex are now permissible. On the contrary, when a regulatory agency intends to permit recipients to utilize sex-based classifications, it says so explicitly. *See, e.g.*, 34 C.F.R. § 106.34(b) (2017); 7 C.F.R. §§ 15a.405, 15a.410, 15a.415 (permitting recipients to provide separate housing, toilet, locker room, and shower facilities on the basis of sex, and to separate students by sex for physical education classes, contact sports, and classes on human sexuality, among other reasons).

among them. "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)). To read an exception for dress codes into the statute would be to ignore the Court's directive to give Title IX "a sweep as broad as its language." *N. Haven*, 456 U.S. at 521 (quoting *Price*, 383 U.S. at 801).

Perhaps most critically, a finding that the Skirts Requirement violates Title IX's prohibition on sex discrimination accords with Title IX's core purpose to eliminate "stereotyped notions" regarding women's presumed weakness or physical or intellectual inferiority. *See* 118 Cong. Rec. 5804, 5808 (1972) (statement of Sen. Bayh) (Title IX was designed as "a strong and comprehensive measure to provide women with solid legal protection from the persistent, pernicious discrimination which [was] serving to perpetuate second-class citizenship for American women."). Accordingly, this Court as well as the Fourth Circuit and other courts around the country have correctly recognized that Title IX's prohibition on sex discrimination encompasses discrimination based upon sex stereotypes. DE 91, pp. 10-11; *see also, e.g.*, *M.D. v. Sch. Bd. of City of Richmond*, 560 F. App'x 199, 203 (4th Cir. 2014) (recognizing viability of sex stereotyping theory under Title IX and reversing and remanding dismissal of minor, *pro se* plaintiff's case to provide an opportunity to develop the record that his harassment case was based on "a failure to conform to gender stereotypes" rather than based on sexual orientation); *Wolfe v. Fayetteville Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011) (plaintiff could prevail under Title IX by proving that "the harasser intended to discriminate against him 'on the basis of sex,' meaning the harassment was motivated by either the plaintiff's gender or failure to conform with gender stereotypes"); *Sturgis*, 2011 WL 4351355, at *4 (denying motion to dismiss challenge to

gendered yearbook dress code requirement on the ground that the plaintiff stated a viable claim under a sex stereotyping theory).

As detailed above, the stated purpose of the Skirts Requirement was to differentiate between boys and girls, promote traditional gender roles, and foster "chivalry"—i.e. the notion that girls are "fragile vessels that men should take care of and honor." R56.1 Stmt. ¶¶ 94-96 The message conveyed by the Skirts Requirement, as understood by the young women who have brought this suit, is not only that girls are more "fragile" than boys, but also that they are and should be less physically active, that their comfort and ability to participate on equal terms in school activities matters less, and ultimately, that they are worth less than boys. *Id.* ¶¶ 222, 256; Ex. 7 ¶¶ 16-17; Ex. 8 ¶ 19; Ex. 4 ¶¶ 22-23 These archaic notions represent precisely the type of "social evil of sex discrimination in education" that Title IX was designed to "root out, as thoroughly as possible." 118 Cong. Rec. at 5804 (1972) (statement of Sen. Bayh).

**B.    The Skirts Requirement Denies Plaintiffs Educational Benefits and Opportunities.**

In addition to being facially discriminatory and irreparably tainted by stereotypes, the Skirts Requirement has, in practice, resulted in Plaintiffs being deprived of and excluded from educational opportunities. *See Hayden*, 743 F.3d at 581-82. As discussed in Sections I.B and II.D, above, as a result of the Skirts Requirement, Plaintiffs have been not merely uncomfortable, but also distracted from their studies, and have refrained from engaging fully in sports and physical activities during recreational periods that are critical to children's physical, academic, and psychological development. They have thus been "excluded from" and "denied the benefits of" valuable educational opportunities at CDS. 20 U.S.C. § 1681(a). Defendants are aware of these limitations, yet choose not to act; they have, in effect, privileged their own ideologies regarding "traditional" gender roles and the purported preferences of a majority of parents over

45

the comfort and freedom of Plaintiffs, opting to continue to impose the Skirts Requirement on all students rather than simply affording Plaintiffs the option of wearing pants or shorts. This cannot stand under Title IX.

## IV. THE SKIRTS REQUIREMENT VIOLATES THE NORTH CAROLINA CONSTITUTION.

As discussed in Section II above, Defendants have failed to demonstrate that the Skirts Requirement is substantially related to the achievement of an important governmental objective for purposes of satisfying heightened scrutiny under a federal equal protection analysis. Because the same heightened level of review applies to sex-based classifications under the North Carolina Constitution, *Dep't of Transp. v. Rowe*, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001), Plaintiffs are entitled to summary judgment on this claim as well.

