IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO.: 7:16-CV-30-H

BONNIE PELTIER, as Guardian )
of A.P., a minor child; )
ERIKA BOOTH, as Guardian of )
I.B., a minor child; and )
PATRICIA BROWN, as Guardian )
of K.B., a minor child; )
)
    Plaintiffs, )
)
)
    v. )
)       **ORDER**
)
CHARTER DAY SCHOOL, INC., )
ROBERT P. SPENCER,CHAD )
ADAMS, SUZANNE WEST, COLLEEN )
COMBS, TED BODENSCHATZ, and )
MELISSA GOTT in their )
capacities as members of the )
Board of Trustees of Charter )
Day School, Inc., and THE )
ROGER BACON ACADEMY, INC., )
)
    Defendants. )

This matter is before the court on the parties' cross motions for summary judgment [DE #149 and #158]. Appropriate responses and replies have been filed, and the time for further filing has expired. The following additional motions are also ripe for review:

(1) Motion to Strike Answer to Amended Complaint [DE #200];

(2) Motion to Stay Motion to Strike [DE #203];

(3)  Motion for Extension of Time to File Response to Motion to Strike [DE # 203]; and

(4)  Motion for an Advisory Jury [DE #208].

## PROCEDURAL HISTORY

Plaintiffs Bonnie Peltier, as Guardian of A.P., a minor child; Erika Booth, as Guardian of I.B., a minor child; and Patricia Brown, as Guardian of K.B., a minor child; by and through counsel filed the complaint in this matter on February 29, 2016 and an amended complaint on March 11, 2016. Defendants filed a motion to dismiss, which was denied by this court. The parties were ordered to attend a court-hosted settlement conference as to all claims in this matter. The parties did not reach a settlement. Also, during the discovery period, plaintiffs filed a motion for appropriate relief, which was granted on September 29, 2017 [DE #136]. In that order, United States Magistrate Judge Kimberly A. Swank found misconduct by defendants' counsel[1] and ordered that portions of the January 13, 2017, Psychological Report authored by defendants' experts Wells Hively, Ph.D., and Ann Duncan-Hively, Ph.D., J.D., be stricken from the records, specifically, any and all portions which reference or rely upon classroom observations of the minor plaintiffs or other students of Charter Day School or teacher

---

[1] Defendants' former counsel withdrew and defendants now have different counsel than those found to have committed misconduct.

interviews conducted by defendants' experts. The defendants were ordered to submit a revised expert report. Further, defendants are barred from offering, eliciting, presenting or otherwise relying upon any testimony, statements or opinions of their experts concerning their classroom observations of the minor plaintiffs or the teacher interviews. The order allowed further briefing on the amount of sanctions; however, the parties agreed upon an amount of sanctions prior to entry of any order by the court.

Now before the court are the above-listed motions. These motions are ripe for review.

## STATEMENT OF THE FACTS

Plaintiffs are current or former students of Charter Day School, a co-educational, K-8 public charter school in Brunswick County, North Carolina. They brought this action challenging the school's uniform policy, which requires female students to wear "skirts, skorts, or jumpers" ("the skirts requirement") and male students to wear shorts or pants. Plaintiffs do not contest defendants' authority to impose a school uniform policy in general, but only the skirts requirement. They argue the skirts requirement forces them to wear clothing that is less warm and comfortable than the pants their male classmates are permitted to wear and, more importantly, restricts plaintiffs' physical activity,

3

distracts from their learning, and limits their educational opportunities.

Plaintiffs claim the uniform policy violates federal and state law. Specifically, plaintiffs assert the following causes of action: (1) sex-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, brought via 42 U.S.C. § 1983; (2) sex-based discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. and implementing regulations; (3) sex-based discrimination in violation of the Equal Protection Clause in Article I, Section 19 of the North Carolina Constitution; (4) breach of the Charter Agreement between the State Board of Education and Charter Day School, Inc.; and (5) breach of the management agreement between Charter Day School, Inc., and The Roger Bacon Academy, Inc. ("RBA").

The North Carolina General Assembly passed the Charter Schools Act in the mid-1990s. The Act states its purpose as follows:

> The purpose of this Article is to authorize a system of charter schools to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently of existing schools, as a method to accomplish all of the following:
>
> (1) Improve student learning;
>
> (2) Increase learning opportunities for all students, with special emphasis on expanded

learning experiences for students who are identified as at risk of academic failure or academically gifted;

(3) Encourage the use of different and innovative teaching methods;

(4) Create new professional opportunities for teachers, including the opportunities to be responsible for the learning program at the school site;

(5) Provide parents and students with expanded choices in the types of educational opportunities that are available within the public school system; and

(6) Hold the schools established under this Article accountable for meeting measurable student achievement results, and provide the schools with a method to change from rule-based to performance-based accountability systems.

N.C. Gen. Stat. § 115C-218.

Charter Schools are operated by private, nonprofit corporations. N.C. Gen. Stat. § 115C-15(b). The board of directors of the school decides "matters related to the operation of the school, including budgeting, curriculum, and operating procedures." N.C. Gen. Stat. § 115C-15(d).

