**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1001

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as
Guardian of I.B., a minor child; KEELY BURKS,

Plaintiffs – Appellees,

v.

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER, in his capacity as
member of the Board of Trustees of Charter Day School, Inc.; CHAD ADAMS, in
his capacity as member of the Board of Trustees of Charter Day School, Inc.;
SUZANNE WEST, in her capacity as member of the Board of Trustees of Charter
Day School, Inc.; COLLEEN COMBS, in her capacity as member of the Board of
Trustees of Charter Day School, Inc.; TED BODENSCHATZ, in his capacity as
member of the Board of Trustees of Charter Day School, Inc.; MELISSA GOTT, in
her capacity as member of the Board of Trustees of Charter Day School, Inc.

Defendants – Appellants,

and

THE ROGER BACON ACADEMY, INC.,

Defendant.

------------------------------

NORTH CAROLINA INSTITUTE FOR CONSTITUTIONAL LAW; CIVITAS
INSTITUTE, INC.; PAUL B. STAM, JR.,

Amici Supporting Appellant.

NATIONAL WOMEN'S LAW CENTER; A BETTER BALANCE; AMERICAN
ASSOCIATION OF UNIVERSITY WOMEN; AMERICAN FEDERATION OF
STATE, COUNTY, AND MUNICIPAL EMPLOYEES; AMERICAN

FEDERATION OF TEACHERS; ANTI-DEFAMATION LEAGUE; AUTISTIC SELF ADVOCACY NETWORK; BOLD FUTURES; CALIFORNIA WOMEN LAWYERS; CLEARINGHOUSE ON WOMEN'S ISSUES; COALITION OF LABOR UNION WOMEN; DESIREE ALLIANCE; DISABILITY RIGHTS ADVOCATES; DISABILITY RIGHTS EDUCATION & DEFENSE FUND; END RAPE ON CAMPUS; EQUALITY CALIFORNIA; FEMINIST MAJORITY FOUNDATION; FORGE, INCORPORATED; GENDER JUSTICE; GIRLS FOR GENDER EQUITY; GIRLS INC.; GLBTQ LEGAL ADVOCATES & DEFENDERS; HUMAN RIGHTS CAMPAIGN; KENTUCKY ASSOCIATION OF SEXUAL ASSAULT PROGRAMS; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LEGAL AID AT WORK; LEGAL MOMENTUM; LEGAL VOICE; NATIONAL ASSOCIATION OF SOCIAL WORKERS; NATIONAL ASSOCIATION OF WOMEN LAWYERS; NATIONAL CENTER FOR TRANSGENDER EQUALITY; NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL CRITTENTON; NATIONAL NETWORK TO END DOMESTIC VIOLENCE; NATIONAL ORGANIZATION FOR WOMEN FOUNDATION; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; NATIONAL WOMEN'S POLITICAL CAUCUS; OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE; PARTNERSHIP FOR WORKING FAMILIES; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; SHRIVER CENTER ON POVERTY LAW; SISTERREACH; SOUTHERN POVERTY LAW CENTER; STOP SEXUAL ASSAULT IN SCHOOLS; THE AFIYA CENTER; THE WOMEN'S LAW CENTER OF MARYLAND; TRANSGENDER LAW CENTER; WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS; WOMEN LAWYERS ON GUARD INC.; WOMEN WITH A VISION, INC.; WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA; WOMEN'S BAR ASSOCIATION OF THE STATE OF NEW YORK; WOMEN'S INSTITUTE FOR FREEDOM OF THE PRESS; WOMEN'S LAW PROJECT; WOMEN'S MEDIA CENTER; WOMEN'S RIGHTS AND EMPOWERMENT NETWORK; WOMEN'S ALL POINTS BULLETIN; NATIONAL EDUCATION ASSOCIATION; NORTH CAROLINA ASSOCIATION OF EDUCATORS; THE SOCIETY FOR RESEARCH IN CHILD DEVELOPMENT; THE SOCIETY FOR THE PSYCHOLOGICAL STUDY OF SOCIAL ISSUES; THE COGNITIVE DEVELOPMENT SOCIETY; THE SOCIETY FOR RESEARCH ON ADOLESCENCE; PROFESSOR RUTHANN ROBSON,

Amici Supporting Appellee.

———————————

**No. 20-1023**

———————————

2

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as Guardian of I.B., a minor child; KEELY BURKS,

        Plaintiffs – Appellants,

    v.

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; CHAD ADAMS, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; SUZANNE WEST, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; COLLEEN COMBS, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; TED BODENSCHATZ, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; MELISSA GOTT, in her capacity as member of the Board of Trustees of Charter Day School, Inc.,

        Defendants – Appellees,

    and

THE ROGER BACON ACADEMY, INC.,

        Defendant.

------------------------------

NATIONAL WOMEN'S LAW CENTER; A BETTER BALANCE; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES; AMERICAN FEDERATION OF TEACHERS; ANTI-DEFAMATION LEAGUE; AUTISTIC SELF ADVOCACY NETWORK; BOLD FUTURES; CALIFORNIA WOMEN LAWYERS; CLEARINGHOUSE ON WOMEN'S ISSUES; COALITION OF LABOR UNION WOMEN; DESIREE ALLIANCE; DISABILITY RIGHTS ADVOCATES; DISABILITY RIGHTS EDUCATION & DEFENSE FUND; END RAPE ON CAMPUS; EQUALITY CALIFORNIA; FEMINIST MAJORITY FOUNDATION; FORGE, INCORPORATED; GENDER JUSTICE; GIRLS FOR GENDER EQUITY; GIRLS INC.; GLBTQ LEGAL ADVOCATES & DEFENDERS; HUMAN RIGHTS CAMPAIGN; KENTUCKY ASSOCIATION OF SEXUAL ASSAULT PROGRAMS; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LEGAL AID AT WORK; LEGAL MOMENTUM; LEGAL VOICE; NATIONAL ASSOCIATION OF SOCIAL WORKERS;

3

NATIONAL ASSOCIATION OF WOMEN LAWYERS; NATIONAL CENTER FOR TRANSGENDER EQUALITY; NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL CRITTENTON; NATIONAL NETWORK TO END DOMESTIC VIOLENCE; NATIONAL ORGANIZATION FOR WOMEN FOUNDATION; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; NATIONAL WOMEN'S POLITICAL CAUCUS; OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE; PARTNERSHIP FOR WORKING FAMILIES; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; SHRIVER CENTER ON POVERTY LAW; SISTERREACH; SOUTHERN POVERTY LAW CENTER; STOP SEXUAL ASSAULT IN SCHOOLS; THE AFIYA CENTER; THE WOMEN'S LAW CENTER OF MARYLAND; TRANSGENDER LAW CENTER; WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS; WOMEN LAWYERS ON GUARD INC.; WOMEN WITH A VISION, INC.; WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA; WOMEN'S BAR ASSOCIATION OF THE STATE OF NEW YORK; WOMEN'S INSTITUTE FOR FREEDOM OF THE PRESS; WOMEN'S LAW PROJECT; WOMEN'S MEDIA CENTER; WOMEN'S RIGHTS AND EMPOWERMENT NETWORK; WOMEN'S ALL POINTS BULLETIN; NATIONAL EDUCATION ASSOCIATION; NORTH CAROLINA ASSOCIATION OF EDUCATORS; THE SOCIETY FOR RESEARCH IN CHILD DEVELOPMENT; THE SOCIETY FOR THE PSYCHOLOGICAL STUDY OF SOCIAL ISSUES; THE COGNITIVE DEVELOPMENT SOCIETY; THE SOCIETY FOR RESEARCH ON ADOLESCENCE; PROFESSOR RUTHANN ROBSON,

Amici Supporting Appellants.

NORTH CAROLINA INSTITUTE FOR CONSTITUTIONAL LAW; CIVITAS INSTITUTE, INC.; PAUL B. STAM, JR.

Amici Supporting Appellees.

————————

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington. Malcolm J. Howard, Senior District Judge. (7:16-cv-00030-H-KS)

————————

Argued: March 11, 2021                    Decided: August 9, 2021

————————

Before KEENAN, QUATTLEBAUM, and RUSHING, Circuit Judges.

————————

4

Reversed and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Rushing joined. Judge Keenan wrote an opinion, concurring in part and dissenting in part.

———————————

**ARGUED:** Aaron Michael Streett, BAKER BOTTS L.L.P., Houston, Texas, for Appellants/Cross-Appellees. Galen Leigh Sherwin, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees/Cross-Appellants. **ON BRIEF:** J. Mark Little, Travis L. Gray, BAKER BOTTS L.L.P., Houston, Texas, for Appellants/Cross-Appellees. Ria Tabacco Mar, Jennesa Calvo-Friedman, Louise Melling, Amy Lynn Katz, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Irena Como, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Jonathan D. Sasser, ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellees/Cross-Appellants. Jeanette K. Doran, NORTH CAROLINA INSTITUTE FOR CONSTITUTIONAL LAW, Raleigh, North Carolina, for Amicus North Carolina Institute for Constitutional Law. Paul B. Stam, Jr., R. Daniel Gibson, STAM LAW FIRM, PLLC, Apex, North Carolina, for Amici The Civitas Institute, Inc. and Paul B. Stam, Jr. Brian R. Matsui, Aaron D. Rauh, MORRISON & FOERSTER LLP, Washington, D.C., for Amici Society for Research in Child Development, Society for the Psychological Study of Social Issues, Cognitive Development Society, and Society for Research on Adolescence. Alice O'Brien, Eric A. Harrington, Rebecca Yates, NATIONAL EDUCATION ASSOCIATION, Washington, D.C.; Verlyn Chesson-Porte, NORTH CAROLINA ASSOCIATION OF EDUCATORS, Raleigh, North Carolina, for Amici The National Education Association and North Carolina Association of Educators. Emily Martin, Neena Chaudhry, Sunu Chandy, Adaku Onyeka-Crawford, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Courtney M. Dankworth, DEBEVOISE & PLIMPTON LLP, New York, New York, for Amici National Women's Law Center and Coalition of Civil Rights and Public Interest Organizations. Jayme Jonat, Nina Kanovitch Schiffer, HOLWELL SHUSTER & GOLDBERG LLP, New York, New York, for Amicus Professor Ruthann Robson.