Moreover, Defendants face an even higher burden because North Carolina courts apply strict scrutiny "when a regulation . . . infringes on the ability of some persons to exercise a fundamental right." *Id.* Strict scrutiny is appropriate in this case because the North Carolina Constitution establishes, and the North Carolina courts have long recognized, that public education is a fundamental right. *See* N.C. Const. art. I, § 15 (citizens have "a right to the privilege of education, and it is the duty of the State to guard and maintain that right"); N.C. Const. art. IX, § 2(1) (requiring that there be "a general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students"). *Sneed*, 299 N.C. at 618, 264 S.E.2d at 113 ("[E]qual access to participation in our public school system is a fundamental right, guaranteed by our state constitution and protected by considerations of procedural due process." (citing *Givens v. Poe*, 346 F. Supp. 202 (W.D.N.C. 1972))); *Leandro v. State*, 346 N.C. 336, 345, 488 S.E.2d 249, 254 (1997) (finding that "there is a qualitative standard inherent in the right to education guaranteed by this state's constitution" which,

combined with constitutional guarantee of "equal opportunities . . . for all students," establishes

the right fundamental right to a sound basic education). Defendants therefore must meet an

extremely high burden to justify unequal restrictions on this fundamental right by showing that

the restriction "[is] 'necessary to promote a compelling governmental interest.'" *Leandro*, 346

N.C. at 357, 488 S.E.2d at 261 (quoting *Town of Beech Mountain v. Cty. of Watauga*, 324 N.C.

409, 412, 378 S.E.2d 780, 782 (1989)). Because, as articulated in Section II, above, the Skirts

Requirement fails to satisfy heightened scrutiny, it cannot survive the more demanding test of

strict scrutiny. Thus, no matter which test this Court applies, Defendants will be unable to carry

their burden of justifying the Skirts Requirement under the North Carolina Constitution.

## V.   BECAUSE DEFENDANTS HAVE VIOLATED THE FEDERAL AND STATE CONSTITUTIONS AND TITLE IX, SUMMARY JUDGMENT IS APPROPRIATE FOR PLAINTIFFS' BREACH OF CONTRACT CLAIMS.

Defendants' legal violations under Title IX and the U.S. and North Carolina Constitutions

further cause them to be in breach of contractual obligations, set forth in the Charter Agreement

between CDS, Inc./RBA and the State Board of Education (SBE), and in the Management

Agreement between RBA and CDS, Inc., binding them to comply with all applicable laws.

Because Plaintiffs are the direct and intended beneficiaries of these guarantees of compliance,

they may therefore recover remedies, including declaratory and equitable relief, for breach.

A party may assert a claim for breach of contract where she is "either a party to the

contract or a third party beneficiary of the contract." *Holshouser*, 134 N.C. App. at 399, 518

S.E.2d at 24–25 (citing *State ex. rel Long v. Interstate Casualty Ins. Co.*, 120 N.C. App. 743,

747, 464 S.E.2d 73, 75 (1995)), *aff'd*, 524 S.E.2d 568 (N.C. 2000). A party can establish that she

is a third-party beneficiary if she can show "(1) that a contract exists between two persons or

entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for

the direct, and not incidental, benefit of the plaintiff." *Id.*; *accord Revels v. Miss Am. Org.*, 182 N.C. App. 334, 336, 641 S.E.2d 721, 723–24 (2007). "A person is a direct beneficiary of [a] contract if the contracting parties intended to confer a legally enforceable benefit on that person." *Holshouser*, 134 N.C. App. at 400, 518 S.E.2d at 25 (citing *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646, 651, 407 S.E.2d 178, 181 (1991)); *see also* Restatement (Second) of Contracts § 302 (1981). In determining the intent of the contracting parties, courts "consider [the] circumstances surrounding the transaction as well as the actual language of the contract." *Raritan*, 329 N.C. at 652, 407 S.E.2d at 182. In the case of contracts between governmental and non-governmental entities, third-party beneficiaries may recover if the terms of the contract provide for such recovery or if the third party could recover from the promisee directly. *See* Restatement (Second) of Contracts § 313(2); *Matternes v. City of Winston-Salem*, 286 N.C. 1, 14, 209 S.E.2d 481, 488-89 (1974) (citing analogous provision in Restatement (First) of Contracts § 145 (1932)).

It is undisputed that the Charter Agreement and RBA Management Agreement are valid, enforceable contracts. R56.1 Stmt. ¶¶ 275, 289. It is also clear from the circumstances and the contracts themselves that students were intended to be direct third party beneficiaries of both agreements.