In this case, the nonprofit corporation which holds the charter for the School is defendant Charter Day School, Inc. ("CDS, Inc.").[2] CDS, Inc. also holds charters for three other charter schools, South Brunswick Charter School, Douglass Academy, and

_____

[2] Charter Day School, Inc. (referred to herein as "CDS, Inc.") is the nonprofit corporation holding the charter, while Charter Day School (referred to herein as "the School") is the school plaintiffs attend.

Columbus Charter School. [DE #160 ¶10]. CDS, Inc. was incorporated by Baker Mitchell in 1999. [DE #160 ¶2]. Mr. Mitchell served on the original CDS, Inc. Board of Trustees and currently serves as Board Secretary, a non-voting position. [DE #160 ¶22]. After the formation of CDS, Inc., it applied to open a charter school, which was approved for an initial five-year term. The School began operations for the 2000-2001 academic year. The State renewed the charter of CDS, Inc. to operate the School for ten years in 2005, with another ten-year renewal in 2015. When the School first opened, it had 53 students; it has since grown to over 900 students in elementary and middle school campuses.

The individual defendants, Robert Spencer, Chad Adams, Suzanne West, Colleen Combs, Ted Bodenschatz, and Melissa Gott (collectively "the Board" or "the Board members") comprise the Board of Trustees of CDS, Inc. and adopt the disciplinary rules, regulations, policies and procedures for the School. [DE #160 ¶¶11, 13].

The original charter application filed by CDS, Inc. notified the State that it intended to enter into an "educational management contract" with defendant RBA. [DE #160 ¶19]. RBA is a for-profit corporation and a legal entity separate from CDS, Inc. [DE #160 ¶20]. Mr. Mitchell is the founder, president, and sole shareholder of RBA. [DE #160 ¶21]. RBA's Chief Financial Officer, Mark Dudeck,

serves at the treasurer of CDS, Inc., but is not part of the Board. [DE #160 ¶23]. The charter agreement between CDS, Inc. and the State bars RBA employees from serving on the Board. RBA manages the day-to-day operations of the four charter schools chartered under CDS, Inc., undertaking various functions including leasing land and school buildings to the School, acquiring materials, etc. [See DE #160 ¶¶25-26].

The School is a "traditional values" charter school. [DE #160 ¶54, 55]. The four sections of the School's pledge are "to keep myself healthy in body, mind and spirit," "to be truthful in all my works," "to be virtuous in all my deeds," and "to be obedient and loyal to those in authority." Id. The School uses the direct instruction method and a classical curriculum to fulfill the School's mission. [DE #160 ¶¶54, 59].

Since the School's original charter, it has required students to adhere to a uniform policy for the following purpose: "to instill discipline and keep order" so that "student learning is not impeded." Use of uniforms also "helps promote a sense of pride and of team spirit, as every student is a member of the academic team." [DE #160 ¶¶68, 119-121.] Plaintiffs do not dispute the authority of CDS, Inc. and the School to establish and enforce a uniform policy in general.

All students must wear white or navy blue tops, tucked into khaki or blue bottoms. Boys may wear pants or knee-length shorts with a belt, while girls may wear knee-length or longer jumpers, skirts or skorts but may not wear pants or knee-length shorts. Girls may wear, but are not required to wear, socks, stockings or leggings. Boys must wear socks. All students must wear closed-toe/closed-heel shoes; flip flops, Crocs and sandals are prohibited. [DE #13-2]. In addition to the required uniform, the school also has grooming standards in place which regulate jewelry, hair length and color, as well as makeup and facial hair.[3] [DE #13-4 at 29-30]. Plaintiffs are challenging the skirts requirement only.

In addition to the uniform policy, students at the School are permitted to wear a separate physical education ("PE") uniform on days they are scheduled to have PE class, which consists of a

_____

[3] Girls:
- May wear single stud and small earrings that are no longer than ½ inch (no more than 2 per ear)
- Small, non-eccentric necklaces and bracelets may be worn. Not more than one necklace and one bracelet.
- Watches may be worn.
- Excessive or radical haircuts and colors are not allowed.
- Makeup is not allowed for elementary students; middle school girls may wear conservative make-up.

Boys:
- No jewelry is allowed.
- Watches may be worn.
- Hair must be neatly trimmed and off the collar, above the eyebrows, and not below the top of the ears or eyebrows.
- Excessive or radical haircuts and colors are not allowed.
- No mustache or beards. Boys must be clean shaven.

8

School approved t-shirt or sweatshirt and sweatpants or shorts. [DE #151 ¶¶50-51]. Because students in different classes are scheduled to have PE on different days, some percentage of the School's students wear the PE uniform on any given school day. [DE #151 ¶¶49-51]. Additionally, the uniform policy is suspended for various reasons on specific days, including certain field trip days, special events such as health, archery or girls' sports; when students achieve certain academic benchmarks; when students make donations to non-school-related charity organizations; or for celebrations or special events at the school. [DE #151 ¶¶52-59].