———————————

5

QUATTLEBAUM, Circuit Judge:

This case involves a charter school's dress code. The dress code includes certain requirements for both boys and girls, certain requirements for boys only and certain requirements for girls only. Three female students sued the school and the company that manages it challenging one of the requirements applicable only to girls—that they wear either skirts, jumpers or skorts, instead of pants or shorts. While the suit involves a host of legal theories, the only ones before us today ask whether a charter school's dress code may give rise to a claim under either the Equal Protection Clause or Title IX, 20 U.S.C. § 1681.

After discovery, all parties moved for summary judgment. The district court granted summary judgment to Plaintiffs on the equal protection claim, but to Defendants on the Title IX claim, holding that Title IX did not reach school dress codes. For the reasons set forth below, we conclude that the charter school here was not a state actor when promulgating the dress code and, thus, is not subject to an equal protection claim. At the same time, however, we determine that claims of sex discrimination related to a dress code are not categorically excluded from the scope of Title IX. Accordingly, we reverse on both claims and remand for further proceedings consistent with this opinion.

I.

A.

In the mid-1990s, the North Carolina General Assembly passed the Charter School Act. *See* N.C. Gen. Stat. § 115C-218, *et seq*. The law "authorize[d] a system of charter schools to provide opportunities for teachers, parents, pupils, and community members to

6

establish and maintain schools that operate independently of existing schools." *Id.* § 115C-218(a). Charter schools were designed to "[i]mprove student learning" and "[e]ncourage the use of different and innovative teaching methods." *Id.* § 115C-218(a)(1), (3). The goal was to "[p]rovide parents and students with expanded choices in the types of educational opportunities that are available within the public school system." *Id.* § 115C-218(a)(5). Any child eligible to attend a public school may choose to attend a charter school, but no one is required to attend one. *Id.* § 115C-218.45(a)–(b).

Although charter schools are nominally public schools under North Carolina law, they are operated by private nonprofit corporations rather than the local public school board. *Id.* § 115C-218.15. The nonprofit's board of directors has authority to decide matters related to the school's operation. *Id.* § 115C-218.15(d). Charter schools have wide latitude to experiment with pedagogical methods and are exempt from statutes applicable to local boards of education. *Id.* § 115C-218.10. Instead, they are governed by their charter, or contract, between the nonprofit corporation and the state. *Id.* § 218.15(c). The charter provides the primary means of state accountability over charter schools. If the corporation violates any charter provision, the state can revoke the charter or bring a breach-of-contract action. *Id.* § 115C-218.95. Likewise, the state can revoke the charter or decline to renew it if the school underperforms. *Id.* Although charter schools must adopt policies governing student conduct and discipline, the state does not supervise the content of those policies. *Id.* § 115C-390.2(a). Relevant here, there is no state law or charter provision requiring the imposition of a dress code.

7

B.

Charter Day School, Inc. ("CDS") is a nonprofit corporation that holds a charter from North Carolina. Baker Mitchell incorporated CDS in 1999, intending to open a charter school in rural Brunswick County. That school, Charter Day, initially served just over fifty students. It has grown substantially and currently educates over 900 elementary and middle school students. CDS's volunteer Board of Directors sets the school's policies. Mitchell was initially Chair of the Board, but he is now Board Secretary, a non-voting position.

CDS entered into an "educational management contract" with The Roger Bacon Academy, Inc. ("RBA") to manage day-to-day operations at Charter Day. RBA is a for-profit corporation, which Mitchell also founded and wholly owns. CDS's charter application was filed in conjunction with RBA, with Mitchell as the signatory. The charter incorporated the management agreement between CDS and RBA, which delegates to RBA management of all day-to-day operations of the school, including enforcement of "the rules, regulations and procedures adopted by CDS." J.A. 360.

Charter Day operates as a school promoting traditional values. It advances a "traditional curriculum, traditional manners and traditional respect." J.A. 1719. Students must use polite forms of address, such as "Ma'am" and "Sir." It also embodies a classical curriculum, which focuses on literature, history and Latin. As part of this traditional approach, the school adopted a uniform policy.

The dress code, according to Defendants, helps "instill discipline and keep order." J.A. 2079. All students must wear white or navy-blue tops and khaki or blue bottoms. Shirts must be tucked in and only closed-toed shoes are allowed. In addition, there are some

8

requirements that apply only to boys or girls. Boys may not wear jewelry and must keep

hair "neatly trimmed and off the collar . . . and not below the top of the ears or eyebrows."

J.A. 101. Boys must also wear a belt. But while boys may wear pants or shorts, girls must

wear skirts, jumpers or skorts, which can be paired with leggings for warmth. On days with

physical education class, however, students have different uniforms. On those days, girls

may wear gym shorts or sweatpants. The skirt requirement is also waived on some special

occasions, like field trips.[1]

If a student violates the dress code, the school typically notifies the parents, which

is intended to be informative rather than punitive. A student may also be pulled from class

to obtain compliant attire. And while students, in theory, may face expulsion for violating

the disciplinary code, which includes the dress code, according to CDS no student has been

expelled for a uniform policy violation.

One of the plaintiffs, Bonnie Peltier, a parent of a kindergartener at Charter Day,

inquired about the reasons for the skirt requirement at an orientation. School officials

directed her to contact Mitchell. Mitchell responded to her email, explaining that Charter

Day was "determined to preserve chivalry and respect among young women and men,"

and there was a need to "restore . . . traditional regard for peers." J.A. 70. Believing the

skirt requirement to be discriminatory, Peltier, through counsel, requested the school

change it. CDS denied that request, responding that the uniform policy was adopted "to

---

[1] Because the parties refer to the requirement that girls wear skirts, jumpers or skorts as the "skirt requirement," we will as well for simplicity. By doing so, however, we do not intend to suggest that the options other than skirts are irrelevant.

9

establish an environment in which our young men and women treat one another with mutual respect." J.A. 427 (citing Mitchell's email to Peltier).

## C.

Subsequently, three female students, a kindergartener, fourth and eighth grader, through their parents, sued to challenge the skirt requirement as unlawful under Title IX, the Equal Protection Clause and North Carolina law. The suit named CDS, its Board members in their representative capacities and RBA as defendants. After the district court denied Defendants' motion to dismiss, the case proceeded to discovery.

During depositions, Plaintiffs claimed the skirt requirement created practical problems. The girls testified that they could not move as freely and comfortably in their skirts, which led them to avoid activities during recess. It also required them to cross their legs or keep their knees together while sitting. This focus on how they must sit "distracted [them] from [their] academic work." J.A. 504. They also testified that wearing leggings with a skirt did not keep them as warm in the winter as pants would have.

In addition to these practical concerns, Plaintiffs also expressed concerns about the psychological effects of the requirement. One plaintiff testified that the requirement conveyed the message that "girls should be less active than boys and that they are more delicate than boys. This translates into boys being put in a position of power over girls." J.A. 499. Plaintiffs' expert, a developmental psychologist, testified that research shows requiring girls to wear skirts reinforces "gender roles in which girls are viewed as passive and focused on their appearance instead of agency." J.A. 2467.

10

CDS officials attempted to explain the reasons for the requirement. Expounding on his claim that it furthered chivalry, Mitchell testified that "chivalry" meant "a code of conduct where women are . . . regarded as a fragile vessel that men are supposed to take care of and honor." J.A. 414. He also remarked that it was important to distinguish boys from girls because boys should treat girls more "courteously and more gently than boys." J.A. 413. CDS Board members largely endorsed Mitchell's reasoning. And the Assistant Headmaster of the elementary school similarly explained that wearing skirts "models the difference" between boys and girls and promotes "the proper treatment of young ladies." J.A. 1090.

### D.

After discovery, the parties filed cross-motions for summary judgment, and the district court delivered a mixed ruling. The district court granted summary judgment in favor of Plaintiffs on the § 1983 claim against CDS, but not RBA. It granted summary judgment in favor of Defendants, however, on the Title IX claim.

On the equal protection claim, the district court began by analyzing whether CDS and RBA acted under color of state law for purposes of § 1983. It first noted that the North Carolina legislature's designation of charter schools as public schools was not outcome determinative but merely one factor to consider. Then, it reasoned that CDS was performing a "historical, exclusive and traditional state function" by providing "free, public education," even though education more broadly was not an exclusive state function. Finally, the district court explained that by incorporating the dress code into its disciplinary handbook, CDS brought the policy under the extensive regulation of the state, which has a

11

statute expressing a policy disfavoring serious disciplinary actions for minor violations, such as dress code violations. *See* N.C. Gen. Stat. § 115C-390.2. It therefore concluded that CDS was acting under color of state law when it promulgated the uniform policy. It also concluded, however, that RBA was not a state actor because it did not have the authority to approve or change the uniform policy, and it thus granted summary judgment to RBA on the equal protection claim. The district court then concluded that CDS could not prevail on the merits of the equal protection analysis because the requirement did not further any of the purposes Defendants offered. It therefore granted Plaintiffs summary judgment against CDS on the equal protection claim.

As to the Title IX claim, the district court determined that Title IX did not apply to sex-specific school dress codes. It noted that the United States Department of Education previously regulated this matter by prohibiting discrimination "against any person in the application of any rules of appearance," but it later withdrew that regulation altogether. 40 Fed. Reg. 24,141 (June 4, 1975); *see* 47 Fed. Reg. 32,526–57 (July 28, 1982). In the withdrawal, the Department stated that "[t]here is no indication in the legislative history of Title IX that Congress intended to authorize Federal regulations in the area of appearance codes." 47 Fed. Reg. at 32,527. The district court gave *Chevron*[2] deference to this withdrawal, determining that the text of Title IX did not speak to this precise issue and the agency's interpretation was reasonable.