The Charter Agreement requires CDS, Inc. to comply with North Carolina Charter School statutes, which were themselves enacted to "[i]mprove student learning" and to "[i]ncrease learning opportunities for all students." N.C. Gen. Stat. § 115C-218(a). The Charter statute expressly prohibits sex discrimination in charter schools. *Id.* §§ 115C-218.55. The Charter Agreement calls for CDS to provide educational services directly to enrolled children, rather than to the other Party, SBE. R56.1 Stmt. ¶¶ 273-76 & Exs. 93, 94; DE 13-6. And the 2015 Charter

Agreement expressly requires Charter Day School, Inc. to ensure that the Public Charter School complies with "the Federal and State Constitutions and all applicable federal laws and regulations, including, but not limited to, such laws and regulations governing . . . civil rights." R56.1 Stmt. ¶ 324; DE 13-6 ¶ 5.1. The 2000 and 2005 Charter agreements specifically require notice to parents and students of these legal requirements. Ex. 93 ¶ C; Ex. 94 ¶ 4. At the same time, all three versions of the Charter Agreement disclaim any obligation to monitor compliance with federal law. Ex. 93 ¶ C; Ex 94 ¶ 4; DE 13-6 ¶ 5.4. This provides particularly strong evidence that students and parents, named in the contract, are intended to be permitted a right to legally enforce CDS's compliance with the Constitution and civil rights laws.

Like the Charter Agreement, the Management Agreement between CDS, Inc. and RBA requires that RBA "provide educational programs that meet federal, state and local requirements, and the requirements imposed under the Law and the Charter." DE 13-7, § 4.08. It further provides that RBA must not "directly cause CDS to be in material breach of the educational and business requirements of its Charter with the SBE." *Id.* § 4.13. Students are named numerous times throughout the Management Agreement as the intended beneficiaries of the services RBA is to provide under its terms. *See, e.g., id.* § 2.02; (RBA provides "all labor, materials, equipment, facilities and supervision necessary for the provision of educational services to students")*; id.* § 4.02 (RBA "implement[s]" CDS's "educational goals and programs"); *id.* § 4.11 (RBA is "responsible and accountable to the [CDS, Inc.] Board for the performance of students who attend [CDS]"). The same or nearly identical terms appear in all prior and subsequent versions of the Management Agreement. Exs. 15, 117-121.Thus, CDS students are the intended beneficiaries of the Management Agreement and have a right to enforce it.

Yet, as demonstrated above, RBA, through its employees and its President, Mr. Mitchell, caused CDS, Inc. to adopt of a series of discriminatory dress codes.[14] RBA formulated and implemented the Skirts Requirement premised on impermissible, archaic sex stereotypes, motivated by Mr. Mitchell's antiquated vision of "traditional gender roles." In doing so, and in continually recommending that the Skirts Requirement remain in place, RBA caused and continues to cause CDS, Inc. to implement a sex discriminatory policy in violation of Title IX and the State and Federal Constitutions and breach the Charter Agreement. This, in turn, constitutes a breach of the Management Agreement by RBA, which Plaintiffs, as CDS students seek to enjoin.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant summary judgment to Plaintiffs on all claims and award them the full relief they seek: a declaration that the Skirts Requirement is discriminatory, an injunction requiring Defendants to change the CDS Uniform Policy to permit girls to wear pants or shorts, nominal damages, and an award of attorneys' fees and costs.

This the 29th day of November, 2017.

ELLIS & WINTERS LLP

/s/ Emily E. Erixson
Jonathan D. Sasser
NC State Bar No. 10028
Emily E. Erixson
NC State Bar No. 47136
Post Office Box 33550
Raleigh, NC  27636
Telephone: (919) 865-7000

---

[14] Although the CDS Board has final authority to adopt those rules, it is clear from the record that it routinely accepts RBA-proposed rules and actions, including changes to the Uniform Policy. *See, e.g.*, R56.1 Stmt. ¶¶ 295-301 (discussing process of approving addition of polo dresses to Uniform Policy).

50

Facsimile: (919) 865-7010
jon.sasser@elliswinters.com
emily.erixson@elliswinters.com
Local Civil Rule 83.1 Counsel

AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA LEGAL
FOUNDATION

/s/ Christopher A. Brook (with permission)
Christopher A. Brook
NC Bar No. 33838
Legal Director, American Civil Liberties
Union of North Carolina Legal Foundation
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: (919) 834-3466
Facsimile: (866) 511-1344
cbrook@acluofnc.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

/s/ Galen Sherwin (with permission)
Galen Sherwin
(LR 83.1(a) special appearance)
Amy Lynn Katz
(LR 83.1(a) special appearance)
Lenora M. Lapidus
(LR 83.1(a) special appearance)
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2615
llapidus@aclu.org
gsherwin@aclu.org
wrp_ak@aclu.org

*Attorney for Plaintiffs*

51

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2017, I electronically filed the foregoing Memorandum in Support with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ Emily E. Erixson
*Attorneys for Plaintiffs*