Violation of the uniform policy may result in disciplinary action. The uniform policy is primarily enforced by the School's teachers. [DE #160 ¶75]. When a student is out of compliance, a standardized, written notification is sent home to the student's parents. [DE #160 ¶76]. Repeated noncompliance results in a phone call to the parents. [DE #160 ¶79]. Sometimes items are loaned to students who cannot afford or do not have a particular item. [DE #160 ¶81]. A student who is out of compliance may be removed from class and sent to the School office or his or her parents may be called and asked to pick up the child. Additionally, the student could be excluded from class for the day and could be expelled; however, no child has ever been expelled for a uniform policy violation. [Answer, DE #94 ¶49].

9

Plaintiffs and their parents/guardians ad litem have testified that plaintiffs find skirts less comfortable on a daily basis and less warm in the wintertime than pants. [DE #151 ¶¶123-126, 154-64, and 179-257.] The skirts requirement forces them to pay constant attention to the positioning of their legs during class, distracting them from learning, and has led them to avoid certain activities altogether, such as climbing or playing sports during recess, all for fear of exposing their undergarments and being reprimanded by teachers or teased by boys. [Id. ¶¶123-153, 179-257.] They claim the skirts requirement sends a message that their comfort and freedom to engage in physical activity are less important than those of their male classmates. [Id. ¶¶ 165-258.]

The Board has the authority to establish and alter the uniform policy's specific requirements. The Board believes the uniform policy's current requirements inextricably support the School's broader, traditional-values educational model. One Board member stated that the requirements of the uniform policy, including its sex-differentiated requirements, "work seamlessly together in a coordinated fashion in a disciplined environment that has mutual respect between boys and girls and between each other as students." [Adams Dep. 134:1-15, DE #161-1]. The Board members focus on the uniform policy as a whole and not on the specific gender-based requirements, noting it is part of the overall design of the School to instill discipline, order, and mutual respect. However, the

Board members in their depositions all seemed to be unable to answer whether it would disrupt discipline if girls were allowed to wear pants (leaving in place the rest of the uniform policy). Furthermore, they often relied on the School's high enrollment and the parents' apparently satisfaction with the policy. They note that the uniform policy is part of the School's traditional values education, and that changing any of the specific requirements risks inadvertently changing the broader goal. [DE #160 ¶¶ 118-121, 124-128].

Defendants make much of the test scores and achievements of their students, comparing both the success of the students at the School versus students in traditional public schools within the county, as well as the girls in the School versus the boys in the school. There is no dispute among the parties that the test scores of the School are high compared to traditional public schools in the areas. Nor is there any dispute that plaintiffs chose to send their children to the School, in part, because of the high test scores. Defendants attempt to tie this success to the uniform policy; however, they do not bring forth any facts showing specifically how the skirts requirement furthers this success.

## I.   Standard of Review

Summary judgment is appropriate pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. _Celotex Corp. v. Catrett_, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, _Anderson_, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Summary judgment is not a vehicle for the court to resolve disputed factual issues. _Faircloth v. United States_, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. _Anderson_, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. _United States v. Diebold, Inc._,

369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. The evidence must also be such that a reasonable jury could return a verdict for the non-moving party. Id. at 248. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

## II. Title IX Claims[4]

Title IX provides: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). An implied private right of action exists for enforcement of Title IX. Preston v. Virginia ex rel. New River Cmty. Coll., 31 F.3d 203, 206 (4th Cir.1994) (citing Cannon v. Univ. of Chicago, 441 U.S. 677 (1979)). "Title IX has no administrative exhaustion requirement and no notice provisions. Under its implied private right of action, plaintiffs can file directly in court[.]" Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 255 (2009). The court notes that not all distinctions

---

[4] Plaintiffs do not bring a Title IX claim against the board members. School officials and individuals are not proper Title IX defendants. Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009).

on the basis of sex are impermissible under Title IX. See, e.g., 20 U.S.C. § 1686 (allowing separate living facilities for different sexes). In this circuit, courts have looked to Title VII cases as guidance for Title IX cases. See Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir.2007).

Defendants argue they are entitled to summary judgment on plaintiffs' Title IX claims for the following reasons: (1) RBA receives no federal financial assistance and it has no authority to alter the uniform policy, which is set by the Board of CDS, Inc; and (2) as to both defendants, the federal agencies tasked with enforcing Title IX interpret it not to apply to school personal-appearance codes at all.

In 1982, the United States Department of Education ("ED") promulgated amendments to its Title IX regulations to revoke the provision that had "prohibit[ed] discrimination in the application of codes of personal appearance." Nondiscrimination on the Basis of Sex, 47 Fed. Reg. 32,526 (July 28, 1982) (hereinafter, "Withdrawal of Appearance-Code Regulation"). ED found "no indication in the legislative history of Title IX that Congress intended to authorize Federal regulations in the area of appearance codes." Id. at 32,527. The agency determined that "issues involving codes of personal appearance [should] be resolved at the local level" and that ED should concentrate its resources "on areas . . . more central to the statute's prohibition of discrimination

14

on the basis of sex in education programs which receive Federal financial assistance." Id.