---

[2] *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

12

At the same time, the district court denied summary judgment without prejudice on the state law claims—allowing the possibility of further litigation on these claims if necessary. These include a North Carolina Equal Protection Clause claim and a third-party beneficiary breach of contract claim based on CDS's charter which, among other things, requires compliance with civil rights laws, including the applicable state and federal constitutional provisions.

Defendants sought to appeal the district court's ruling. The district court determined there was no just reason for delay and entered partial final judgment on its equal protection and Title IX rulings. *See* Fed. R. Civ. P. 54(b).[3] In doing so, it permanently enjoined CDS from enforcing the skirt requirement. CDS timely appealed the grant of summary of judgment to Plaintiffs on the equal protection claim, and Plaintiffs cross-appealed the grant of summary judgment to Defendants on the Title IX claim and to RBA on the equal protection claim. We have jurisdiction over this partial final judgment on the equal protection and Title IX claims pursuant to 28 U.S.C. § 1291.

---

[3] We conducted a sua sponte review of the district court's entry of final judgment under Rule 54(b) as required by our precedent. *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1336 (4th Cir. 1993). We find no error with the district court's analysis that partial final judgment was warranted in these circumstances.

13

II.

We begin with Plaintiffs' equal protection claim.[4] Before proceeding to the merits of that claim, however, we must first decide whether CDS and RBA are state actors against which a § 1983 claim may be maintained.

A.

A plaintiff can only succeed on a § 1983 claim if a defendant acts "under color of [state law]." 42 U.S.C. § 1983. Therefore, § 1983 does not regulate private conduct. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). In some circumstances, however, a private actor's conduct may be considered state action, rather than private action. To determine whether a private actor is engaging in state action for the purposes of § 1983, we ask, "is the alleged infringement of federal rights fairly attributable to the State?" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (internal quotation marks omitted).[5]

That general question has informed a hodgepodge of cases that lack a neat analytical structure. In some cases, the Supreme Court has reasoned an activity may only be state action when it results from the state's "coercive power" or when the state provides "significant encouragement" of the action. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (holding that Medicaid recipients failed to establish state action in a nursing home's

---

[4] We review a district court's grant or denial of summary judgment de novo. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014).

[5] Whether a private actor's conduct is "under color of [state law]" "has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United States v. Price*, 383 U.S. 787, 794 n.7 (1966). Therefore, we are guided by cases dealing with both provisions.

14

decision to discharge Medicaid patients to lower levels of care because those decisions were made independently by private staff, not the state). Other times, the Court has asked whether a state delegates a constitutional obligation to a private party. *West v. Atkins*, 487 U.S. 42, 54–55 (1988) (holding that a state-contracted physician's treatment of an inmate was state action because the state had a constitutional obligation under the Eighth Amendment to provide medical care to inmates). Similarly, the Court has also inquired whether a state delegates a public function traditionally reserved exclusively to the state. *Rendell-Baker*, 457 U.S. at 842. And finally, the Court has sometimes reasoned that activity "entwined with governmental policies" or actors is state action. *Evans v. Newton*, 382 U.S. 296, 299 (1966); *see also Brentwood Acad. v. Tenn. Secondary Schs. Athletic Assoc.*, 531 U.S. 288, 298 (2001) (holding a school athletic association was a state actor because it was pervasively entwined with public officials).

As evidenced by those different inquiries, "[t]here is no precise formula to determine whether otherwise private conduct constitutes 'state action.'" *Arlosoroff v. Nat'l Collegiate Athletic Assoc.*, 746 F.2d 1019, 1021 (4th Cir. 1984). "Facts that address any of these criteria are significant, but no one criterion must necessarily be applied." *Brentwood Acad.*, 531 U.S. at 303. And "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.* at 295–96. At bottom, however, the key question remains whether there is a "close nexus between the State and the challenged action" such that private conduct "may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974).

15

We are not left in the dark, however, in analyzing whether a privately operated school can be a state actor. Both the Supreme Court and other circuits have addressed this question in similar contexts. These cases provide a guide on how to proceed here.

In *Rendell-Baker*, the Supreme Court analyzed whether a nominally private school that functioned almost exclusively as a government contractor was a state actor. 457 U.S. at 837. The private school was operated by a board of directors with no public affiliation. *Id.* at 832. It specialized in teaching students with drug or behavioral problems, or other special needs. *Id.* Nearly all of the students were referred by the public school system or drug courts, and the local public school committees paid the tuition of students they referred, which, when combined with other state and federal funding, resulted in somewhere between 90–99% of the school's operating budget each year. *Id.* The school also issued diplomas certified by the local public school board. *Id.* In order to receive state funding, the school had to comply with a variety of "detailed regulations concerning matters ranging from recordkeeping to student-teacher ratios," as well as certain "personnel standards and procedures." *Id.* at 833. And as a "contractor" with the state and local public school committee, the school had to provide certain individualized services for students. *Id.* at 833.

Even though the school in *Rendell-Baker* derived virtually all its funding from, and was regulated by, the state, the Court held it was not a state actor when it fired certain employees. *Id.* at 837. The Court began its analysis by comparing the school to the nursing home in *Blum*, which instructed that near-total public funding does not turn private action into state action. *Id.* at 840. Then, the Court reasoned that although the state extensively

16

regulated the school, "the decisions to discharge the [employees] were not compelled or even influenced by any state regulation." *Id.* at 841. Finally, in considering whether the school was performing a traditionally exclusive public function, the Court noted that although "the education of maladjusted high school students is a public function," it was not "the exclusive province of the State." *Id.* at 842. Instead, it was a "legislative policy choice" to provide that public function. *Id.*

Other circuits have followed the reasoning in *Rendell-Baker* when analyzing whether private schools or charter schools can be state actors. The First Circuit rejected a claim that a privately operated school, which contracted with the state to be the exclusive provider of public education in a district, was a state actor when disciplining a student because it did not perform an exclusive public function. *Logiodice v. Trustees of Maine Cent. Inst.*, 296 F.3d 22, 27 (1st Cir. 2002). It noted that "even publicly funded education of last resort was not provided exclusively by government in Maine." *Id.* The Third Circuit similarly concluded a publicly funded school that educated juvenile sex offenders was not a state actor because, "[a]s was true of the [school] in *Rendell-Baker*," the school did not perform a function traditionally within the exclusive province of the state. *Robert S. v. Stetson School, Inc.*, 256 F.3d 159, 166 (3d. Cir. 2001) (Alito, J.). The Ninth Circuit followed a similar analysis regarding a charter school operator with no material differences from CDS. *See Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010). In that case, the Ninth Circuit held that a private non-profit corporation that operated a public charter school was not a state actor when it took employment actions against a teacher. *Id.* at 808. It began its analysis noting that the state's statutory designation of the

17

charter school as a public school was insufficient on its own to make the school a state actor for all purposes because that designation does not "resolve the question whether the state was sufficiently involved in causing the harm to plaintiff." *Id.* at 814. It then determined that *Rendell-Baker* "foreclosed" the argument that "public educational services" are traditionally an exclusive state function. *Id.* at 814–15. And because no regulation compelled the employment decision at issue, the Court determined that the charter school was not a state actor. *Id.* at 816–17. With that legal landscape in mind, we turn to the facts here.

## B.

"A determination of whether a private party's allegedly unconstitutional conduct is fairly attributable to the State requires us to begin by identifying the specific conduct of which the plaintiff complains." *Mentavlos v. Anderson*, 249 F.3d 301, 311 (4th Cir. 2001) (alterations adopted and internal citations omitted). Plaintiffs here challenge CDS's uniform requirement that girls wear skirts, jumpers or skorts, rather than pants or shorts like boys. Thus, our decision today does not address whether a charter school can ever be a state actor. We only decide today that CDS's skirt requirement is not "fairly attributable" to the state for § 1983 purposes. *Rendell-Baker*, 457 U.S. at 838.

## 1.

Our analysis begins with *Rendell-Baker*. Charter Day has few differences from the school in *Rendell-Baker* and several meaningful similarities. Both schools are run entirely by private actors that contract with the state. *Rendell-Baker*, 457 U.S. at 832. Both schools receive nearly all their funding from the state. *Id.* Students at both schools could attend a

18

general public school instead; thus, they effectively, if not explicitly, opt in to attending the school. *Id.* at 832 n.1. And Charter Day is arguably under even less state regulation than the school in *Rendell-Baker*—indeed, the purpose of the charter school system in North Carolina is to promote experimentation and school choice through deregulation. N.C. Gen. Stat. § 115C-218(a)(1), (3), (5)–(6).

On the other hand, there are two main differences. First, Charter Day is by law a "public school," whereas the school in *Rendell-Baker* was nominally private. *Id.* § 218.15(a); *Rendell-Baker*, 457 U.S. at 832. Second, and relatedly, CDS does not charge any tuition, whereas the state reimbursed the school in *Rendell-Baker* for tuition it technically charged students. N.C. Gen. Stat. § 115C-218.50(b); *Rendell-Baker*, 457 U.S. at 832.