Further, ED and many other federal agencies adopted the Title IX Common Rule[5] pursuant to Executive Order 12,250. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 65 Fed. Reg. 52,858, 52,859 (Aug. 30 2000) (codified at 22 different locations) ("The promulgation of these Title IX regulations will provide guidance to recipients of Federal financial assistance who administer education programs or activities.")

Defendants urge this court to give proper deference to the agency interpretation under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). Under Chevron's two-step analysis,

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather,

---

[5] In a prior order, this court noted that it did not appear the USDA was one of the agencies which adopted the Common Rule. However, the USDA has since adopted the Common Rule. Education Program or Activities Receiving or Benefitting From Federal Financial Assistance, 82 Fed Reg. 46,655 (Oct 6, 2017) (codified at 7 C.F.R. §§ 15a.100-15a.605).

15

if the statute is silent or ambiguous with respect to
the specific issue, the question for the court is whether
the agency's answer is based on a permissible
construction of the statute.

   "The power of an administrative agency to administer
a congressionally created . . . program necessarily
requires the formulation of policy and the making of
rules to fill any gap left, implicitly or explicitly, by
Congress." Morton v. Ruiz, 415 U.S. 199, 231, 94 S. Ct.
1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has
explicitly left a gap for the agency to fill, there is
an express delegation of authority to the agency to
elucidate a specific provision of the statute by
regulation. Such legislative regulations are given
controlling weight unless they are arbitrary,
capricious, or manifestly contrary to the statute.
Sometimes the legislative delegation to an agency on a
particular question is implicit rather than explicit. In
such a case, a court may not substitute its own
construction of a statutory provision for a reasonable
interpretation made by the administrator of an agency.

Chevron, 467 U.S. at 842-44.

   Title IX does not directly speak to the "precise question" of
school uniform policies or appearance codes, suggesting that
Congress left this matter to the agency's discretion. See Id. at
842. Additionally, in thirty-five years, Congress has never
overridden ED's interpretation of the statute. ED has provided an
answer, interpreting Title IX to "permit[] issues involving codes
of personal appearance to be resolved at the local level."
Withdrawal of Appearance-Code Regulation, 47 Fed Reg. at 32,527.
At least twenty other federal agencies have joined in this

interpretation. The court finds this long-standing interpretation of Title IX is not "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844. Therefore, Title IX does not regulate the uniform policy at issue here, and defendants are entitled to summary judgment on the Title IX claims.

### III. Equal Protection Claims

#### a. State Action

Defendants first argue that plaintiffs' Equal Protection Claim ("EPC") claims brought pursuant to § 1983 fail because none of the defendants act "under color of [State] statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Plaintiffs contend that as owners and operators of a charter school specifically designated as a public school under North Carolina law, defendants are state actors subject to the Constitution's equal protection mandate.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

In order to establish a claim under § 1983, plaintiffs must show (1) that defendants deprived them of a right secured by the Constitution and laws of the United States and (2) that they deprived them of this right under color of state law. Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001). Both the state-action requirement of the Fourteenth Amendment and the under-color-of-state-law requirement of § 1983 "exclude[] from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" Mentavlos, 249 F.3d at 310 (quoting American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999)). Thus, courts treat the under-color-of-law requirement and the state-action requirement as equivalents for analytical purposes. Rendell-Baker v. Kohn, 457 U.S. 830, 837-38 (1982). "The state action requirement 'reflects judicial recognition of the fact that "most rights secured by the Constitution are protected only against infringement by governments."'" Mentavlos, 249 F.3d at 310 (quoting Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998)). This is so, in part, to "'preserve[] an area of individual freedom by limiting the reach of federal law' and 'avoid[] impos[ition] [up]on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'" Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619 (1991) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 936-37 (1982)).

However, there are times when the actions of private individuals and organizations may be deemed state action. "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior may be fairly treated as that of the State itself.'" Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)).

As the defendants in this matter are not public officials, but rather private individuals or organizations, plaintiffs have to show that the "allegedly unconstitutional conduct is fairly attributable to the State." Sullivan, 526 U.S. at 50.

Caselaw dictates that the court must first, through a factual inquiry, determine the specific conduct of which plaintiffs complain. Mentavlos, 249 F.3d at 311. Once the court has identified the specific conduct at issue, the court must then use factors from case law to determine whether state action exists. While there is no precise formula for this determination, several factors exist. A private entity may be considered a "state actor"

> "(1) when a sufficiently close nexus exists between a regulated entity and a state such that the actions of the former are fairly treated as those of the state; (2) when the state 'has exercised coercive power or has provided such significant encouragement that the action must in law be deemed to be that of the state'; and (3) 'when the private entity has exercised powers that

are traditionally the exclusive prerogative of the
state.'"