These two distinctions do not meaningfully change *Rendell-Baker*'s analysis. Both distinctions are formal, rather than functional. State action case law places more weight on function than nominal characterizations. *See Brentwood Acad.*, 531 U.S. at 298 ("The nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings . . . ."); *see also Caviness*, 590 F.3d at 815–16 ("Caviness's argument that *Rendell-Baker* does not control this case since the school there was private, whereas here Horizon is a public school as a matter of Arizona law, merely restates his erroneous argument that the state's statutory characterization is necessarily controlling."). As the Ninth Circuit recognized in *Caviness*, the statutory designation of a school as public cannot change the fact that it is run by a private corporation comprised entirely of private actors. 590 F.3d at 814. The Supreme

19

Court has already instructed that statutory designations are insufficient alone to make a private actor's conduct state action. *Jackson,* 419 U.S. at 350 n.7. Although this designation may create some perceived entwinement between the state and Charter Day, reality belies any perception. Functionally, North Carolina's charter school statutory scheme disentangles the state from the day-to-day operations of CDS, and in particular CDS's promulgation of a dress code. The statutory scheme clearly reflects a "legislative policy choice" to contract with privately operated schools to provide a hands-off approach by the state, enabling pedagogical experimentation and school choice. *Rendell-Baker*, 457 U.S. at 842. Likewise, the fact that CDS is directly publicly funded, rather than reimbursed for tuition it charges by the state, is a formal distinction. The school in *Rendell-Baker* covered up to 99% of its operating budget from public funds, and like CDS, it had to comply with provisions in its contract with the state. *Id.* at 832. That charter schools cannot charge tuition in North Carolina merely reflects the legislative designation of the schools as public, and thus open equally, in theory, to all. It does not functionally change the relationship between CDS and the state.

Therefore, while the dissent relies heavily on these formal distinctions, that reliance is at odds with the guidance from the Supreme Court and with the decisions of our sister circuits, which would recognize Charter Day as a privately operated school. In sum, it does not seem that Charter Day has meaningful differences from the school in *Rendell-Baker*.

*Rendell-Baker* does not itself foreclose the inquiry, however, because we are assessing different conduct. That case asked whether the school was a state actor when it fired employees. *Id.* at 831. Here, we are tasked with determining whether CDS was a state

20

actor when it promulgated the skirt requirement. Those actions are different. But for the reasons explained below, this difference is not outcome determinative. CDS's skirt requirement, however different than its firing of an employee, is still not "fairly attributable" to the state. *Id.* at 840.

2.

A tour through *Rendell-Baker*'s analysis and the various state action inquiries confirms that CDS was not a state actor in promulgating the skirt requirement. While the relevance of these inquiries may depend on the circumstances of a case, here they all point toward one answer. CDS's promulgation of the skirt requirement is not "fairly attributable" to North Carolina. *Id.* at 838.

Our first stop on that tour involves whether CDS performs a traditionally exclusive state function. The parties quarrel over what level of granularity we must analyze CDS's function. CDS argues that we must consider education in general, whereas Plaintiffs argue we should endorse the district court's analysis of whether providing "free, public education" is traditionally an exclusive state function. J.A. 2732. *Rendell-Baker* instructs the answer lies in the middle of these extremes. The Court asked whether "the education of maladjusted high school students" was "the exclusive province of the State." *Rendell-Baker*, 457 U.S. at 842. That was the function the school provided, and the Court determined it to be outside the State's exclusive province. Thus, we cannot look at education in general. But at the same time, we cannot narrow the scope by using answer-assuming adjectives to circumvent the functional inquiry. Asking whether "free, public education" is traditionally an exclusive state function is circular because it "ignores the

21

threshold state-action question." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) (explaining that asking whether "the operation of a public forum for speech" was a traditional, exclusive government function improperly avoided the state action inquiry). We agree with the First Circuit that "there is no indication that the Supreme Court had this kind of tailoring by adjectives in mind when it spoke of functions 'exclusively' provided by government." *Logiodice*, 296 F.3d at 27. Instead, we focus solely on what function the actor provides. *See Mentavlos*, 249 F.3d at 314–15 (describing a public military college's function as "to educate civilian students and produce community leaders" after looking to the school's stated mission).

In North Carolina, charter schools operate "independently of existing schools" to improve learning and educational options by offering "different and innovative teaching methods." N.C. Gen. Stat. § 115C-218(a). Charter Day fulfills this role by educating K-8 students using a classical curriculum—thus, its function is to provide an alternative method of primary education. As the North Carolina statutory scheme makes plain, charter schools are designed to provide alternative methods of education outside the traditional state school system. And so schools like Charter Day cannot be considered "traditionally the *exclusive* prerogative of the state." *Jackson*, 419 U.S. at 353 (emphasis added).

Private actors have a long history, both nationwide and in North Carolina, of carrying out primary education, especially alternative methods of primary education. From its colonial beginnings, North Carolina provided some public funds to private schools. *See, e.g.*, 1808 N.C. Sess. Law LXXII (An Act to amend an Act entitled "An Act to establish an Academy in the City of Raleigh," passed in the Year one thousand eight hundred and

22

one); 1805 N.C. Sess. Law XL (An Act Respecting the Warrenton Academy); 1796 N.C. Sess. Law LXI (An Act to authorize the Trustees of the Lumberton academy to lay off and sell a part of the town common; to raise a fund for the purpose of building said academy). Over time, even with the proliferation of public schooling, private schools continued to provide alternative primary education opportunities. Last year, over 100,000 children in North Carolina attended a private school, including over 75,000 K–8 students. *2020 North Carolina Private School Statistics*, STATE OF NORTH CAROLINA, DEPARTMENT OF ADMINISTRATION, DIVISION OF NON-PUBLIC EDUCATION 2 (2020), *available at* https://files.nc.gov/ncdoa/Annual-Conventional-Schools-Stats-Report-2019-2020_1.pdf. Private schools, including both religious and independent schools, by their very nature provide a spectrum of alternative curriculums and methods. Students that attend private schools in North Carolina, moreover, may still receive state funding. *See* N.C. Gen. Stat. § 115C-562.1, *et seq*. Some may even attend private schools for free with the benefit of state funds. STATE EDUCATION ASSISTANCE AUTHORITY, *Household Income Eligibility Guidelines* (2021), *available at* https://www.ncseaa.edu/wp-content/uploads/sites/1171/2020/10/HHIncomeEligibilityGuidelines.pdf. In addition to private schools, homeschooling has always played a substantial role in our society as an alternative primary education method. "While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Flagg Brothers Inc. v. Lefkowitz*, 436 U.S. 149, 159 (1978). Providing an alternative method of primary education, even freely, is not one of them. Considering all of this, we conclude that CDS does not perform a traditionally exclusive state function.

23

Our next stop considers whether any state law or regulation compels CDS's skirt requirement. The district court reasoned that CDS "has brought the uniform policy under extensive regulation of the State by making violations of the uniform policy a disciplinary violation" because North Carolina law discourages long-term suspension or expulsion for minor disciplinary violations, such as non-compliance with a dress code. J.A. 2735; *see* N.C. Gen. Stat. § 115C-390.2. But that expressed policy is not an "extensive regulation" of school uniform policies. *Rendell-Baker*, 457 U.S. at 841. In fact, there is no state policy at all that requires, prohibits or regulates uniform policies. Thus, no state law or regulation "compelled" the specific action challenged here—the skirt requirement. *Id.* Therefore, it does not result from the state's "coercive power" or extensive regulation such that it warrants attribution to the state itself. *Blum*, 457 U.S. at 1004. In short, neither state law nor state regulation compels CDS's skirt requirement.

Continuing our tour, we next examine whether CDS is "pervasive[ly] entwined" with the state. *Brentwood Acad.*, 531 U.S. at 291. Charter schools in North Carolina operate independently of local school boards. N.C. Gen. Stat. § 115C-218.15. CDS's Board of Directors, which the government has no role in selecting, "decide[s] matters related to the operation of the school, including budgeting, curriculum, and operating procedures." *Id.* § 115C-218.15(d). CDS "is exempt from statutes and rules applicable to a local board of education." *Id.* § 218.10. And while charter schools must "adopt policies to govern the conduct of students and establish procedures to be followed by school officials in disciplining students," the state does not approve or supervise the content of those policies. *Id.* § 390.2(a). Put simply, apart from the fact that Charter Day bears the public school

24

label, the state takes a hands-off approach in deciding or supervising the school's policies. The state is so hands-off, in fact, that it disclaims liability "for any acts or omissions of the charter school."[6] *Id.* § 115C-218.20(b). This reality is a far cry from the "public entwinement in the management and control" necessary for state action. *Brentwood Acad.*, 531 U.S. at 297 (noting the "bottom up" and "top down" entwinement between the nominally private actor and the state).

Our final tour stop involves the question of whether North Carolina has delegated its constitutional obligation to provide public schooling, thus making CDS's conduct state action under *West v. Atkins*, 487 U.S. 42 (1988). *See* N.C. Const. art. IX § 2 (setting forth the state's obligation to provide for a "uniform system of free public schools"). In *West*, the Court held that a physician who contracted with the state to provide medical services to prison inmates was a state actor when treating patients. 487 U.S. at 54. The Court pointed to the constitutional obligation under the Eighth Amendment to provide medical care to inmates, and it concluded the state abdicated this obligation by deferring solely to the contracted-physician's professional judgment. The physician was therefore "authorized and obliged to treat prison inmates" and "clothed with the authority of state law." *Id.* at 55 (quoting *United States v. Classic*, 313 U.S. at 326).

---

[6] The state statute is silent as to whether charter schools are entitled to sovereign immunity. *Id.* § 115C-218.20(a) ("Any sovereign immunity of the charter school . . . is waived to the extent of indemnification by insurance."). Governmental immunity and state action are two sides of the same coin. But while the doctrines are related and contain similar analyses, they are distinct. *See Cunningham v. Gen. Dynamics Info. Tech.*, 888 F.3d 640, 646–47 (4th Cir. 2018) (explaining that a government contractor receives immunity if the state acted within its constitutional power to authorize an action).