Mentavlos, 249 F.3d at 313 (quoting Haavistola v. Cmty. Fire Co.
of Rising Sun, 6 F.3d 211, 215 (4th Cir. 1993)); see also Brentwood
Acad., 531 U.S. at 295-96. In assessing whether these circumstances
exist, the court may be guided by such factors as

> "(1) 'whether the injury caused is aggravated in a unique
> way by the incidents of governmental authority'; (2)
> 'the extent and nature of public assistance and public
> benefits accorded the private entity'; (3) 'the extent
> and nature of governmental regulation over the
> institution'; and (4) 'how the state itself views the
> entity, i.e., whether the state itself regards the actor
> as a state actor.'"

Mentavlos, 249 F.3d. at 313 (quoting Goldstein v. Chestnut Ridge
Volunteer Fire Co., 218 F.3d 337, 343 (4th Cir. 2000)).

Here, plaintiffs complain of the issuance and application of
a school uniform policy by a private corporation and its Board
members. The uniform policy consists of the specific uniform
requirements and the grooming standards. These requirements and
standards are incorporated into the Discipline section of the
Student Handbook, which lists several items that "students will"
and "students will not" di. Under "students will not," item
number 20 is "violate the dress code." Therefore, not wearing the
appropriate uniform is considered a disciplinary violation. Here,
then, the precise question before the court is "Whether a non-
profit board and its members who are all private individuals (not
state officials or employees) but operate a public charter school

20

in North Carolina act under color of state law when they promulgate and enforce a uniform policy/dress code which is incorporated into the discipline policy of the charter school.?"

    i.    *"Public School"—How the State Views the Entity*

Under this analytical framework, plaintiffs first argue that defendants are state actors simply because North Carolina statutory law designates charter schools as public schools. <u>See</u> N.C. Gen. Stat. § 115C-218.15(a) ("A charter school that is approved by the State shall be a public school within the local school administrative unit in which it is located. All charter schools shall be accountable to the State Board for ensuring compliance with applicable laws and the provisions of their charters.") This court noted that charter schools are public schools under state statute in a prior order. [DE #91 at 12 (citing <u>Yarbrough v. East Wake First Charter Sch.</u>, 108 F.Supp. 3d 331, 337 (E.D.N.C. 2015))]. Plaintiffs believe the inquiry begins and ends here. However, as noted *supra*, defendants are two private corporations and six individuals, none of whom are public officials. The court finds that the fact that charter schools are deemed public schools in North Carolina is simply one factor to consider. It does not end the inquiry and does not automatically mean the defendants are "state actor[s] for all purposes . . . as a matter of law." <u>Caviness v. Horizon Cmty. Learning Ctr, Inc.</u>,

590 F.3d 806, 813 (9th Cir. 2010). "Rather, a private entity may be designated a state actor for some purposes but still function as a private actor in other respects." Id.

## ii. *"Historical, Exclusive and Traditional State Function"*

In Rendell-Baker, the court noted the question is not "simply whether a private group is serving a 'public function'' but rather "whether the function performed has been 'traditionally the exclusive prerogative of the State.'" Rendell-Baker, 457 U.S. at 842 (quoting Jackson, at 353). While education is a public function in North Carolina, the mere fact that a private entity performs a function serving the public does not make it state action. Many students are educated in private and home school settings. Therefore, while education is an important public function; education is not the "'exclusive prerogative of the State.'" Rendell-Baker, 457 U.S.at 842 (quoting Jackson, 419 U.S. at 353). However, here defendants are providing free, public education, and "free, public education, whether provided by public or private actors, is an historical, exclusive, and traditional state function." Riester v. Riverside Cmty. Sch., 257 F. Supp. 2d 968, 972 (S.D. Ohio 2002).

In North Carolina, free, public education has long been historically governmental. Article IX of The North Carolina Constitution provides for a uniform system of free public schools:

22

> The General Assembly shall provide by taxation and
> otherwise for a general and uniform system of free
> public schools, which shall be maintained at least
> nine months in every year, and wherein equal
> opportunities shall be provided for all students.

N.C. Const. art. IX, § 2(1).

Therefore, CDS, Inc. is performing an historical, exclusive and traditional state function.

### iii. *"State Regulation"*

Charter schools, in North Carolina, are creatures of a statutory scheme whose express purpose is to "authorize a system of charter schools to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently." N.C. Gen. Stat. § 115C-218(a). It is undisputed that the School is a charter school funded with public funds. Further, "[e]xcept as provided in [Article 14a of the North Carolina General Statutes] and pursuant to the provisions of its charter, a charter school is exempt from statutes and rules applicable to a local board of education or local school administrative unit." N.C. Gen. Stat. § 115C-218.10.