25

There are important differences between *West* and the circumstances here. First, unlike in *West*, the state here has not abdicated its constitutional obligation through a private contract. In *West*, the state provided the inmate his needed medical care entirely through a contracted private physician. *Id.* at 44, 55. In other words, the state fulfilled one-hundred percent of its constitutional obligation through a contract with a private actor. That is not the case here. North Carolina never stepped away from its role in providing a public school system free to all. It still operates public schools that can, and do, accommodate each child who wishes to attend. By providing an alternative option of charter schools, North Carolina has not delegated its obligation to provide a public education system; rather, it simply delegated the operation of charter schools, which were not necessary to fulfill its constitutional obligation to begin with. North Carolina law is clear that charter schools "operate independently of existing schools," N.C. Gen. Stat. § 115C-218(a), to offer "different and innovative teaching methods," *id.* § 115C-218(a)(3), and to provide "expanded choices in the types of educational opportunities" available to students. *Id.* § 115C-218(a)(5). These schools are thus an additional option beyond the "traditional public schools that have been established in order to comply with [N.C. Const. art. IX]." *Sugar Creek Charter Sch., Inc. v. State*, 712 S.E.2d 730, 741 (N.C. App. 2011) ("N.C. Const. art. IX, § 2(1) does not implicitly prohibit the establishment of public schools in addition to the traditional public schools that have been established in order to comply with this basic constitutional mandate.").

Second, and further illustrating this point, students at Charter Day had a choice that the inmate in *West* never had. The inmate in *West* had no choice but to submit to the

services of the contracted physician the state provided. Emphasizing this point, the Court noted that "[i]t is only those physicians authorized by the State to whom the inmate may turn." *Id.* at 55. It thus concluded that if the physician was deliberately indifferent in providing treatment, that harm "was caused . . . by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care." *Id.* In other words, the inmate had no choice but to submit to the state's medical services, and the state chose to fulfill its obligation through a private actor. By contrast, Charter Day students have a choice. They were never "den[ied] . . . a venue independent of the State," nor were they "den[ied] . . . a venue" that North Carolina had a constitutional obligation to provide. *Id.* Any student in North Carolina may still attend a traditional public school—which the state still completely operates. Because no student must attend Charter Day, and every student may still attend a traditional public school, North Carolina has not delegated its constitutional obligation to CDS. Thus, *West* does not lead to the conclusion that CDS is a state actor.

In sum, CDS's skirt requirement is not "fairly attributable" to the state. *Rendell-Baker*, 457 U.S. at 838.[7] The Constitution only reaches government conduct. Under *Rendell-Baker* and in consideration of the state action doctrine, the skirt requirement is CDS's conduct, not North Carolina's. Because § 1983 does not regulate private conduct, Plaintiffs cannot prevail on their equal protection claim. Therefore, we reverse the district

---

[7] For the same reasons, RBA is not a state actor either. RBA is a further step removed from state action because its contractual relationship is with CDS, not the state.

court's grant of summary judgment to Plaintiffs against CDS and affirm the district court's grant of summary judgment to RBA on this claim.

C.

Last, we appreciate the passion of our good colleague's dissent to this portion of our opinion. We join her in acknowledging and celebrating the accomplishments of women she identifies and innumerable others. Nothing in our opinion should be construed otherwise. To that point, our opinion neither endorses nor rejects the dress code and the reasons offered by CDS for its implementation. Rather, it is an evaluation of Plaintiffs' Equal Protection claim under current law.  Under our precedent, CDS is not a state actor in promulgating its dress code, which means that, even if it causes the harms Judge Keenan describes, CDS is not subject to an Equal Protection claim. Whether we like that law or not, we are bound to follow it.

And to be clear, our decision that CDS is not a state actor in promulgating its dress code for purposes of a § 1983 claim does not give it, or any other charter school operator, a license to discriminate. While none are currently before us, several other mechanisms remain in place to prevent discrimination and to empower victims of discrimination to seek recourse. North Carolina can ensure accountability through enforcement of its charter. CDS's charter, for example, requires compliance with civil rights laws, including applicable state and federal constitutional provisions. Plaintiffs here have a third-party beneficiary claim based upon that charter provision pending before the district court. In addition, federal civil rights statutes, like Title VI and Title IX, likely apply to most charter schools as recipients of federal funds. And states and localities may very well have their

28

own civil rights laws applicable to charter schools. Between accountability measures at the local level and robust civil rights laws, the lack of a federal Equal Protection Clause remedy does not enable a charter school to discriminate without consequence. Plaintiffs can pursue their other claims and, if the facts support them, obtain the appropriate relief. But since the district court has not addressed those issues and we have remanded the case to it as set forth below, we elect not to comment on the evidence.

## III.

We now turn to Plaintiffs' Title IX claim. Plaintiffs argue the district court erred in granting summary judgment to Defendants on the grounds that Title IX does not apply to sex-based dress codes. We agree. In considering that argument, we first address whether Title IX applies to RBA, before determining whether Title IX applies to dress codes like the one at CDS and, if it does, what the proper standard is for such a claim.

## A.

At the outset, we must resolve which Defendants are recipients of federal funds for Title IX purposes. The district court did not reach this issue. The parties agree that Title IX regulates CDS, as a direct recipient of federal funds. They dispute, however, whether the same is true for RBA. According to RBA, Title IX does not reach it because it does not receive public funding directly but instead only through its contract with CDS. It points to *National Collegiate Athletic Association v. Smith*, 525 U.S. 459, 468 (1999), as holding that benefiting from federal funding is not enough to be considered a recipient for Title IX purposes.

29

Title IX's regulations, however, clarify that RBA is a recipient of federal funds such that it is subject to Title IX liability. The Department of Education has defined "recipient" to mean anyone "to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance." 34 C.F.R. § 106.2(i). CDS directly receives federal funds. RBA receives federal funds "through another recipient," here, CDS, and RBA "operates" the charter school. *Id.* These facts therefore make RBA a "recipient" under the regulation's definition.

In addition, RBA's argument stretches *NCAA* too far. The Supreme Court held in that case that the NCAA, which received dues from its federally funded member colleges, was not subject to Title IX. *NCAA*, 525 U.S. at 468. That the NCAA may have "indirectly benefit[ed] from the federal assistance afforded its members" was not enough to make the NCAA itself, a membership organization, a recipient of federal funds under Title IX. *Id.* But the Court still reiterated in *NCAA* that receiving federal assistance "through an intermediary" amounts to being a "recipient[] within the meaning of Title IX." *Id.* RBA receives fees derived almost entirely from federal funds, not dues, from CDS to operate a school. Because RBA receives these federal funds earmarked for education, it is a recipient under Title IX. 34 C.F.R. § 106.2(i). *NCAA* does not alter the plain application of that regulation.

B.

Having determined that both CDS and RBA are subject to the requirements of Title IX, we next consider whether Title IX's prohibitions apply to school dress codes. We start with Title IX's text. Pursuant to 20 U.S.C. § 1681(a): "No person in the United States shall,

30

on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." The statute's text suggests that it applies to any instances, not specific circumstances, where students are "excluded from participation in," "denied the benefits of" or "subjected to discrimination" on account of sex. 20 U.S.C. § 1681(a). Following that broad language, Congress listed several detailed exceptions, which clarified the institutions and activities that fell under Title IX's purview. *See* 20 U.S.C. § 1681(a)(1)–(9). For instance, certain religious and military institutions are exempt from Title IX's prohibitions. *Id.* § 1681(a)(3)–(4). As are boy or girl conferences, such as Boys State and Girls State. *Id.* § 1681(a)(7). And the membership practices of certain social organizations, like fraternities and sororities, are excepted. *Id.* § 1681(a)(6). Importantly, Congress did not make an exception for the implementation of dress codes.

Defendants claim that the text is ambiguous as it does not specify whether Title IX applies to dress codes. And in response to that alleged ambiguity, they argue we should follow the district court's lead and defer to the agency's decision to rescind its Title IX regulation dealing with appearance codes. Initially, the Education Department's regulations prohibited discrimination "against any person in the application of any rules of appearance." 40 Fed. Reg. 24,141 (June 4, 1975). Seven years later, following a notice-and-comment period, the Department revoked that regulation. 47 Fed. Reg. 32,526–27 (July 28, 1982). The agency noted that "[d]evelopment and enforcement of appearance codes is an issue for local determination." *Id.* at 32,526. It based this determination on the fact that "[t]here is no indication in the legislative history of Title IX that Congress intended

31

to authorize Federal regulations in the area of appearance codes." *Id.* at 32,527. It also justified the revocation by noting that it "permits the Department to concentrate its resources on cases involving more serious allegations of sex discrimination." *Id.* at 32,526.

We give *Chevron* deference to an agency's reasonable statutory interpretation of vague terms or ambiguous interpretive questions. *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021). It is "a tool of statutory construction whereby" we defer to "agencies charged by Congress to fill any gap left . . . in the statutes they administer." *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011) (quoting *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 817 (4th Cir. 2001)). The analytical framework is familiar. First, we ask "[i]f the intent of Congress is clear." *Chevron*, 467 U.S. at 842. If it is, that ends the inquiry. *Id*. But if the statute is unclear as to the precise interpretive question, and the ordinary tools of statutory construction do not lend an answer, then we ask if the agency's interpretation is a permissible one. *Id.* at 843.

But before we engage with that familiar *Chevron* framework, the parties raise an antecedent question. Plaintiffs argue the rescission is not the typical agency decision for which *Chevron* deference is considered. They argue that the rescission created a blank slate rather than a new rule. In other words, there is no agency interpretation to which we can defer. It is true that *Chevron* deference only applies to agency "rules carrying the force of law," *Mead Corp.*, 533 U.S. at 227, that interpret "the meaning or reach of a statute." *Chevron,* 467 U.S. at 844 (quoting *U.S. v. Shimer*, 367 U.S. 374, 382 (1961)). The rescission does seem different than that. Although the rescission went through the notice-and-comment process, that only reflects the process required to revoke a regulation

32

promulgated pursuant to those procedures. *See* 5 U.S.C. §§ 551(5), 553. And currently, there are no Department of Education regulations on the issue of appearance codes. Neither party cited, nor have we found, any decisions addressing whether *Chevron* deference should be applied in these circumstances.