In furtherance of fostering the statutory goal of independence, the charter school's board, not the State, decides "matters related to the operation of the school, including budgeting, curriculum, and operating procedures." N.C.Gen. Stat. §115C-218.15(d). However, despite the stated goal and some

freedoms, the State extensively regulates portions of charter school operations. For example, the State sets the formula for funding allocation, establishes criteria for student admission and prohibits charter schools for charging tuition. N.C. Gen. Stat. § 115C-218.45, § 115C-218.50(b). It also requires charter schools to comply with instructional standards adopted by the State Board of Education, N.C. Gen. Stat. § 115C-218.85, and prohibits charter schools from sectarianism or discrimination, N.C. Gen. Stat. §§ 115C-218.50(a), 115C-218.55 ("A charter school shall not discriminate against any student on the basis of ethnicity, national origin, gender, or disability.").

State law also requires public schools, including charter schools, to establish a student code of conduct and discipline. N.C. Gen. Stat. § 115C-390.2; N.C. Gen. Stat. § 115C-218.60.[6]

By subjecting charter schools to Article 27, the general statutes provide that charter schools "shall adopt policies to govern the conduct of students and establish procedures to be followed by school officials in disciplining students. These policies must be consistent with the provisions of this Article and the constitutions, statutes, and regulations of the United

_____

[6] N.C. Gen. Stat. § 115C-218.60 provides:
The [charter] school is subject to and shall comply with Article 27 of Chapter 115C of the General Statutes, except that a charter school may also exclude a student from the charter school and return that student to another school in the local school administrative unit in accordance with the terms of its charter after due process.

States and the State of North Carolina." N.C. Gen. Stat. § 115C-390.2(a). Among the many regulatory restrictions on disciplinary codes within this section, is a statutory restriction on the use of long-term suspensions and expulsions for non-serious violations of the discipline codes, including dress code violations:

> Board policies shall minimize the use of long-term suspension and expulsion by restricting the availability of long-term suspension or expulsion to those violations deemed to be serious violations of the board's Code of Student Conduct that either threaten the safety of students, staff, or school visitors or threaten to substantially disrupt the educational environment. Examples of conduct that would not be deemed to be a serious violation include the use of inappropriate or disrespectful language, noncompliance with a staff directive, **dress code violations**, and minor physical altercations that do not involve weapons or injury. The principal may, however, in his or her discretion, determine that aggravating circumstances justify treating a minor violation as a serious violation.

N.C. Gen. Stat. § 115C-390.2 (emphasis added).

In the matter before the court, the Board of CDS, Inc. incorporated the uniform policy into the Discipline Code of the Student Handbook. Further, defendants admit that violations may result in disciplinary action. [DE #94 ¶49]. The court need not decide whether every dress code or uniform policy of a charter school is extensively regulated by the State because, in this matter, CDS, Inc. has brought the uniform policy under extensive regulation of the State by making violations of the uniform policy a disciplinary violation.

This case presents a multi-faceted analysis regarding whether the actions of defendants constitute state action. However, this is the analysis the court must conduct based on the statutory scheme established by the North Carolina General Assembly — a scheme which attempts to contract out and fully fund an historical, traditional and exclusively state function, namely free public education, to private corporations and individuals. Answering the precise question before the court, the court finds that under the facts and circumstances presented here, CDS, Inc. and its board members acted under color of state law when they incorporated into the disciplinary code of the School a uniform policy the violation of which could subject students to discipline. The undersigned notes this finding does not equate to a finding that North Carolina charter schools and their board members are state actors for all purposes, only that the action complained of here occurred under color of state law.

b. Defendant RBA

Defendants argue the lack of state action is even clearer with respect to RBA. RBA holds no direct contract with the State and receives no direct public funding but rather contracts with CDS, Inc. to provide "necessary educational facilities and management services." Perhaps even more important, RBA has no direct authority to change the uniform policy. The uniform policy

is set by the Board, and RBA's officers are not members of the Board of CDS, Inc. Plaintiffs argue that RBA was equally subject to the delegation of authority by the State for the education of students at the School, and has played a principal role in the creation, governance, and operation of the School from its inception. Plaintiff notes that the Charter Application was filed by CDS, Inc., "in conjunction with" RBA; the logo on the application is that of RBA, and the header on each page lists both CDS, Inc. and RBA. Mr. Mitchell is listed as the primary contact. The Application detailed the operation and management of the school by RBA.

The facts show that RBA and CDS, Inc. are significantly intertwined, yet legally distinct entities. RBA provides the facilities, maintenance, staff and administration. However, despite these close connections, CDS, Inc. is the non-profit entity which holds the charter with the State and the Board of CDS, Inc. is the entity with final authority over the uniform policy at issue in this matter. Therefore, the court finds the state action doctrine does not extend so far as to cover RBA in this particular instance. While the court notes that RBA and its principals appear to exercise much indirect influence over the Board of CDS, Inc., CDS, Inc. remains the legal entity charged with approving the uniform policy and discipline code at issue. Therefore, RBA's

motion for summary judgment as to the constitutional claims is
GRANTED.

    c. EPC Claims Analysis

    Having found state action on the part of CDS, Inc., the court
turns to the issue of whether the uniform policy, as currently
written and enforced, violates the equal protection clause. "The
equal protection clause of the Fourteenth Amendment protects
individuals against intentional, arbitrary discrimination by
government officials." Hayden ex rel. A.H. v. Greensburg Cmty.
Sch. Corp., 743 F.3d 569, 577 (7th Cir. 2014)(quoting Village of
Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam).
"Whether and when the adoption of differential grooming standards
for males and females amounts to sex discrimination is the subject
of a discrete subset of judicial and scholarly analysis." Hayden,
743 F.3d at 577 (citing numerous cases involving allegations of
sex discrimination regarding dress codes).