Nor is it clear that when the Department revoked the regulation it was interpreting "the meaning or reach of a statute." *Chevron*, 467 U.S. at 844. To be sure, the rescission suggested that a regulation on appearance codes was not intended by Congress. But that does not mean it is a substantive interpretation of the statute's reach. Instead, the agency described the rescission, at least in part, as an administrative prioritization, rather than as a substantive interpretation of Title IX's meaning. Moreover, the Department of Education has, in fact, investigated complaints regarding sex-based appearance codes in schools since the rescission. *See* Brief of Amici Curiae National Women's Law Center et al. at 13–14. It has done so even in the last few years, citing to 34 C.F.R. § 106.31 (the regulatory section which no longer contains anything specific to dress codes) as its authority for investigating the complaint. *See Archway Classical Acad.—Trivium E.*, OCR Case No. 08-16-1095 (Dep't of Educ. Sept. 28, 2017).

We decline, however, to answer the difficult question of whether the rescission was a "rule[] carrying the force of law" about Title IX's meaning. *Mead Corp.*, 533 U.S. at 227. Even assuming it was, we cannot give the agency deference. The statute plainly answers the interpretive question—Title IX encompasses sex-based dress codes.

"[T]he judiciary is the final authority on issues of statutory construction . . . ." *Chevron*, 467 U.S. at 843 n.9. That authority grounds step one of the *Chevron* analysis. *See*

33

*Arangure v. Whitaker*, 911 F.3d 333, 338 (6th Cir. 2018). In asking whether Congress's intent was clear at step one, we must apply the "traditional tools of statutory construction" before we can declare an interpretive question ambiguous. *Chevron*, 467 U.S. at 843 n.9; *see also Nat'l Elec. Mfrs. Ass'n*, 654 F.3d at 504. It is our constitutional obligation to say what the law is, and the Supreme Court has reminded courts not to abdicate that duty at step one of the *Chevron* analysis. *See Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018) ("[T]he Court need not resort to *Chevron* deference, as some lower courts have done, for Congress has supplied a clear and unambiguous answer to the interpretive question at hand."); *id.* at 2120 (Kennedy, J., concurring) (admonishing lower courts for rushing to give "reflexive deference" instead of using the tools of statutory construction to discern if Congress's intent was clear at step one).

Not only is it our duty to say what the law is; our failure to do so risks damaging the rule of law. If we defer to agencies' reasonable interpretations of unambiguous statutes, we unconstitutionally delegate our duty to interpret the law. Practically, such delegation could result in constant flip-flopping over what the law is, depending on who is in the power. Elections rightly have consequences. But the meaning of the law should not be one of them.

Here, the text of Title IX is clear, which ends the analysis at step one of *Chevron*. As explained above, the statute broadly prohibits sex-based discrimination in schools that receive federal funding. That sweeping prohibition is followed by a handful of exceptions. *See* 20 U.S.C. § 1681(a)(1)–(9). Dress codes are not listed among those exceptions. Here, a consideration of Title IX's entire text, including the list of specific exceptions, which does not include dress codes, leaves no ambiguity. To the contrary, it indicates Congress

34

contemplated exceptions to its broad prohibition against discrimination on the basis of sex and identified areas outside the scope of Title IX. Had Congress intended to exclude dress codes, it obviously knew how to do so. It could have included dress codes in the list of specified exceptions. Or it could have provided that the list was illustrative or non-exhaustive. But it did neither.

Defendants argue that the lack of a specific mention of dress codes in the text creates an ambiguity. But "[s]ilence . . . does not necessarily connote ambiguity, nor does it automatically mean that a court can proceed to *Chevron* step two." *Arangure*, 911 F.3d at 338. Defendants are right that the statute does not say the words "dress code." But it also does not say the word "retaliation," yet the Supreme Court has held Title IX prohibits retaliation based on a complaint of sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) ("The Court of Appeals' conclusion that Title IX does not prohibit retaliation because the 'statute makes no mention of retaliation' ignores the import of our repeated holdings construing 'discrimination' under Title IX broadly." (internal citation omitted)). Nor does Title IX say the words "sexual harassment," and yet the Supreme Court has also held that Title IX encompasses it. *Id.* ("Though the statute does not mention sexual harassment, we have held that sexual harassment is intentional discrimination encompassed by Title IX's private right of action.") (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992)). Those holdings are no surprise, because "Congress did not list *any* specific discriminatory practices when it wrote Title IX." *Id.* at 175. Instead, "Congress gave the statute a broad reach" by writing a "general prohibition on discrimination, followed by specific, narrow exceptions to that broad

35

prohibition." *Id.* Dress codes should be considered just like than any other activity under Title IX's purview; they cannot be categorically excepted. That much Congress made clear. Therefore, we cannot defer to the Department on this point. Dress codes are not excluded from Title IX.

C.

Having settled that Title IX is applicable here, we must determine how to apply it. The parties disagree on the standard we should use to evaluate the merits of the Title IX claim. Defendants argue we must evaluate the uniform policy as a whole and compare the burden it places on each sex. *See Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104 (9th Cir. 2006) (en banc) (reviewing employee policy that required women but not men to wear facial makeup). Plaintiffs, by contrast, would apply the facts to determine whether the requirement subjects girls to discrimination, excludes them from participating in educational activities, or deprives them of equal educational opportunity.

We have little precedent to guide us. Defendants' argument that we must compare the uniform policy's burdens on boys and girls as a whole is grounded in a lone out-of-circuit Title VII decision arising in the employment context. *See id.* at 1108–11. There, the Ninth Circuit rejected a Title VII claim by a casino waitress who asserted that makeup requirements applicable to women were discriminatory. But, given the appearance requirements for men that were part of the same policy, *Jespersen* held the makeup requirements did not impose an "unequal burden" on women. *Id.* Normally, "[w]e look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX." *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th

36

Cir. 2007). But *Jespersen* has not garnered support from other courts. And we have never addressed sex-specific dress codes in either the Title VII or Title IX context before.

Plaintiffs, on the other hand, rely on recent decisions from this Court and the Supreme Court that call for a more individualized inquiry. In *Grimm v. Gloucester County School Board*, 972 F.3d 586, 618 (4th Cir. 2020), which involved a transgender student's allegation that bathroom accommodations at a public high school violated Title IX, we asked, in addressing the "subjected to discrimination" prong, whether the individual was treated "worse than others who are similarly situated." *Id.* at 618 (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020)). And in the context of a Title VII claim that an employer terminated an employee based on sexual orientation, the Supreme Court held that the "focus should be on individuals, not groups." *Bostock*, 140 S. Ct. at 1740. That is because Title VII declares that an employer cannot "discriminate against any *individual* . . . ." 42 U.S.C. § 2000e-2(a)(1) (emphasis added); *see Bostock*, 140 S. Ct. at 1740–41 (focusing on the repeated use of "individual" in Title VII's text as indicative that the analysis must focus on individuals rather than groups). Title IX's language closely resembles Title VII's. *See* 20 U.S.C. § 1681(a) ("No *person* . . . shall, on the basis of sex, . . . be subjected to discrimination . . . .") (emphasis added).

Neither *Grimm* nor *Bostock* completely square with our case here. Both of those cases involved different allegations. *Grimm* involved Title IX but had nothing to do with a dress code. *Bostock* involved Title VII, not Title IX, and involved allegations of individualized employment discrimination.

37

But despite these differences, their reasoning that we conduct an individualized analysis is consistent with the broadly applicable text of Title IX. To repeat, Title IX forbids a federally funded school from "exclud[ing] from participation," "den[ying] the benefits of" an education program or "subject[ing] to discrimination" any student "on the basis of sex." 20 U.S.C. § 1681(a). Title IX's text expresses concern for individual harm, not group inequality. *See* 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination . . . ."). And *Bostock* tells us that if a burden is sufficient to meet the standard for individualized harm we describe today, it is not canceled out by other parts of the policy that impose individualized harm to others. As we learned as children, "two wrongs don't make a right." Therefore, following *Grimm* and *Bostock*, the question here is whether CDS's skirt requirement excluded Plaintiffs from participation, denied them education benefits, or "treated [them] worse than similarly situated students." *Grimm*, 972 F.3d at 618.

Because the district court held that Title IX categorically did not apply to dress codes, it did not assess the parties' evidence to determine if there was a genuine issue of material fact as to this claim. Rather than our doing so now, we remand for the district court to address the parties' motions for summary judgment under the standard we set forth today. Plaintiffs allege all three theories of liability under Title IX. Thus, on remand, the district court should evaluate whether there are genuine issues of material fact as to each of these three theories.

The application of the first two theories—whether Plaintiffs were "excluded from participation" or were "denied the benefits of" an educational program in their education

38

at Charter Day—is self-evident from Title IX's text. Plaintiffs' third theory—that they were "subjected to discrimination" on the basis of sex—is less self-evident. Therefore, we take this opportunity to provide the district court with guidance on application of that theory on remand.

Asking whether Plaintiffs are treated worse than their peers presents a different question than the Equal Protection Clause does. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 256–57 (2009) (noting that the Title IX and Equal Protection Clause standards "may not be wholly congruent"). Title IX does not ask, like the Equal Protection Clause, whether there is any good reason for treating sexes differently. Rather, the "subjected to discrimination" prong of Title IX asks whether an individual is treated worse than a similarly situated peer because of sex. Not all distinctions without good reason harm an individual. Mitchell's attempt to justify the skirt requirement illustrates this point. His comments regarding his view of women in our society provide insufficient justification for the skirt requirement to satisfy the heightened scrutiny required under the Equal Protection Clause. But that is not the Title IX inquiry, which asks whether Plaintiffs are treated worse than similarly situated peers. Mitchell's comments may be relevant, but they would not be dispositive of the Title IX analysis. So while these analyses may have some overlap and may sometimes reach the same result, they are distinct inquiries. *See Wilcox v. Lyons*, 970 F.3d 452, 463–64 (4th Cir. 2020).