    Courts traditionally have and should refrain from regulating
the day-to-day issues presented in local schools, leaving such
matters to local authorities, See Epperson v. Arkansas, 393 U.S.
97, 104 (1968)("By and large, public education in our Nation is
committed to the control of state and local authorities.").
Further, generally, "children do not possess the same rights as
adults." Schleifer ex rel Schleifer v. City of Charlottesville,

28

159 F.3d 843, 847 (4th Cir. 1998). While public schools have more expansive power to regulate the conduct of schoolchildren, See Vernonia School Dist. 47J v. Acton, 515 US 646, 656-57 (1995), it is well established that children do not "shed their constitutional rights . . . at the schoolhouse gate." Tinker v. Des Moines Indep. Comny Sch Dist., 393 U.S. 503, 506 (1969).

Here, plaintiffs have shown that CDS, Inc. has promulgated and is enforcing a uniform policy at the School that requires girls to wear skirts, and, on its face, treats girls differently than boys by not allowing them to wear pants. Further, plaintiffs argue this policy and its enforcement cause girls to suffer a burden that the boys do not suffer and that the policy is based on impermissible sex stereotypes. Plaintiffs argue this policy and its enforcement constitute unconstitutional sex discrimination.

Under the constitutional framework and controlling precedent, sex is not a proscribed classification like race or national origin. United States v. Virginia, 518 U.S. 515, 533 (1996). "Physical differences between men and women [] are enduring." Id. "'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration." Id. Plaintiffs urge this court to adopt the intermediate scrutiny used in Virginia to this gender based uniform policy. See id. Defendants argue that the intermediate scrutiny in Virginia does not apply and that

courts have upheld dress codes with gender distinctions that require students to dress in conformity with accepted standards of the community. "Sex-differentiated standards consistent with community norms may be permissible to the extent they are part of a comprehensive, evenly-enforced grooming code that imposes comparable burdens on both males and females alike." Hayden, 743 F.3d at 581.

The caselaw in this specific area is not well developed, at least not in recent jurisprudence. Most recent uniform and dress code cases are claims based on the First Amendment, not the Equal Protection Clause. Arguably, the most analogous cases are the hair length cases of the Vietnam era, cases decided long before United States v. Virginia and not based explicitly on an Equal Protection analysis. Since the 1960s and 70s, there have been limited cases concerning requirements that girls wear skirts. This is likely a function, at least partly, of changing community standards that have led to the near eradication of prohibitions on girls wearing pants.

However, the court need not decide the exact breadth of application of Virginia's intermediate scrutiny or whether Hayden's "comparable burdens" standard is part of intermediate scrutiny, because even under a "comparable burden" analysis, the court finds the skirts requirement does not pass muster. While

this court recognizes that certain sex-differentiated standards consistent with community norms may be permissible, the skirts requirement in this case is not consistent with community norms. Women (and girls) have, for at least several decades, routinely worn both pants and skirts in various settings, including professional settings and school settings. Females have been allowed to wear trousers or pants in all but the most formal or conservative settings since the 1970s.[7] According to plaintiffs' expert, most public school dress codes across the country allowed girls to wear pants or shorts by the mid-1980s. "[I]t is worth noting that the community standards which may account for the differences in standards applied to men and women, girls and boys, do not remain fixed in perpetuity. Hayden, 743 F.3d at 581-82.

While defendants argue the skirts requirement is based on the traditional values approach of the school as a whole and is in place to instill discipline and keep order, defendants have shown no connection between these stated goals and the requirement that girls wear skirts. Defendants argue that the sex-differentiated requirements cannot be viewed in isolation but instead "work

_____

[7] According to the expert's report, female cadets at West Point have been permitted to wear trousered uniforms since the first coed class entered in 1976 and females began wearing pant suits on the Senate floor for the first time over twenty-five years ago, in 1993. [DE #152-20].

seamlessly together in a coordinated fashion in a disciplined environment that has mutual respect between boys and girls and between each other as students" and that the uniform policy, and specifically the skirts requirement, helps the students to "act more appropriately" toward the opposite sex. They argue that taking away the "visual cues" of the skirts requirement would hinder respect between the two sexes. However, even assuming these are legitimate goals, defendants have not shown how the skirts requirement actually furthers these stated goals. The evidence shows that on any given day, a portion of the female student population is not subject to the skirts requirement. The undisputed facts show that there are a number of days (P.E. days at least once per week, as well as special event, and field trips days) where girls are not required to wear skirts. There has been no evidence presented that the boys treat the girls differently or vice versa on those days. When questioned about the skirts requirement, none of the Board members deposed could explain how requiring girls to wear skirts specifically furthered the policy's stated goals. Further, there is no evidence that requiring girls to wear skirts on a daily basis is consistent with community standards of dress in Brunswick County or in North Carolina generally.