We also emphasize two other considerations. First, the harm must be objective. *Grimm* and *Bostock* both involved objective, individualized harm. In *Grimm*, for example, the plaintiff produced evidence of medical conditions from avoiding the use of separate

39

restroom facilities far away from class, as well as evidence of suicidal thoughts resulting from the stress of the situation. 972 F.3d at 617. And in *Bostock*, the plaintiff's employment was terminated. 140 S. Ct. at 1737. Following *Bostock* and *Grimm*, it is not enough that a plaintiff subjectively claims to be worse off. There must be evidence supporting objective harm.

Second, if Plaintiffs demonstrate they are objectively worse off than similarly situated peers, they must show that their sex is a but-for cause of that harm. Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). "That language—'on the basis of sex'—is significant." *See Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021). It "requires 'but-for' causation in Title IX claims . . . ." *Id.* at 237; *see also Grimm*, 972 F.3d at 616 (noting that "sex remains a but-for cause" in transgender discrimination). Therefore, in demonstrating that they have been "subjected to discrimination" "on the basis of sex," Plaintiffs must show that their sex is a but-for cause of being worse off than similarly situated peers. 20 U.S.C. § 1681(a).

## IV.

This case raises several weighty issues. While we cannot, in this appeal, comprehensively answer the extent to which a charter school can be a government actor, we decide here that CDS and RBA were not state actors in promulgating and enforcing Charter Day's uniform policy. Therefore, Defendants are entitled to summary judgment on the § 1983 claim. At the same time, however, we conclude that, as recipients of federal education funds, CDS and RBA are subject to Title IX, which covers dress codes.

40

Therefore, we remand to the district court to determine whether there is a genuine issue of material fact as to whether the skirt requirement excluded Plaintiffs from participation, denied them education benefits or subjected them to discrimination under Title IX.

*REVERSED AND REMANDED*

41

BARBARA MILANO KEENAN, Circuit Judge, concurring in part and dissenting in part:

No, this is not 1821 or 1921. It's 2021. Women serve in combat units of our armed forces. Women walk in space and contribute their talents at the International Space Station. Women serve on our country's Supreme Court, in Congress, and, today, a woman is Vice President of the United States. Yet, girls in certain *public* schools in North Carolina are required to wear skirts to comply with the outmoded and illogical viewpoint that courteous behavior on the part of both sexes cannot be achieved unless girls wear clothing that reinforces sex stereotypes and signals that girls are not as capable and resilient as boys. I therefore part company with my friends in the majority and would hold that the actions of Charter Day School (CDS), a *public* school created under North Carolina law and funded almost entirely by governmental sources, are actions of the state for purposes of Section 1983. Moreover, I would hold that CDS' enforcement of the skirts requirement, with its many attendant harms to girls, denies these girls at this *public* school their constitutional guarantee of Equal Protection under the law.[1] Accordingly, I would affirm this part of the district court's judgment.

Additionally, I am pleased to agree with my colleagues' conclusions in Part III of the majority opinion remanding the plaintiffs' Title IX claim. I also agree that RBA is not a state actor for purposes of the Equal Protection Clause. Therefore, I will not address those issues separately.

---

[1] Although the welfare of the boys who attend CDS is not directly at issue here, I observe that they, too, are affected adversely by CDS' skirts policy in being required to carry umbrellas in this charade of chivalry financed by state and local government.

42

I.

In my view, the majority's "state action" analysis jumps off the rails by relying heavily on *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), a case dealing with a private, rather than a public, school. The majority's circumvention of the statutory text is puzzling because North Carolina law unambiguously defines its charter schools as public schools established under the state's authority and responsibility to provide its citizens a free public education. N.C. Gen. Stat. §§ 115C-218(a)(5), 115C-218.15(a).

To prevail on their Equal Protection claim under Section 1983, the plaintiffs were required to show that: (1) the defendants deprived them of a constitutional right, and (2) the defendants did so "under color of [State] statute, ordinance, regulation, custom, or usage" (the state action requirement). *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (alteration in original) (citation omitted). The "under-color-of-state-law" requirement of Section 1983 "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id.* (citation and internal quotation marks omitted). In determining whether a defendant acted under color of state law, our "ultimate inquiry" is whether "there [is] a sufficiently close nexus between the challenged actions" of the defendant and the state so that the defendant's action "may be fairly treated as that of the State itself." *Id.* at 314 (citation and internal quotation marks omitted).

The majority sets out the many factors that this Court and the Supreme Court have considered in evaluating a private actor's nexus to the state. Maj. Op. 14-15. No single factor "in isolation[] establishes state action." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 343 (4th Cir. 2000). Instead, we look at the totality of the circumstances

43

of the relationship between the private actor and the state to determine whether the action in question fairly is attributable to the state.  *Id.*

The state action analysis required in this case is not complicated.  The North Carolina Constitution mandates that the state "provide by taxation and otherwise for a general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students."  N.C. Const. art. IX, § 2, cl. 1.  To fulfill this duty, in addition to establishing traditional public schools, the North Carolina legislature has authorized the creation of public charter schools that are overseen by a state advisory board.  N.C. Gen. Stat. § 115C-218.  Charter schools may only operate under the authority granted to them by their charters with the state.  *See id.* §§ 115C-218.15(c), 115C-218.5.  The state may revoke a school's charter, among other reasons, for non-compliance with the terms of the charter, poor student performance, or poor fiscal management.  *See id.* § 115C-218.95.  In defining the nature of charter schools, North Carolina law expressly provides:

> A charter school that is approved by the State ***shall be a public school*** within the local school administrative unit in which it is located.  All charter schools shall be accountable to the State Board for ensuring compliance with applicable laws and the provisions of their charters.

*Id.* § 115C-218.15(a)[2] (emphasis added); *see also Sugar Creek Charter Sch., Inc. v. North Carolina*, 712 S.E.2d 730, 742 (N.C. Ct. App. 2011) (observing that charter schools are "indisputably public schools").  And "for purposes of providing certain State-funded employee benefits," the North Carolina legislature has specified that "charter schools are

---

[2] Citing this statutory provision and the North Carolina Constitution, CDS' charter reiterates that charter schools are public schools under state law.

44

public schools and that the employees of charter schools are public school employees."
N.C. Gen. Stat. § 115C-218.90(a)(4). Thus, under the plain language of these statutes,
charter schools, as a matter of state law, are public institutions.

Consistent with this "public" designation, charter schools in North Carolina receive
a per-pupil funding allotment from the state board of education based on the amount
provided for students attending traditional public schools. N.C. Gen. Stat. § 115C-
218.105(a). The local school administrative unit where each student resides similarly
transfers the student's share of local funding to the charter school that the student attends.
*Id.* § 115C-218.105(c). As a result of these and other public funding mechanisms, CDS
receives 95% of its funding from public sources.[3]

This structure of the North Carolina charter school system compels the conclusion
that the state has delegated a portion of its duty to provide free primary schooling to charter
school operators like CDS. *See Goldstein*, 218 F.3d at 342 ("[I]f the state delegates its
obligations to a private actor, the acts conducted in pursuit of those delegated obligations
are under color of law."); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct.
1921, 1929 n.1 (2019) ("[A] private entity may, under certain circumstances, be deemed a
state actor when the government has outsourced one of its constitutional obligations to a
private entity."). The fact that students have the option of attending a traditional public
school is irrelevant to the question whether a charter school is a state actor. We look to the
structure of the charter school to determine whether it is a state entity, not to North Carolina

---

[3] CDS also receives funding from the federal government pursuant to certain federal
laws, including the Individuals with Disabilities Education Act.

students' ability to select a different school with non-discriminatory policies. North Carolina cannot escape the consequences of discriminatory treatment of any portion of the state's student body by outsourcing the state's educational responsibilities to state-created and state-funded entities. *See West v. Atkins*, 487 U.S. 42, 56-57, 56 n.14 (1988) (holding that a doctor under contract with a state prison was a state actor, because a contrary rule would allow the state "to contract out all services which it is constitutionally obligated to provide and leave its citizens with no means for vindication of [their] rights." (citation omitted)).

Accordingly, given the plain statement by the North Carolina legislature designating charter schools as "public," and the near-total governmental funding flowing to CDS, the school clearly "exercised power possessed by virtue of state law and made possible only because the [school] is clothed with the authority of state law." *Id.* at 49 (citation and internal quotation marks omitted). For these reasons, I would conclude that CDS' implementation of the skirts requirement at this North Carolina public school is "fairly attributable" to the state of North Carolina. *See Mentavlos*, 249 F.3d at 311.

This conclusion is not altered by the majority's reliance on *Rendell-Baker*, 457 U.S. at 833-35, in which former employees at a private school that contracted with state and local governments challenged their discharges under the First, Fifth, and Fourteenth Amendments. In concluding that the employees' terminations were not attributable to the state for purposes of Section 1983, the Court reasoned that the private school was

> not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not

46

> become acts of the government by reason of their significant or even total engagement in performing public contracts.

*Id.* at 840-41. The Court also noted that, although the school generally was subject to "extensive regulation," the state had little involvement in personnel matters, including the type of action challenged by the plaintiffs. *Id.* at 841-42.

Although *Rendell-Baker*, like the present case, involved a school, the similarity between the two cases ends there. The institution in *Rendell-Baker* indisputably was a private school, *id.* at 831-32, not a school created by operation of state law or designated as a "public" school by the state legislature. By contract, employees of the private school in *Rendell-Baker* were not considered government employees, *id.* at 833, while, as noted above, the North Carolina code designates employees of charter schools as public employees entitled to receive certain state benefits, including state-employee health and retirement plans, *see* N.C. Gen. Stat. § 115C-218.90. And, instead of receiving statutorily mandated public funding, the school in *Rendell-Baker* was reimbursed by the state and local governments for student tuition under contracts that the private school executed with those governmental units. *Id.* at 832-33.