It is not the holding of this court that dress, grooming and uniform policies cannot have differences for boys and girls.

However, even under the <u>Hayden</u> theory of an "evenly-enforced grooming code" with "comparable burdens," defendants cannot show that the uniform policy imposes comparable burdens. Yes, the boys at the School must conform to a uniform policy as well. But plaintiffs in this case have shown that the girls are subject to a specific clothing requirement that renders them unable to play as freely during recess, requires them to sit in an uncomfortable manner in the classroom, causes them to be overly focused on how they are sitting, distracts them from learning, and subjects them to cold temperatures on their legs and/or uncomfortable layers of leggings under their knee-length skirts in order to stay warm, especially moving outside between classrooms at the School. Defendants have offered no evidence of any comparable burden on boys. While defendants emphasize that the uniform policy is most frequently enforced against boys for failure to wear a belt, there is no evidence that wearing a belt inhibits the boys' ability to fully participate in the programs or activities of the School. Therefore, the skirts requirement causes the girls to suffer a burden the boys do not, simply because they are female.

Under the facts of this specific case, the court finds that the skirts requirement of the uniform policy of the School promulgated by CDS, Inc., as written and enforced, violates the Equal Protection Clause. Plaintiffs are entitled to summary

judgment on this issue.  Defendants' motion for summary judgment on this issue is DENIED.

## IV.  North Carolina Constitutional Claims

The North Carolina Constitution provides a direct cause of action only in the absence of an adequate state remedy.  "An adequate state remedy exists if, assuming the plaintiffs claim is successful, the remedy would compensate the plaintiff for the same injury alleged in the direct constitutional claim." J.W. v. Johnston Cty. Bd. of Educ., No. 5:11-CV-707-D, 2012 WL 4425439, at *17 (E.D.N.C. Sept. 24, 2012)(quoting Estate of Fennell ex rel. Fennell v. Stephenson, 137 N.C.App. 430, 437, 528 S.E.2d 911, 915–16 (2000)).

Neither plaintiffs nor defendants have adequately addressed this issue in a manner in which the court can provide proper analysis.  Therefore, the motions for summary judgment as to the North Carolina constitutional claims are DENIED WITHOUT PREJUDICE to be refiled, if appropriate, with proper support.

## V.  Breach of Contract Claims

Plaintiffs contend they are third-party beneficiaries to the contract between the State of North Carolina and CDS, Inc. as well as the management agreement between CDS, Inc. and RBA.  While plaintiffs contend their status as third-party beneficiaries is

34

clear, the court finds, similar to the state constitutional claim, that neither defendants nor plaintiffs have adequately addressed this legal issue in a manner in which the court can provide proper analysis. Therefore, the cross motions for summary judgment are DENIED WITHOUT PREJUDICE as to the breach of contract claims to be refiled, if appropriate, with proper support.

## VI. <u>Procedural Motions</u>

As to the Motion to Strike Answer to Amended Complaint [DE #200], Motion to Stay Motion to Strike [DE #203], and Motion for Extension of Time to File Response to Motion to Strike [DE # 203], all of these are procedural motions which only need be addressed if summary judgment is ultimately denied. While the court is denying without prejudice the motions for summary judgment as to the state law claims, the denial is solely for the purposes of seeking additional filings from the parties. Therefore, judicial efficiency would not be served by addressing the procedural motions at this time. Therefore, these motions are DENIED WITHOUT PREJUDICE to be refiled if necessary. If refiled, the court will consider them as if filed on their original filing date so as to avoid prejudicing the parties as to timeliness arguments.

Also before the court is defendants' motion for this court to allow trial before an advisory jury [DE #208]. The court, in its discretion, denies this request.

## CONCLUSION

For the foregoing reasons, the court hereby orders as follows: the cross motions for summary judgment [DE #149 and #158] are GRANTED IN PART, DENIED IN PART, AND DENIED WITHOUT PREJUDICE IN PART. Specifically, as to the Title IX claims, defendants' motion for summary judgment is GRANTED and plaintiffs' motion DENIED. As to the EPC claim, defendants' motion is GRANTED as to defendant RBA and DENIED as to all other defendants. Plaintiffs' motion for summary judgment is GRANTED as to CDS, Inc. and the individual board members insofar as the court finds the skirts requirement violates the equal protection clause. As to the North Carolina Constitutional and breach of contract claims, the cross motions are DENIED WITHOUT PREJUDICE. The motion to strike, motion to stay and motion for extension of time [DE #200, #203] are DENIED WITHOUT PREJUDICE to be refiled if necessary, and the motion for an advisory jury [DE #208] is DENIED.

The clerk is directed to refer this matter to the magistrate judge for further case management.

This __28TH__ day of March 2019.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#26

36