In evaluating whether an entity's conduct amounts to state action, we must "identify[] the specific conduct of which the plaintiff complains" to determine whether that conduct is "fairly attributable to the State." *Mentavlos*, 249 F.3d at 311 (citation and internal quotation marks omitted). The challenged action in *Rendell-Baker* involved a personnel decision at a private institution, a matter that clearly was outside the purview of the state's regulation. 457 U.S. at 841-42. In contrast, here, although North Carolina does

47

not regulate charter schools' implementation of dress codes, CDS characterized its dress code, including the skirts requirement, as central to the school's *educational* philosophy, pedagogical priorities, and mission of providing a "traditional school with a traditional curriculum, traditional manners[,] and traditional respect." The skirts requirement thus is a component of the school's core educational function, which North Carolina has delegated to CDS. As discussed further below, the skirts requirement directly impacts the educational experience of female students at CDS, including the plaintiffs' ability to participate in school activities and safety drills, and the long-term psychological consequences for students subjected to pernicious sex-based stereotypes.

Under the circumstances presented, I would reject CDS' attempt to characterize itself as a government contractor, akin to a private entity that builds bridges and dams. CDS would not exist but for North Carolina's creation of the public charter school system and the state's decision to grant CDS a charter. The state legislature unambiguously created charter schools as public entities, and the legislature has established a funding structure that results in CDS receiving almost all its funding directly from governmental sources. And, as openly acknowledged by CDS, the challenged discriminatory action is central to the school's core educational function. Accordingly, for purposes of our Equal Protection Clause analysis, I would affirm the district court's determination that CDS' implementation of the skirts requirement was carried out under color of state law.

II.

Turning to the merits of the plaintiffs' constitutional claim, I also would affirm the district court's holding that the skirts requirement plainly violates the Equal Protection Clause. In its attempts to justify the sex-based classification, CDS has offered nothing more than harmful stereotypes about how girls should look, behave, and be treated by boys, based on the archaic, unsupported concept that girls are "fragile" and must be handled "gently." We should be long past the days of condoning such differential treatment under the guise of "chivalry," a justification that the Constitution does not tolerate. Moreover, the skirts requirement does not bear any logical relationship to the attainment of any important governmental objective.

Courts are required to apply intermediate scrutiny to sex-based classifications like the skirts requirement. *United States v. Virginia*, 518 U.S. 515, 532-33 (1996); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020). This heightened scrutiny imposes a "demanding" burden on the defendant, which must provide an "exceedingly persuasive" justification for the sex-based classification. *Virginia*, 518 U.S. at 533. Accordingly, to satisfy intermediate scrutiny, the defendant "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (alterations, citations, and internal quotation marks omitted).

Most relevant here,

justifications for gender-based distinctions that are rooted in overbroad generalizations about the different talents, capacities, or preferences of males and females will not suffice. Legislative classifications which distribute

49

> benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the 'proper place' of women and their need for special protection.

*Knussman v. Maryland*, 272 F.3d 625, 635-36 (4th Cir. 2001) (citations and internal quotation marks omitted). In other words, we will reject sex-based classifications that "appear to rest on nothing more than conventional notions about the proper station in society for males and females." *Id.* at 636; *see also Virginia*, 518 U.S. at 550 (rejecting defendant's reliance on "generalizations about the way women are" to justify differential treatment); *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1692 (2017) (when the government's "objective is to exclude or 'protect' members of one gender in reliance on fixed notions concerning that gender's roles and abilities, the objective itself is illegitimate" (citation, quotation marks, and alterations omitted)).

I would reject CDS' attempt to divert our attention from the constitutional infirmity of the skirts requirement by arguing that the dress code as a whole is intended to "help to instill discipline and keep order," and "to establish an environment in which [the school's] young men and women treat one another with mutual respect." CDS' purported reason for implementing a dress code does not impact our analysis, nor is it relevant whether other portions of the dress code are discriminatory toward male students. Rather, the question before us is whether the *sex-based classification* of the skirts requirement is directly supported by an important governmental objective.

Applying the proper lens, I would conclude that the skirts requirement fails intermediate scrutiny. CDS does not attempt to disguise the true, and improper, rationale behind its differential treatment of girls. In his initial response to a parent's objection to

50

the requirement, Baker Mitchell, the founder of CDS, explained that the skirts requirement embodies "traditional values."  According to Mitchell, the requirement for girls to wear skirts was part of CDS' effort "to preserve chivalry and respect among young women and men," which also included requiring boys "to hold the door open for the young ladies and to carry an umbrella" to keep rain from falling on the girls.  Mitchell later elaborated that chivalry is "a code of conduct where women are treated, they're regarded as a fragile vessel that men are supposed to take care of and honor."  Mitchell explained that, through the skirts requirement, CDS sought to "treat [girls] courteously and more gently than boys."  CDS board members agreed with these assessments, including CDS' goal of fostering "traditional roles" for boys and girls.

It is difficult to imagine a clearer example of a rationale based on gender stereotypes.  On their face, the justifications proffered by CDS "rest on nothing more than conventional notions about the proper station in society for males and females."  *Knussman*, 272 F.3d at 636; *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982) (a sex-based classification reflecting "archaic and stereotypic notions . . . is illegitimate"); *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994) (rejecting "the very stereotype the law condemns" as a justification for a state's sex-based policy (citation omitted)).  Under long-standing precedent of the Supreme Court and the Fourth Circuit, CDS' reasoning does not satisfy the rigors of intermediate scrutiny.[4]

---

[4] Because CDS' proffered justifications for the skirts requirement are so plainly invalid, I will not linger on the question whether CDS could satisfy the tailoring requirement for intermediate scrutiny.  I note, however, the illogical nature of CDS'

The record is replete with evidence of the harm caused by the stereotypes underlying the skirts requirement. A developmental psychologist explained that the skirts requirement "contradict[s] modern educational practices that foster independence, agency, and self-confidence," by "teach[ing] both boys and girls that girls should value appearance over agency, and attractiveness over autonomy," a stereotype that has proven damaging to girls. And, contrary to the rationale proffered by CDS, gender stereotypes negatively affect the social relationships between boys and girls. For example, the evidence showed that children who believe in gender stereotypes are less likely to play with children of another gender, and boys who hold such beliefs are more likely to be the perpetrators of sexual harassment. There also was evidence that gender stereotypes can have dire psychological consequences for girls, including increased incidences of eating disorders, depression, anxiety, low self-esteem, and risky sexual behaviors. And, academically, gender stereotypes perpetuate the so-called "achievement gap" between boys and girls in the areas of science, mathematics, and engineering, as well as girls' decision to "opt out" of careers in these fields.

Consistent with this expert evidence, the plaintiffs recounted the negative psychological consequences that they experienced due to the skirts requirement. One plaintiff explained that the skirts requirement conveyed the school's view that girls "simply

position that the skirts requirement results in boys paying more respect toward female students. In addition to the skewed notion that children will respect each other if they wear gender-specific clothing, the record is clear that the plaintiffs were subject to ridicule and reprimand when their undergarments were visible and were worried that boys would look up their skirts.

weren't worth as much as boys," and that "girls are not in fact equal to boys."  Another plaintiff stated that the skirts requirement "sends the message that girls should be less active than boys and that they are more delicate than boys," resulting in boys "feel[ing] empowered" and "in a position of power over girls."  And, when a teacher instructed a kindergarten-aged plaintiff to "sit like a princess" by folding her legs to avoid exposing her underwear, she learned that the comfort of boys, not girls, was more valued.  Indeed, these were the very messages that CDS sought to convey.

In addition to these intangible harms, the plaintiffs described in detail their inability to engage fully in school activities as a result of the skirts requirement.  On one occasion, when a first-grade student wore shorts to school due to a misunderstanding of the dress code, she was removed from class and required to spend the day in the school office.  The evidence also showed that the plaintiffs avoided numerous physical activities, including climbing, using the swings, and playing soccer, except for days on which they were permitted to wear their unisex physical education uniforms.  One plaintiff recounted an incident in which she was reprimanded by a teacher when the shorts portion of her skort was exposed during a cartwheel, causing the plaintiff to refrain from such play in the future.  The plaintiffs also could not participate comfortably in school emergency drills that required students to crawl and kneel on the floor, fearing that boys would tease them or look up their skirts.  And, notably, CDS effectively has acknowledged the physical inequities and burdens caused by the skirts requirement by mandating unisex uniforms with shorts or pants for physical education class.

Ultimately, the evidence showed that the skirts requirement has restricted the extent to which the plaintiffs can obtain the academic, social, and physical benefits of their education at CDS, and has exposed them to ongoing psychological harm and discriminatory treatment solely on the basis of their gender.[5] The record thus conclusively supports the district court's determination that the plaintiffs have been denied their constitutional guarantee of Equal Protection, in violation of the Supreme Court's decades-old decision to root out differential and harmful treatment based on gender stereotypes. *See Virginia*, 518 U.S. at 550; *Miss. Univ. for Women*, 458 U.S. at 724-25; *see also Morales-Santana*, 137 S. Ct. at 1689-90 (collecting cases).

To be clear, the Equal Protection Clause does not prevent public schools from teaching universal values of respect and kindness. Here, however, the skirts requirement blatantly serves to perpetuate harmful gender stereotypes as part of the public education provided to our country's young citizens. CDS has imposed the skirts requirement with the express purpose of telegraphing to young children that girls are "fragile," require protection by boys, and warrant different treatment than male students, stereotypes with potentially devastating consequences for young girls. Such a rationale falls woefully short of the "exceedingly persuasive justification" required for the skirts requirement to survive constitutional scrutiny. *Virginia*, 518 U.S. at 531. Therefore, I would hold that if CDS

---

[5] The acquiescence of certain parents to this discrimination is irrelevant to the Equal Protection analysis. The only pertinent question is whether *the plaintiffs* have been subjected to an unjustified sex-based classification. And, for the reasons discussed above, the answer is a resounding yes.

54

wishes to continue instilling these harmful beliefs in its students, CDS must do so as a private school without the sanction of the state.